No. 106,870

In the Matter of PHILLIP DEAN KLINE, *Respondent.*

(311 P.3d 321)

Opinion filed October 18, 2013.

*Alexander M. Walczak*, Deputy Disciplinary Administrator, and *Stanton A. Hazlett*, Disciplinary Administrator, argued the cause and were on the brief for the petitioner.

*Thomas W. Condit*, of Cincinnati, Ohio, argued the cause, and *Kyle E. Krull*, of Overland Park, was with him on the briefs for respondent, and *Phillip Dean Kline*, respondent, argued the cause pro se.

*Per Curiam*: This is a contested original proceeding in discipline against respondent, Phillip D. Kline. The disciplinary hearing panel concluded Kline committed multiple violations of the Kansas Rules of Professional Conduct (KRPC) while serving as Kansas Attorney General and later as Johnson County District Attorney. The panel recommends an indefinite suspension while the Disciplinary Administrator argues for disbarment.

As fully detailed below, after reviewing each instance of misconduct found by the panel, we find clear and convincing evidence that Kline committed 11 KRPC violations. In assessing discipline, we have considered the facts and circumstances of each violation; the ethical duties violated by Kline to the public, the legal system, and the legal profession; the knowing nature of his misconduct; the injury that resulted from the misconduct; the existence of aggravating and mitigating factors; and the applicable advisory American Bar Association (ABA) Standards for imposing discipline.

Ultimately, after applying that framework, we reject the Disciplinary Administrator's suggestion of disbarment and conclude Kline's misconduct warrants indefinite suspension, the discipline recommended by the panel.

## PROCEDURAL BACKGROUND

The formal proceedings began with the Disciplinary Administrator's complaint against Kline filed on January 14, 2010. This

complaint alleged multiple KRPC violations for Kline's alleged misconduct related to his investigation of abortion clinics while he served as Kansas Attorney General and for his role with a citizen-requested grand jury while he served as Johnson County District Attorney. The formal disciplinary proceedings spanned a 21-month period. During that time, the three-attorney hearing panel ruled on numerous prehearing motions, including permitting the Disciplinary Administrator to file two amended .complaints to which Kline responded.

The proceedings culminated in 12 days of evidentiary hearings— 8 in February 2011 and March 2011 related to allegations concerning Kline's abortion clinic investigations and 4 more days in July 2011 concerning Kline's conduct regarding the citizens' grand jury. During the July hearing, the panel also heard evidence regarding aggravating and mitigating circumstances that might affect the nature or degree of discipline imposed.

The panel released its 185-page Final Hearing Report on October 12, 2011, dividing the claims into 14 general areas of misconduct and finding Kline violated the KRPC in 10 areas, with multiple violations in some. And based on its conclusion that Kline "ha[d] repeatedly violated many of the Kansas Rules of Professional Conduct, including the most serious of the rules, the rules that prohibit engaging in false or dishonest conduct," the panel recommended an indefinite suspension of Kline's license to practice law. Kline filed a 175-page pleading captioned "Exceptions to the Hearing Panel Final Report" on December 22, 2011, thereby noting his objections to the hearing panel's report and triggering this review.

In an order effective May 18, 2012, five members of the Kansas Supreme Court recused from hearing this action. On June 4, 2012, Presiding Justice Dan Biles appointed two Kansas Court of Appeals judges and three district court judges to serve temporarily on the court to participate in the hearing and decision of this matter. After ruling on several pretrial motions, the court as presently constituted heard oral argument on November 15, 2012.

KLINE'S INVESTIGATION OF ABORTION CLINICS

The Disciplinary Administrator alleged misconduct by Kline

spanning a period of nearly 6 years with prosecutorial proceedings before six separate courts. Consequently, the factual history is detailed and voluminous. We have broadly summarized in this section the facts related to Kline's investigation of abortion clinics. A more particularized discussion is included in our subsequent analysis of each violation found by the hearing panel. Later in this opinion, we have set out facts regarding the panel's findings of misconduct related to the grand jury proceeding in Johnson County.

*Background*

Respondent was admitted to the Kansas bar in 1987. At the time of the disciplinary hearing, his license had been suspended for failure to pay the annual registration fee. Kline testified he chose not to pay the fee because "I don't believe I should be here and I didn't want to send you money." Kline, who testified at the hearing that he is a law professor at Liberty University in Virginia, admitted he does not "intend to practice in Kansas anymore" and instead intends to practice in Virginia. Nevertheless, in August 2012, Kline paid his fees and was reinstated.

In November 2002, Kansas voters elected Kline as Attorney General. He took office in January 2003. In January 2007, Kline departed statewide office after losing his re-election bid to then Johnson County District Attorney Paul Morrison. After Kline lost re-election, the Johnson County Republican Central Committee appointed him to complete Morrison's term as District Attorney.

*Attorney General Opinion No. 2003-17*

Approximately 5 months after taking office as Attorney General, Kline issued Attorney General Opinion No. 2003-17, interpreting the reach of K.S.A. 38-1522. That statute required anyone identified as a "mandatory reporter" to notify the state Department of Social and Rehabilitation Services (SRS) if that reporter reasonably suspected a physically, mentally, emotionally, or sexually abused child was "injured." K.S.A. 38-1522 (revised and now codified at K.S.A. 2012 Supp. 38-2223). Kline's opinion specifically addressed a legislator's question as to "under what circumstances a doctor who provides abortion procedures is required to report rape and/or sexual abuse of a minor." Att'y Gen. Op. No. 2003-17.

In responding, Kline defined the statutory reporting requirements as to suspected sexual abuse of children 15 and under much more broadly than had his predecessors. Kline's opinion stated:

"Kansas law clearly provides that those who fall under the scope of the reporting requirement must report any reasonable suspicion that a child has been injured as a result of sexual abuse, *which would be any time a child under the age of 16 has become pregnant. As a matter of law such child has been the victim of rape or one of the other sexual abuse crimes and such crimes are inherently injurious.*" (Emphasis added.) Att'y Gen. Op. No. 2003-17.

In this opinion, Kline recognized its potentially broad implications for health care providers in general, not just those providing abortions to minors:

"We are aware that although this opinion is limited to the question posed, the consequences of the conclusion reach further. Other situations that might trigger a mandated reporter's obligation, because sexual activity of a minor becomes known, include a teenage girl or boy who seeks medical attention for a sexually transmitted disease, a teenage girl who seeks medical attention for a pregnancy, or a teenage girl seeking birth control who discloses she has already been sexually active." Att'y Gen. Op. No. 2003-17.

Kline's predecessor, Attorney General Robert T. Stephan, had issued an opinion in 1992 interpreting K.S.A. 1991 Supp. 38-1522 more narrowly. Instead of suggesting that any child under the age of 16 who becomes pregnant is the victim of a rape or other sexual abuse crime, Stephan's opinion reasoned:

"Whether a *particular minor in a particular case has been injured as a result of sexual intercourse and a resulting pregnancy must be determined on a case-by-case basis.* The fact of pregnancy certainly puts one on notice that sexual abuse (as statutorily defined) has probably occurred, and *requires persons listed in K.S.A. 1991 Supp. 38-1522(a) to investigate further* whether the child has suffered injury, physical or emotional, as a result of such activity. If there is reason to suspect that the child has been injured, that person is then required to report such suspicions and the reasons therefore." (Emphasis added.) Att'y Gen. Op. No. 1992-48.

In essence, pursuant to Kline's opinion, any child under the age of 16 engaged in sexual activity met the definition of "injured," and a mandatory reporter with knowledge of such activity was required to report or risk conviction of a Class B misdemeanor. See K.S.A. 38-1522(g). In contrast, pursuant to Stephan's opinion, the same sexual activity indicated only potential injury requiring the health

care provider to investigate further to determine whether a report was required. Compare *Att'y Gen. Op. No. 2003-17* (providing: "Consequently, a doctor called upon to perform an abortion for a girl under the age of 16 years is put on notice that, as a matter of law, an injury as a result of sexual abuse has occurred) with *Att'y Gen. Op. No. 1992-48* (stating: "However, we do not believe that pregnancy of an unmarried minor *necessarily* constitutes injury even when that term is understood in its broadest sense.").

Thus, Kline's June 2003 opinion represented a sea change in reporting requirements for health care providers who were aware of the pregnancy of a patient under the age of 16 and potentially for any reporter with knowledge that an individual under the age of 16 was engaged in sexual activity. Kline's advisory opinion sparked a federal lawsuit challenging the constitutionality of his opinion, which ultimately resulted in an injunction prohibiting Kansas prosecutors from enforcing Kline's interpretation of the reporting statute. That case is discussed below. See 298 Kan. at 181-83.

### Investigation of Abortion Clinics

The record contains a "Special Investigation" memo dated April 2, 2003. The memo does not identify who wrote it or to whom it was directed. It does advise that Kline's office had "received numerous inquiries regarding the conduct" of Dr. George Tiller of Women's Health Care Services (WHCS) in Wichita, Kansas. Further, the memo asserted these inquiries alleged Tiller "continues to perform abortions on females under 16 years of age without filing a report to competent authority concerning '[sexual] abuse of child' as required by K.S.A. 38-1522(a)."

In a "confidential memo" dated July 15, 2003, and directed to Kline and Senior Deputy Attorney General Eric Rucker, Assistant Attorney General Stephen Maxwell and Special Agent in Charge Thomas Williams recommended convening an investigation that would attempt to identify instances when an abortion clinic in Kansas failed to report sexual abuse. Maxwell and Williams suggested to Kline that comparing sexual abuse reports provided to SRS under K.S.A. 38-1522 with termination of pregnancy reports provided

to the Kansas Department of Health and Environment (KDHE) under a different statute, K.S.A. 65-445, could accomplish the task.

Sexual abuse reports submitted to SRS contain the name and address of the potential victim, in addition to information about the nature of the injury and potential abuse. Termination of pregnancy reports do not identify the patients who have had their pregnancies terminated, but they do contain demographic information including patient age and address and whether the abortion was necessary to prevent substantial and irreversible impairment of a major bodily function.

In the memorandum, Maxwell and Williams proposed that Kline's office compare the demographic information, such as the address listed in both reports, to identify instances in which a Kansas clinic performed an abortion on a patient under 16 and reported the abortion to KDHE but failed to report the sexual abuse to SRS.

Williams and Maxwell further recommended convening a judicial inquisition as authorized by K.S.A. 22-3101(1) to obtain sexual abuse reports from SRS and termination of pregnancy reports from KDHE. The memo noted that while Kline could access SRS records under K.S.A. 38-1507, which permits law enforcement agencies to view reports when it is "reasonably necessary to carry out their lawful responsibilities," KDHE records could not be obtained without a subpoena. Accordingly, the memo suggested Kline first seek the sexual abuse reports from SRS to develop the "legal showing" to "justify the initiation of a Judicial Inquisition." The confidential memo also advised that if SRS requested an explanation of the nature of the inquiry, "SRS will be told that the Attorney General desires to determine if there is a serious latent sexual abuse problem." The memo noted a potential legal obstacle to initiating an inquisition—*i.e.,* "the absence of a definitive complainant or allegation that a medical provider knowingly failed to report a specific incident of sexual abuse as statutorily defined by K.S.A. 21-3503(1)(a)." If the SRS records revealed potential violations of K.S.A. 38-1522, the memo recommended Kline's office seek to convene a judicial inquisition.

After Williams sought and obtained statistical information regarding the number and content of sexual abuse reports from SRS,

he sought permission from SRS to review the actual reports. In July 2003, SRS, acting through Chief Counsel John Badger, requested additional information about the investigation. Rucker responded, advising SRS the reports were necessary for Kline's office to investigate legal violations by mandatory reporters. SRS replied, expressing concern whether K.S.A. 38-1507 permitted access to the information for "the type of investigation [Kline's] office [wa]s conducting" and requesting Kline's office provide "a thorough and specific explanation" for seeking the reports. SRS noted its caution stemmed from its need to ensure compliance with the law and its concern for the information's sensitivity.

In the meantime, in early October 2003, numerous licensed health care professionals and social workers filed an action in United States District Court for the District of Kansas seeking to enjoin Kansas prosecutors from enforcing K.S.A. 38-1522 as it related to "incidents of sexual activity between adolescents under the age of sixteen and persons of similar age in which injury is not reasonably suspected." See *Aid for Women v. Foulston*, 327 F. Supp. 2d 1273, 1275 (D. Kan. 2004) (*Aid for Women I*). In part, the plaintiffs sought to prevent prosecutors from enforcing the statute in a manner consistent with Kline's Attorney General Opinion No. 2003-17. See 327 F. Supp. 2d at 1278-79. We discuss the *Aid for Women* litigation further at 298 Kan. at 181-83.

*Inquisition in Shawnee County District Court*

In response to SRS's request for further explanation, Kline's staff discontinued seeking the agency's voluntary compliance. Instead, Kline's office applied to open an inquisition in Shawnee County District Court on October 29, 2003. The application, filed by Maxwell, indicated SRS had "not been cooperative" with Kline's requests. Williams' affidavit supporting the inquisition and the documents accompanying that affidavit explained that Kline's office sought to view sexual abuse reports and files but SRS declined, requesting "an explanation of the reason and analysis of the law supporting the request." Shawnee County District Court Judge Richard D. Anderson, then chief judge, approved the application and issued a subpoena to SRS seeking the information Kline's of-

fice had sought. SRS complied with the subpoena on November 10, 2003.

In May 2004, Kline's office requested another inquisition subpoena be issued to KDHE. In support, Williams provided an affidavit broadly seeking the "production of records relative to abortions performed in Kansas for the years 2001, 2002, 2003 and 2004, to date." It appears the "records" Kline's office sought were the termination of pregnancy reports abortion providers filed with KDHE.

Judge Anderson issued the requested subpoena, but KDHE objected, arguing K.S.A. 65-445 prohibited the agency from releasing this information without "reasonable cause" to believe a statutory violation had occurred and that Kline had not made the requisite showing. Judge Anderson ultimately ordered KDHE to comply but permitted KDHE to redact abortion providers' names. KDHE partially complied with the subpoena on July 6, 2004, by providing Kline with abortion reports for 2003.

Twenty days later, on July 26, 2004, the United States District Court issued a preliminary injunction in *Aid for Women I* prohibiting prosecutors from enforcing K.S.A. 38-1522, as interpreted by Kline's opinion, as to sexual activity of adolescents of similar age when no injury was suspected. In doing so, the court found the plaintiffs had satisfied their burden to show a likelihood of prevailing on the merits that K.S.A. 38-1522, as interpreted by Kline's opinion, violated patients' informational privacy rights. The court concluded:

"The court is also struck by the magnitude of the change in policies outlined in [Attorney General Opinion No. 2003-17]. It is persuasive that the parties operated under the 1992 advisory opinion for a substantial period of time without discernible problems. This mitigates against allowing a breach of minors' informational privacy rights even if such a breach is made in an investigatory context. Further, the court is hesitant to sanction such a monumental change in policy considering the new policy's imposition on the informational privacy rights of minors." *Aid for Women I*, 327 F. Supp. 2d at 1288.

Three days after the federal court's ruling, on July 29, 2004, Williams asked Judge Anderson to issue a subpoena to KDHE requiring it to identify the abortion providers who submitted the

reports, information Judge Anderson had previously allowed KDHE to redact. The affidavit supporting this request indicated Kline's office also was investigating late-term abortions irrespective of a patient's age. Judge Anderson issued the requested subpoena on August 9, 2004. In response, KDHE revealed the identities of the two reporting clinics as Comprehensive Health of Planned Parenthood of Kansas and Mid-Missouri, Inc. (CHPP) and WHCS (collectively "the clinics").

An internal memorandum dated, August 3, 2004, documented Kline's recent direction to his staff to expand the investigation beyond compliance with mandatory reporting statutes to the performance of illegal late-term abortions. The memo acknowledged this investigation necessarily would include adult patients and described its focus:

"[to] fully address the false reporting by abortion providers as to the reason and basis for their determinations to provide a late term abortion, and investigation [sic] to determine whether evidence exists to determine that one or more abortion providers may be performing prohibited late term abortions without meeting the exceptions as set forth in KSA 65-6703."

In late August 2004, Kline's staff applied for search warrants of CHPP and WHCS, seeking complete and unredacted copies of abortion patients' medical files. Although Judge Anderson found probable cause to issue the warrants, he expressed "firm opinions" against their execution. Specifically, Judge Anderson identified concern that the seizure would reveal patient identities and potentially cause "public frenzy."

Instead of executing the warrants, Kline's office requested, and Judge Anderson issued, records subpoenas to both clinics. The subpoena to CHPP required production of 30 complete patient medical records, while the subpoena to WHCS required production of 60 complete patient records. Both clinics filed motions to quash. Judge Anderson conducted a hearing on the motions on October 5, 2004, and ultimately denied them, directing the clinics to comply and deliver the records to his chambers. The court also directed that before production to or photocopying by Kline, the court would apply certain safeguards, including review of the files by a

court-appointed special counsel and by physicians designated by Kline and appropriate redaction of patient-identifying information.

Alpha *Mandamus Action and La Quinta Subpoena*

Five days after Judge Anderson's order directing compliance with the subpoenas, the clinics filed an original mandamus action seeking review of Judge Anderson's order and seeking to compel Judge Anderson to quash the subpoenas. *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 910, 128 P.3d 364 (2006). The *Alpha* court stayed compliance with the subpoenas and ordered that the parties make all filings in the case under seal. See *Alpha*, 280 Kan. at 906, 910-11. Judge Anderson answered under seal and attached a transcript of the motion to quash hearing. In February 2005, the Clerk of the Appellate Courts clarified that the parties' briefs should be publicly filed, but the record would remain sealed.

In February 2005, while *Alpha* pended before the court and the injunction issued by the United States District Court in *Aid for Women I* pended in the United States Court of Appeals for the Tenth Circuit, Williams learned that WHCS referred its patients to a nearby La Quinta Inns & Suites, which gave registrants a medical discount upon request. At Kline's direction, Maxwell applied for and Judge Anderson issued a subpoena to La Quinta for its registration records for all guests who had registered at the Wichita location and received a medical discount since January 1, 2003.

Without objection, La Quinta provided Kline's office with the requested registration records in an electronic format. An investigator with Kline's office, Jared Reed, then cross-referenced La Quinta's registration information with other information obtained through the KDHE subpoena. The result was identification of individuals registered at La Quinta who may have been WHCS patients. Reed developed three spreadsheets: one for Kansas residents under age 16, another for non-Kansas residents under age 16, and one for any person age 16 or over. These spreadsheets, which were captioned "2003 & 2004 KDHE Records & Potential Matches from La Quinta Inns, Inc.," included potential WHCS patients' names, ages, contact information, and medical data regarding fetal viability and gestational age.

In the meantime, the clinics filed their briefs in *Alpha* and held a press conference publicly identifying themselves as CHPP and WHCS. But despite the *Alpha* court's directive that the briefs would be public while the record remained sealed, Kline directed his staff to attach to his office's brief documents from the sealed record. These attachments included the transcript from the motion to quash hearing, a redacted version of a subpoena, and Judge Anderson's order. In response, the clinics promptly filed a motion requesting the court hold Kline in contempt, and the court issued an order to show cause why Kline should not be held in contempt. *Alpha*, 280 Kan. at 926.

Former Attorney General Stephan and Rucker appeared at the oral arguments before the *Alpha* court on September 8, 2005. Stephan appeared for the limited purposes of representing Kline on the show cause order, while Rucker handled all other issues. Responding to questions from the court, Rucker stated Kline's office had not subpoenaed any mandatory reporters of sexual abuse other than abortion clinics. But 7 days later, Kline's office filed a "Motion to Clarify" Rucker's statement, declaring that contrary to Rucker's representation, Kline's office indeed had "sought records and information from other mandatory reporters." When the *Alpha* court issued its opinion on February 3, 2006, the court described Rucker's original responses at oral argument as "less than forth-right" and concluded the motion "change[d]" rather than clarified those responses. 280 Kan. at 912.

The *Alpha* court's opinion ordered Judge Anderson (1) to withdraw his order compelling the clinics' responses, (2) to re-evaluate the inquisition and subpoenas in light of Kline's interpretation of the criminal statutes at issue, and (3) to determine whether the subpoenas stood on "firm legal ground." If so, the court ruled, the inquisition could continue and "some version" of the subpoenas could remain in effect. 280 Kan. at 924-25.

As to the contempt issue, the *Alpha* court further held that Kline's attachment of sealed documents to a publicly filed brief, while "troubling" for several reasons, did not result in prejudice. Thus, the court declined to hold Kline in contempt. 280 Kan. at 926-30. Finally, the *Alpha* court warned: "This is an unusually high-

profile case . . . . We caution all parties to resist any impulse to further publicize their respective legal positions, which may imperil the privacy of the patients and the law enforcement objectives at the heart of this proceeding." 280 Kan. at 929-30.

On remand, Judge Anderson conducted a hearing to determine whether Kline's office had established it was on "firm legal ground" in seeking abortion patient medical files from the clinics. In May 2006, Judge Anderson entered an amended order detailing several protective steps required to comply with the *Alpha* mandate. Pursuant to that amended order, CHPP and WHCS redacted patient-identifying information and produced the requested records. An attorney and two physicians appointed by Judge Anderson reviewed the records *in camera* to ensure that they were properly redacted. Judge Anderson then gave the redacted records to Kline.

*Remand of* Aid for Women

Just a few days prior to the *Alpha* court releasing its opinion, the Tenth Circuit Court of Appeals, on January 27, 2006, vacated the district court's preliminary injunction in *Aid for Women I. Aid for Women v. Foulston*, 441 F.3d 1101, 1121 (10th Cir. 2006). The federal appellate court disagreed with the district court's conclusion that the plaintiffs had established a substantial likelihood of prevailing on the merits. Further, the court concluded the district court abused its discretion by failing to adequately analyze issues of irreparable injury, balance of harms, and public interest. 441 F.3d at 1120-21.

On remand, the district court conducted a bench trial on the plaintiff licensed providers' request for a permanent injunction. *Aid for Women v. Foulston*, 427 F. Supp. 2d 1093 (D. Kan. 2006) (*Aid for Women II*), *vacated by* Nos. 06-3187, 06-3188, 06-3202, 2007 WL 6787808 (10th Cir. 2007) (unpublished opinion). The court held that "minor patients have a right to informational privacy concerning consensual sexual activity with an age-mate where there is no evidence of force, coercion, or power deferential." 427 F. Supp. 2d at 1105. Further, the court concluded Kline's opinion and its " 'zero tolerance' " interpretation of K.S.A. 38-1522 impermissibly encroached upon that right. 427 F. Supp. 2d at 1096, 1116.

The court issued a permanent injunction on April 18, 2006, prohibiting prosecutors from enforcing the statute as interpreted by Kline's Attorney General Opinion No. 2003-17. 427 F. Supp. 2d at 1116. Kline appealed the district court's ruling to the Tenth Circuit Court of Appeals. See *Aid for Women v. Foulston*, Nos. 06-3187, 06-3188, 06-3202, 2007 WL 6787808 (10th Cir. 2007) (unpublished opinion).

Effective January 1, 2007, however, the Kansas Legislature repealed the former reporting statute, K.S.A. 38-1522, and replaced it with K.S.A. 2012 Supp. 38-2223. Because of this statutory change, the plaintiffs and Kline's successor, who by then had assumed the office of Attorney General, argued the case was moot. The United States Court of Appeals for the Tenth Circuit agreed and dismissed the *Aid for Women II* appeal in September 2007 and vacated the district court's opinion. See *Aid for Women v. Foulston*, Nos. 06-3187, 06-3188, 06-3202, 2007 WL 6787808 (10th Cir. 2007) (unpublished opinion).

*Kline's Lost Bid for Re-election and Relocation of Clinic Records*

Throughout 2006, Kline campaigned to maintain his position as Attorney General. Four days before the election, Kline appeared by remote camera on a nationally televised program, "The O'Reilly Factor." During this appearance, Kline stated that his investigation showed WHCS typically relied on the patient's mental status to justify late-term abortions. He also discussed an incident in Wichita leading to the conviction of a man who had raped and impregnated a child and then took the child to an abortion clinic.

Kline lost his re-election bid in November 2006 to then Johnson County District Attorney Paul Morrison. Following this political defeat, Kline contacted the Johnson County Republican Central Committee and indicated his interest in completing Morrison's unfinished term. That committee, which was empowered by state law to pick a replacement, selected Kline to complete Morrison's term. See K.S.A. 22a-103 (providing that a vacancy in the office of district attorney is filled by a governor's appointment of "a person elected by a district convention"); see also K.S.A. 25-3902 (discussing procedure for district convention).

On December 20, 2006, before Kline had completed his term as Attorney General, his office filed criminal charges against Tiller in Sedgwick County. But the district court dismissed those charges on jurisdictional grounds the following day. Kline then appointed a special prosecutor to appeal that dismissal, but Morrison fired the special prosecutor after taking office.

Prompted by Kline's departure from statewide office Judge Anderson requested Kline's staff provide him with a status report accounting for the current location of all copies of redacted patient medical records received from the clinics. Maxwell prepared a status report that indicated, in part, that copies of the CHPP records would be sent to the Johnson County District Attorney but gave no indication the WHCS records also would remain in Kline's possession in his new position in Johnson County.

On January 8, 2007—the day Morrison was sworn in as Attorney General and Kline replaced him as Johnson County's District Attorney—Williams and Reed delivered the status report to Judge Anderson and distributed the medical records to other government entities as outlined in the report. As they delivered the records, Rucker, at Kline's direction, phoned Williams and asked him to copy the WHCS records for transfer to Johnson County. Williams and Reed did as instructed. But because of security concerns in the Johnson County office, Reed took the copies of these records to his apartment where they remained for a month and a half. No one updated the status report to Judge Anderson or advised the court that copies of the WHCS records were transferred to the Johnson County District Attorney's office.

*The Retention of WHCS Records and the Creation of Handwritten "Summaries"*

Beginning in January 2007, Kline, now acting as the Johnson County District Attorney, continued to investigate both clinics, and on April 9, 2007, he met with Judge Anderson to request an additional subpoena in the inquisition. In the course of the conversation, Kline showed Judge Anderson a copy of a WHCS patient's medical file. Judge Anderson asked Kline how he obtained it, to

which Kline responded that he "thought [Judge Anderson] knew" he had retained copies of WHCS files.

The following day, after verifying the status report showed Kline had not kept copies of WHCS patient files, Judge Anderson called Maxwell and advised him that Kline's office must return the WHCS records. Later that same day, Kline spoke with Judge Anderson and apparently protested the order to return the files. Judge Anderson agreed to conduct a hearing the following morning to allow Kline to pursue his objection. But Judge Anderson ordered Kline to bring all copies of WHCS records with him to the hearing.

After receiving Judge Anderson's instruction to bring the 62 WHCS patient files, Kline directed his staff to immediately prepare handwritten "summaries" of them. These "summaries" contained demographic information about each patient, including the patient's age, address, corresponding KDHE identification number, identity of the referring physician, and Dr. Tiller's diagnosis.

The following morning at the hearing before Judge Anderson, Kline surrendered his copies of the WHCS records to Morrison's staff. But neither Kline nor any staff member informed Judge Anderson that Kline now had handwritten summaries of the WHCS files, including most all of the confidential, substantive information from them.

CHPP *Mandamus Action*

In June 2007, CHPP filed an original mandamus action seeking, *inter alia*, an order directing Kline to return all patient CHPP medical records to Morrison and to provide an accounting of those records. *Comprehensive Health of Planned Parenthood v. Kline*, 287 Kan. 372, 386, 197 P.3d 370 (2008) (*CHPP*). The *CHPP* court appointed Leavenworth County District Court Chief Judge David J. King as special master and directed him to conduct hearings and make findings of fact. To guide Judge King in doing so, the court provided a list of 17 questions. 287 Kan. at 388.

Judge King first directed the parties to file written responses to the 17 questions. Kline complied with this directive. Judge King then conducted 5 days of hearings. At the November 20, 2007, hearing, CHPP's counsel questioned Kline under oath as to

whether there were "any summaries of [WHCS] records left in Johnson County?" Kline answered:

"I have a summary of three records that pertain to a theory of criminal liability that would have jurisdiction in Johnson County against Doctor Tiller. I have mentioned that to the Office of the Attorney General through correspondence to the Attorney General's Office requesting copies of the actual records relating to those three abortions. The Attorney General has refused to provide those records."

On November 30, 2007, Kline supplemented his written response to the 17 questions propounded by the *CHPP* court. One of those questions asked what " '[i]nquisition records and/or documents' " other than medical records Kline had transferred " 'in his position as Attorney General' " to himself " 'in his position as Johnson County District Attorney.' " *CHPP*, 287 Kan. at 393. In part, Kline responded that he believed no " 'summaries' " had been transferred because he was " 'not aware of any summaries of the files, etc. that were transferred and as District Attorney [I] have had to ask staff to recreate such summaries.' " 287 Kan. at 394. On January 10, 2008, Judge King provided the *CHPP* court with a report and the parties' responses to the 17 questions. 287 Kan. at 399.

The court directed that Kline appear at oral argument in *CHPP* on June 12, 2008. 287 Kan. at 401. At that argument, the court questioned Kline regarding whether he had advised Judge Anderson about the WHCS patient summaries his office "recreated and then retained." Kline first stated he was not familiar with what the court was referencing. When advised the question was referring to summaries he had sworn to in his written responses, Kline indicated he had not seen those responses for several months. Finally, Kline stated he did not believe he had any summaries of WHCS patient files but added he had "sought the records from [Morrison's office] and been refused."

In its December 5, 2008, opinion, the *CHPP* court ordered Kline to turn over "a full, complete, and understandable set of the patient records and any and all other materials gathered or generated by Kline and/or his subordinates in their abortion-related inquisition while Kline was Attorney General." 287 Kan. at 416-17. Kline complied with the directive, including turning over copies of the 62

WHCS summaries, which as discussed below, Kline's administrative assistant found in late 2008 while preparing a subpoena response.

*Criminal Case Against CHPP and Citizen-Requested Grand Jury in Johnson County*

On October 17, 2007, while CHPP's mandamus action continued, Kline filed 107 criminal counts against CHPP in Johnson County District Court, which included: making a false information, K.S.A. 21-3711; failing to maintain a record required to be kept by an abortion provider, K.S.A. 65-6703(b)(5); failing to determine fetal viability before performing a late-term abortion, K.S.A. 65-6703; and unlawfully performing late-term abortions, K.S.A. 65-6703. *State v. Comprehensive Health of Planned Parenthood,* 291 Kan. 322, 336, 241 P.3d 45 (2010).

On October 26, 2007, a group of Johnson County citizens filed in Johnson County District Court a petition under K.S.A. 22-3001 seeking a grand jury investigation of CHPP based on multiple allegations including failing to report child sex abuse and failing to follow the proper standard of care in conducting medical procedures. After a determination that a sufficient number of signatures were secured, the citizen-requested grand jury convened in early December 2007 and met through March 2008 but never issued a true bill, *i.e.,* an indictment. As District Attorney, Kline had a limited statutory role to fulfill with this grand jury as its legal advisor. See K.S.A. 19-713; K.S.A. 22-3007. The disciplinary panel found multiple violations resulting from Kline's actions in either failing to advise the grand jury or in stepping outside of his limited role. The facts and procedural history of the grand jury proceeding are detailed at 298 Kan. at 179-94.

*Criminal Case Against Tiller in Sedgwick County*

Attorney General Morrison and his successor, Attorney General Stephen Six, continued to investigate Tiller. In 2007, the Attorney General's office filed criminal charges in Sedgwick County against Tiller. In November 2008 and January 2009, Sedgwick County District Court Judge Clark V. Owens II conducted hearings on Tiller's motion to dismiss these charges and motion to suppress evidence.

In part, Tiller's motion sought dismissal based on "outrageous governmental conduct," allegedly occurring, in part, during Kline's investigation of Tiller while Kline served as Attorney General. In late 2008, while responding to discovery requests from Tiller, Kline's administrative assistant located the handwritten "summaries" of WHCS patient files. Kline produced the 62 patient summaries pursuant to the subpoena.

Judge Owens conducted a hearing on Tiller's allegations of "outrageous governmental conduct." At that hearing, in response to questioning from Tiller's attorney about respect for patient privacy, Kline testified, "[W]e did not need nor seek adult patient names."

Further, during that hearing, an unknown individual placed a CD on Tiller's counsel's table. This CD included the spreadsheet Reed had prepared in 2005, which used the cross-referenced information derived from the La Quinta subpoena and KDHE records to identify potential WHCS adult patients by name. Judge Owens refused to dismiss the criminal charges against Tiller, and a jury ultimately acquitted him.

In November 2006, the Disciplinary Administrator began receiving complaints against Kline. Kline answered the allegations in a 20-page letter on September 19, 2007.

Against this factual backdrop, we now turn to the parties' arguments and our review of the hearing panel's findings and conclusions.

## STANDARD OF REVIEW

In reviewing a disciplinary panel's report, this court considers the evidence, the panel's findings, and the parties' arguments to determine whether an attorney violated the KRPC and, if so, the appropriate discipline to impose. *In re Ireland*, 294 Kan. 594, 603-04, 276 P.3d 762 (2012). The Disciplinary Administrator must establish misconduct by clear and convincing evidence. 294 Kan. at 604. Clear and convincing requires that the "factfinder believes that the truth of the facts asserted is highly probable." *In re B.D.-Y.*, 286 Kan. 686, 690-98, 187 P.3d 594 (2008). In assessing whether sufficient evidence exists, we refrain from weighing conflicting evidence, assessing witness credibility, or redetermining

questions of fact. See *B.D.-Y.*, 286 Kan. at 705. Keeping these standards in mind, we turn to Kline's arguments.

## THE PANEL DID NOT ERR IN APPLYING KRPC 8.4 TO SEVERAL VIOLATIONS DESPITE THE EXISTENCE OF A MORE SPECIFIC RULE · OR IN FAILING TO "CABIN" KRPC 8.4.

Preliminarily, although Kline separately addresses each violation found by the panel, he asserts two related arguments that apply broadly to several allegations of misconduct in which the panel found violations of KRPC 8.4 (2012 Kan. Ct. R. Annot. 643), including: Kline's responsibility for Williams' interaction with SRS; Kline's directive to attach sealed documents to a publicly filed brief in *Alpha*; Kline's false statements in a motion to clarify filed with the court; Kline's misrepresentation to the *Alpha* court that he did not retain any summaries of WHCS patient medical records; Kline's failure to accurately explain the law to the grand jury; and Kline's filings during the grand jury proceeding.

As relevant to this case, KRPC 8.4 (2012 Kan. Ct. R. Annot. 643-44) makes it professional misconduct for an attorney to "(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice; . . . or (g) engage in any other conduct that adversely reflects on the lawyer's fitness to practice law." Regarding the panel's application of this rule, Kline contends in each circumstance when the panel found a KRPC 8.4 violation, it erred in doing so because a more specific rule governed the alleged misconduct. Alternatively, Kline argues that even if KRPC 8.4 applies, that rule must be "cabined" or constrained by narrowing principles that would limit this court's application of the KRPC and, as stated in Kline's brief, would ensure that the rules are "[c]lear, [o]bjective, and [p]redictible." Because these arguments apply to multiple panel findings, we address them first, referring back to this discussion as relevant.

*The Potential Application of a More Specific Rule Does Not Bar Application of a More General Rule.*

Kline argues that when a more specific rule potentially could govern an attorney's conduct, this court cannot apply the more general "catch-all" provisions of KRPC 8.4. He suggests application of a general rule under such circumstances contradicts rules of statutory construction requiring application of specific rules over general ones.

In support, Kline relies primarily on nonprecedential authority, including cases from other jurisdictions as well as the Restatement (Third) of the Law Governing Lawyers § 5 (1998). He points out a comment to the Restatement cites concerns of fair warning and " 'subjective and idiosyncratic considerations,' " to support its suggestion that when a more specific rule governs a tribunal should not rely on more general, catch-all rules. Kline also cites two appellate cases declining to find a general rule violation when a more specific rule applied. See *O'Brien v. Superior Court*, 105 Conn. App. 774, 794 n.22, 939 A.2d 1223 (2008) (noting some commentators have suggested application of specific rules over general ones); *In the Matter of the Discipline of Two Attorneys*, 421 Mass. 619, 626, 629, 660 N.E.2d 1093 (1996) (declining to find attorney's conduct was "prejudicial to the administration of justice" but finding attorney's conduct violated more specific rules).

Kline also points to *In re Pyle*, 283 Kan. 807, 156 P.3d 1231 (2007). As Kline correctly notes, in *Pyle*, the hearing panel refused to apply KRPC 8.4(g), which prohibits conduct reflecting adversely on the lawyer's fitness to practice, because " 'more specific provisions . . . apply.' " 283 Kan. at 812. But in *Pyle*, each hearing panel member wrote separately and two would have applied *other,* less general, sections of KRPC 8.4. 283 Kan. at 815-16. We simply cannot read *Pyle* as broadly as Kline. At most, *Pyle* demonstrates that a panel may not rely on the more general KRPC 8.4(g) when the conduct engaged in violates another, more specific, provision of KRPC 8.4.

Responding to Kline's "general versus specific" argument, the Disciplinary Administrator directs us to instances in which this

court has found a violation of KRPC 8.4 despite factual support for a more specific violation. See *In re Millett*, 291 Kan. 369, 373, 377, 380, 241 P.3d 35 (2010) (approving panel's finding of KRPC 8.4 violation when attorney lied to a detective while representing a client); *In re Arabia*, 283 Kan. 851, 857, 860, 156 P.3d 652 (2007) (approving panel's finding of a KRPC 8.4 violation when attorney provided false information to a detective while representing a client). The Disciplinary Administrator reasons that such circumstances demonstrate an implicit rejection of Kline's argument.

But we need not rely upon cases implicitly rejecting Kline's suggestion because it was rejected in *In re Roth*, 269 Kan. 399, 7 P.3d 241 (2000). There, the respondent argued the Disciplinary Administrator should have charged him with a violation of KRPC 4.4 (1999 Kan. Ct. R. Annot. 381) instead of the more general KRPC 8.4(g). He also argued that because there was insufficient evidence for a KRPC 4.4 violation, he did nothing wrong. *Roth*, 269 Kan. at 403-04. Like Kline, Roth relied upon the statutory construction rule applied in criminal cases—*i.e.*, a more specific statute prevails over a more general one unless it appears the legislature intended to make the general statute controlling. 269 Kan. at 403 (citing *State v. Le*, 260 Kan. 845, Syl. ¶ 2, 926 P.2d 638 [1996]).

Characterizing the respondent's argument as "novel and convoluted," the *Roth* court critically commented: "The lack of logic in this reasoning is readily apparent." 269 Kan. at 403-04. In rejecting *Roth*'s suggestion, the court observed that the specific and general rules codified in the KRPC complement each other rather than conflict. 269 Kan. at 404 (concluding conduct may not have "technically" violated KRPC 4.4 but still constituted an abuse of the legal process that proved prejudicial to the administration of justice, violating KRPC 8.4).

We reject Kline's argument for the same reasons we rejected Roth's—*i.e.*, it would be illogical to forgive dishonest conduct that violates KRPC 8.4 simply because that conduct arguably is also governed by another rule prohibiting dishonesty in a specific setting. We also disagree with Kline that "fair notice" requires we apply general rules only as a last resort. Every licensed attorney is responsible for observing the Rules of Professional Conduct, re-

gardless of whether the rules recite general or specific obligations. KRPC Preamble ¶ 12 (2012 Kan. Ct. R. Annot. 430) ("Every lawyer is responsible for observance of the Rules of Professional Conduct."); see also KRPC Scope ¶ 19 (2012 Kan. Ct. R. Annot. 431) ("Failure to comply with an obligation or prohibition imposed by a Rule is a basis for invoking the disciplinary process."). Any licensed Kansas attorney reasonably observing the Rules of Professional Conduct would be on notice of a potential for violation of the rules alleged to have been violated under the facts as alleged.

*KRPC 8.4(c), (d), and (g) Should Not Be "Cabined" or Confined by Narrowing Standards.*

Alternatively, Kline contends that even if a general KRPC 8.4 provision can apply over another more specific rule, the general rule must be "cabined" or constrained in order to provide "clear, objective and predictable standards." Kline urges us to imply limiting language in three provisions: KRPC 8.4(c), which prohibits engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; KRPC 8.4(d), which prohibits engaging in conduct prejudicial to the administration of justice; and KRPC 8.4(g), which prohibits engaging in conduct adversely reflecting on the lawyer's fitness to practice. He suggests we can find no violation of these sections unless the attorney's conduct is "egregious and flagrantly violative of accepted professional norms that would be recognized by a reasonable attorney practicing in the same situation." Additionally, Kline argues KRPC 8.4(c) requires proof that the lawyer acted with "malevolent intent that rises above mistake." Finally, he contends conduct occurring during a judicial proceeding violates KRPC 8.4(d) only when that proceeding is prejudiced. We address each argument in turn.

*Kline's suggested standard of "egregious and flagrantly violative of accepted professional norms" does not constrain this court's reading of KRPC 8.4(c), (d), and (g).*

Kline first contends KRPC 8.4(c), (d), and (g), are violated only when conduct is "egregious and flagrantly violative of accepted professional norms." In support, Kline cites cases from other jurisdictions that adopted this or a similar standard. See, *e.g., Attor-*

*ney Grievance v. Marcalus*, 414 Md. 501, 522, 996 A.2d 350 (2010) (concluding Rule 8.4[d] applies only when conduct is " 'criminal or so egregious as to make the harm, or potential harm, flowing from it patent' "); *In the Matter of the Discipline of an Attorney*, 442 Mass. 660, 668-69, 815 N.E.2d 1072 (2004) (concluding rule prohibiting "conduct 'prejudicial to the administration of justice' " is violated only when conduct is " 'egregious' and 'flagrantly violative of accepted professional norms' "); *In re Hinds*, 90 N.J. 604, 632, 449 A.2d 483 (1982) (concluding conduct is " 'prejudicial to the administration of justice' " only when it is "egregious").

But Kline fails to note that with one exception, these other jurisdictions that have adopted this standard did so only in the context of Rule 8.4(d), which prohibits conduct prejudicial to the administration of justice. But see *In re Gadbois*, 173 Vt. 59, 66-68, 786 A.2d 393 (2001) (stating that the rule prohibiting "any other conduct that adversely reflects on the lawyer's fitness to practice law" is only violated by " 'conduct flagrantly violative of accepted professional norms' "). Significantly, this court rejected a similar challenge to KRPC 8.4(d) in *In re Comfort*, 284 Kan. 183, 200-01, 159 P.3d 1011 (2007). There we considered the respondent's vagueness challenge and his suggestion that the rule is " 'a simplistic standard that warns nobody of what hidden layer of discipline awaits them.' " 284 Kan. at 200. In rejecting this argument, we relied on the definition of "prejudicial" and reasoned that this term sufficiently defined the degree of conduct expected from a licensed attorney. 284 Kan. at 201 (quoting *State v. Nelson*, 210 Kan. 637, 639-40, 504 P.2d 211 [1972]).

For this same reason, we reject Kline's suggestion that the phrase "conduct that is prejudicial to the administration of justice" in KRPC 8.4(d) must be constrained in order to provide a clear, objective, and predictable standard. As we held in *Comfort*, the word "prejudice" as used in this context sufficiently defines the standard and restricts a lawyer's conduct. As we noted: " 'The word "prejudicial" is universally found throughout the legal and judicial system.' " 284 Kan. at 200.

Additionally, a holistic reading of our rules contradicts Kline's suggestion that KRPC 8.4(c), (d), and (g) should be confined by a

professional norm standard. As the Preamble to the KRPC notes, some rules apply to lawyers not actively practicing or to practicing lawyers not acting in a professional capacity. KRPC Preamble (2012 Kan. Ct. R. Annot. 427). Similarly, lawyers can be disciplined for conduct outside the profession if the conduct "functionally relates" to the practice of law. Rotunda and Dzienkowski, The Lawyer's Deskbook on Professional Responsibility § 8.4-1(a) (2013). Holding attorneys to a professional norm standard might hinder this court's ability to punish conduct that is not prohibited by professional norms but may still impact a licensed lawyer's fitness to hold that license.

For these reasons, we reject Kline's suggestion that we should confine the application of KRPC 8.4(c), (d), and (g) to conduct that is egregious and flagrantly violative of professional norms.

*A violation of KRPC 8.4(c) does not require that an attorney act with "malevolent intent."*

Kline also argues in addition to adopting the egregious and flagrant standard discussed above, this court should conclude that conduct violates KRPC 8.4(c) (2012 Kan. Ct. R. Annot. 643), which prohibits engaging in "dishonesty, fraud, deceit or misrepresentation," only when such conduct is done with "malevolent intent that rises above mistake." But Kline cites no authority specifically supporting this suggestion and relies instead on implication. He again depends upon *In re Pyle*. In particular, Kline points out the *Pyle* court held that the attorney's conduct did not violate KRPC 8.4(c) because "we discern mistake rather than malevolence." 283 Kan. at 827.

But Kline overstates *Pyle*'s holding. The court there did not require proof of malevolent intent in order to find a violation of KRPC 8.4(c). Rather, it merely used that term to distinguish intentional dishonesty from innocent mistake. See 283 Kan. at 827. Because Kline cites no authority for the proposition that an attorney must act with "malevolent" intent in order to violate KRPC 8.4(c), and we are aware of none, we decline to inject such limiting language in the plain text of KRPC 8.4(c).

*Conduct occurring during a proceeding can be prejudicial to the administration of justice in violation of KRPC 8.4(d) even in the absence of proof of actual harm to the proceeding.*

Kline also argues that when potential misconduct occurs during a proceeding, that conduct can only violate KRPC 8.4(d) (2012 Kan. Ct. R. Annot. 643), which prohibits conduct "prejudicial to the administration of justice," when the conduct harms the actual proceeding. But Kline cites no authority to support this assertion, and given that the rule's plain language imposes no such limitation, we will not infer one.

Further, we rejected Kline's argument in *In re Pyle* when we clarified that an attorney's conduct need not prejudice the proceeding itself in order to constitute a KRPC 8.4(d) violation:

"[T]he 'administration of justice' Rule 8.4(d) seeks to protect from prejudice is much broader than the administration of justice to be effected in any single trial or adjudicatory proceeding. . . . *All* lawyers, by virtue of their licenses, enjoy the status of officers of the court. That status brings with it the responsibility to refrain from conduct unbecoming such officers . . . ." 283 Kan. at 829-30.

Although in *Pyle* the respondent attorney's misconduct occurred outside a proceeding, this court did not limit its interpretation of KRPC 8.4(d). Instead, the court relied on a plain reading of the rule and persuasive authority interpreting KRPC 8.4(d) as prohibiting actions that broadly injure the justice system. See 283 Kan. at 829; see also *In re Johanning*, 292 Kan. 477, 487-88, 254 P.3d 545 (2011) (finding a KRPC 8.4[d] violation when attorney's failure to forward client's criminal restitution payment resulted in no quantifiable injury to client but impacted everyone involved in the process including probation officer and district court which expended time in addressing attorney's conduct); Hazard and Hodes, The Law of Lawyering § 65.6 (3d ed. 2013) (noting that drafters of Rule 8.4(d) intended rule to broadly address "violations of well-understood norms and conventions of practice," not just conduct prejudicing other parties). Thus, although in *Pyle* we dealt with a different kind of conduct, our rationale and analysis apply equally here.

We conclude KRPC 8.4(d) encompasses conduct that injures, harms, or disadvantages the justice system generally, regardless of the context in which that conduct occurs or whether it prejudiced a particular proceeding.

Having found neither of Kline's suggestions for cabining KRPC 8.4 persuasive and having rejected Kline's argument that KRPC 8.4 applies only when a general rule does not apply, we next consider the individual instances found by the panel to have violated the KRPC.

CLEAR AND CONVINCING EVIDENCE DOES NOT SUPPORT THE PANEL'S CONCLUSION THAT KLINE'S INVESTIGATOR INTENTIONALLY MISLED SRS OR THAT KLINE VIOLATED KRPC 8.4(c) AND KRPC 5.3(b) BY PERMITTING THIS CONDUCT.

Initially, the panel found Kline failed to take "reasonable efforts" to ensure that a supervised nonlawyer, his investigator Williams, acted in accordance with the professional obligations of a lawyer, thus violating KRPC 5.3(b) (2012 Kan. Ct. R. Annot. 615). Further, the panel concluded that if Williams were a lawyer, he would have violated KRPC 8.4(c) (2012 Kan. Ct. R. Annot. 643), which prohibits engaging in conduct involving "dishonesty, fraud, deceit or misrepresentation." And because KRPC 5.3(c)(2) makes a lawyer responsible for the conduct of a supervised nonlawyer if the lawyer has direct supervisory authority, knows of the conduct, and fails to avoid or mitigate the conduct, the panel found Kline functionally violated KRPC 8.4(c) through Williams when Williams "intentionally misled" SRS as to the reasons Kline sought information regarding sexual abuse reports.

The parties make several arguments concerning the proper scope of KRPC 8.4. But, as discussed below, any reading of KRPC 8.4 requires proof of dishonesty. And because we find no clear and convincing evidence of dishonesty, we conclude the panel erred in determining Williams' actions violated KRPC 8.4 under either party's interpretation of the rule. Additionally, because Williams' actions, as planned or as carried out, did not violate KRPC 8.4, there is no evidence Kline failed to take reasonable measures to ensure Williams acted in accordance with the rules or was required

to take measures to mitigate the consequences of Williams' inappropriate actions under KRPC 5.3(b) and (c)(2).

*Additional Relevant Facts*

As noted in our factual recitation above, the confidential memo of July 15, 2003, to Kline from Maxwell and Williams suggested that if SRS asked for an explanation about the basis for Kline's interest in the number of sexual abuse reports, "SRS will be told that the Attorney General desires to determine if there is a serious latent sexual abuse problem." Regarding his actual statements to SRS, Williams testified he did not feel he had an obligation to describe the investigation's nature; instead, he spoke in "very broad terms." Williams told SRS that Kline's office was attempting to determine "the nature and magnitude of the sex abuse crime problem in Kansas with children being the victims."

Williams' testimony is generally consistent with an e-mail he sent to Kline on July 19, 2003, describing the initial request of SRS. In that e-mail, Williams advised Kline he told SRS employee Betsy Thompson that Kline's office was "attempting to assess the sexual abuse problem in Kansas and desired statistical information as to the number of sexual abuse reports received by SRS since January 1, 2002, involving children 15 years and younger." According to Williams, Thompson advised that SRS would treat the request as a legislative inquiry. Williams also confirmed that he "stayed away from the underlying issue that we are interested in." Williams noted the SRS employee "made reference to the A.G.'s recent opinion" but that he kept the conversation in "very general terms" again referring to the nature and magnitude of the sexual abuse crime problem in Kansas.

Thompson did not testify at the hearing. Instead, the only other evidence regarding Williams' comments to SRS came from testimony by John Badger, SRS's General Counsel. Badger confirmed Williams had contacted Thompson and initially sought a listing of sexual abuse reports received by the agency on children under the age of 16. Badger testified he believed this request sought public information. Further, when specifically questioned about whether SRS was "misled about why [Kline's office] wanted those num-

bers," Badger said he did not know what justification was offered to Thompson. Badger added the specific reason would not have mattered because the "numbers themselves would probably be public information."

*There Is Insufficient Evidence That Kline's Investigator Misled SRS.*

Although the parties' briefing of this issue focuses on the proper scope of KRPC 8.4 and whether the rules permit an investigator to mislead a nontarget witness, we need not reach that issue. Instead, we must preliminarily determine whether clear and convincing evidence supports the hearing panel's finding that Williams engaged in conduct involving "dishonesty, fraud, deceit or misrepresentation" in violation of KRPC 8.4(c)—conduct for which Kline would be culpable under KRPC 5.3.

In finding clear and convincing evidence that Williams intentionally misled SRS when seeking information from SRS regarding sexual abuse reports, the hearing panel specifically relied on the confidential memo of July 15, 2003, as well as Williams' testimony regarding his conversation with Thompson and his e-mail to Kline following up on that conversation. Yet this evidence does not show Williams acted dishonestly, fraudulently, or deceitfully, or that he intentionally misrepresented the nature of the investigation.

Instead, the record is clear Williams consistently "stayed away" from discussing the specific nature of the investigation, providing Thompson only with a very general statement as to the reason for the request. Moreover, the general information Williams did provide—*i.e.*, that Kline was investigating a "sexual abuse problem in Kansas"—was not inaccurate. Nor did Badger's testimony contradict Williams' characterization of his request. Instead, Badger simply confirmed the insignificance for the reason given since Kline's office was entitled to the statistical information Williams requested.

Under these circumstances, we find a lack of clear and convincing evidence to support the panel's conclusion that Williams' conduct violated KRPC 8.4(c). Thus, Kline was neither responsible for such conduct under KRPC 5.3, nor was he required to mitigate any consequences of Williams' conduct.

## THE PANEL'S FINDING THAT KLINE VIOLATED KRPC 3.3(a)(1) WHEN HE TESTIFIED UNDER OATH THAT HIS OFFICE DID NOT SEEK THE IDENTITIES OF ADULT ABORTION PATIENTS IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

The panel found Kline "knew or should have known" in April 2005 that his office had sought the identities of adult abortion patients. Thus, the panel concluded that when Kline testified under oath in November 2007 and again in January 2009 that his office did not seek adult abortion patients' identities, he violated KRPC 3.3(a)(1) (2012 Kan. Ct. R. Annot. 582), which prohibits a lawyer from knowingly making "a false statement of fact or law to a tribunal."

The panel also found Kline violated KRPC 3.3(a)(1) (2012 Kan. Ct. R. Annot. 582) by failing to "correct a false statement of material fact or law previously made to the tribunal by the lawyer."

### Kline's Testimony

In November 2007, Kline testified before Judge King at a hearing King conducted in his role as special master in the *CHPP* mandamus action:

"Q. [KLINE'S ATTORNEY] Were you seeking the identity of women—the identities of women contained in those records?

"A. [KLINE] The—we had established a method of protecting patient privacy. And Judge Anderson has opined to this. We knew that there would be a concern simply because we were dealing with what might be considered a volatile issue, not because of any strong concern of law. I worked with Judge Anderson to establish a process where the records would be provided in total to him, not to us. But to the court. So *the Court could redact irrelevant information, as well as the identities of adult women* before tendering the records to our possession. I always sought the identity of the children, because the children were victims of crimes. And it was necessary to determine whether actions to protect those children should occur.

"Q. [KLINE'S ATTORNEY] Is that—is that normal for prosecutors to seek the identity of victims of crimes, such as child rape?

"A. [KLINE] Absolutely. In fact, I would say that it's normal to seek the identity of patients when seeking medical records. I just made an exception in our approach in this case as it relates to adult women. . . .

". . . *So I sought the identity for the Court of adult women but never for our office.*" (Emphasis added.)

In January 2009, Kline testified before Judge Owens in a hearing on the defendant's motion to suppress and motion to dismiss in *State v. Tiller*:

"Q. [TILLER'S DEFENSE COUNSEL] You have spoken publicly before about your respect for the privacy of Dr. Tiller's patients, correct?

"A. [KLINE] What I have said is that we did not need nor seek adult patient names, and we sought the identities of children because they were victims of crime."

We proceed to determine whether one or both of these statements were knowingly false in violation of KRPC 3.3.

*Because KRPC 3.3(a)(1) Requires Actual Knowledge of Falsity, the Panel Erred in Relying on What Kline "Should Have Known."*

Kline persuasively argues the panel's rationale for finding a violation of KRPC 3.3(a)(1) is fundamentally flawed because the panel relied upon what he "knew or should have known," but KRPC 3.3(a)(1) requires that a lawyer "knowingly" make a false statement of fact or law. And, as Kline suggests, the term "knowingly" is defined under the rules as "actual knowledge of the fact in question." KRPC 1.0(g) (2012 Kan. Ct. R. Annot. 433).

Kline contends he did not knowingly give false testimony that his office did not seek the identity of adult patients because he did not direct his staff to identify adult patients; he was unaware that his staff sought adult patient identities; and he did not learn about the spreadsheet containing adult patient identities until after both hearings at which he testified that his office had not sought adult patient identities.

The Disciplinary Administrator's brief did not address Kline's contention that KRPC 3.3(a)(1) requires actual knowledge of the falsity of the statement. However, the Disciplinary Administrator conceded at oral argument that the rule does not permit a violation based on constructive knowledge and to the extent the panel relied upon what Kline "should have known," its findings are flawed. Nevertheless, the Disciplinary Administrator urges us to find clear and convincing evidence supports the panel's finding that Kline had actual knowledge of his office's efforts to identify adult abortion patients.

But as discussed below, in light of the panel's fundamental error regarding the level of knowledge required and the indirect evidence the panel relied upon to find violations of KRPC 3.3(a)(1), we cannot accept the Disciplinary Administrator's alternative argument.

*Clear and Convincing Evidence Does Not Support the Panel's Finding That Kline Violated KRPC 3.3(a)(1) by Falsely Testifying.*

Significantly, the panel cited no direct evidence that Kline ordered his staff to seek adult patients' names or that he knew his staff attempted to identify adult patients. Further, our review of the record reveals no such evidence. Instead, the record shows that while Kline directed his staff to expand the investigation to include illegal late-term abortions performed on adults, he also directed they do so without identifying patient names. According to Kline, he did not need adult patient identities because he intended to litigate any case against the clinics as a "paper case" without patient witnesses. With one exception, discussed below, no one on Kline's staff contradicted this testimony.

*Evidence found by the panel*

In the absence of direct testimony, the panel implied Kline "knew or should have known" his testimony was false because: (1) Kline directed his office to subpoena records from La Quinta; (2) Maxwell obtained that subpoena; (3) Williams directed Reed to compare the information from La Quinta with KDHE records to obtain names of adult patients; and (4) Reed prepared spreadsheets which included a spreadsheet containing the identities of adult patients and gave that spreadsheet to Williams.

But as discussed above, even if these facts supported a finding that Kline "should have known" of the falsity of his testimony, this finding would be insufficient to support the panel's finding of a violation of KRPC 3.3(a)(1), which requires actual knowledge of the falsity of the testimony. And while we agree each of these factual findings is supported by the record, we conclude none of them, when considered individually or together, support a conclusion that Kline had actual knowledge that his office obtained the identities of adult patients.

First, while the record supports the panel's finding that Kline directed his staff to seek to subpoena documents from La Quinta, it does not necessarily follow that Kline intended to identify adult abortion patients with this information or that he actually knew his office eventually developed adult patient identities utilizing information obtained through the subpoena. In fact, an internal memorandum dated a few days before Kline's office sought the La Quinta subpoena indicates the subpoena's purpose was to identify "juvenile" patients. This document's validity has not been questioned.

Similarly, while Reed's testimony supports the panel's conclusion that Williams directed Reed to compare the information obtained from La Quinta with the KDHE records in order to obtain names of adult patients, it does not permit an inference that Kline directed Williams to create the spreadsheet or that Kline was aware of or saw the spreadsheets after Reed prepared them. In short, although each of the panel's findings are true, and may demonstrate Kline "should have known" his office sought adult patient identities, the findings do not provide clear and convincing evidence Kline actually knew his office sought adult patient identities prior to testifying to the contrary under oath.

### Evidence not cited by the panel

The Disciplinary Administrator points us to additional evidence in the record, not cited by the panel, that he contends supports a finding Kline actually knew his office sought the identities of adult patients. Specifically, the Disciplinary Administrator encourages us to rely upon (1) a statement made by Kline at his disciplinary hearing; (2) evidence indicating Kline eventually learned of the spreadsheets' existence and his office's effort to identify adult patients; and (3) statements made by Kline's staff speculating whether Kline knew his staff made efforts to identify adult patients. But even this does not supply the clear and convincing evidence needed to support a violation.

First, the Disciplinary Administrator suggests Kline's testimony at his disciplinary hearing demonstrates Kline's actual knowledge

that adult patient information would be included in the La Quinta response:

"Q. [DISCIPLINARY ADMINISTRATOR] And to your knowledge you yourself did not order anybody else in your office to prepare that document?

"A. [KLINE] What I asked my staff to do was try *to identify adult patients and the adult traveling companions*. How they did that was up to them.

"Q. [DISCIPLINARY ADMINISTRATOR] But you didn't specifically you yourself order that this document be prepared?

"A. [KLINE] Well, what I'm saying is my direction could encompass them excluding adult patients to make sure to identify children, but I don't know why they did that. I mean you'd have to ask Mr. Reed or Mr. Williams why the decision to approach the effort to identify children included that spreadsheet. There could be rational explanations regarding the effort to identify children. It makes sense to exclude persons. And I do know that La Quinta gave medical discounts for anybody receiving medical treatment in Wichita. So this would be an effort to try to exclude what might be extraneous information because you don't want to move without full knowledge." (Emphasis added.)

As the Disciplinary Administrator points out, Kline did testify he directed his staff to try and "identify adult patients and the adult traveling companions." But notably, the panel did not rely upon this testimony to support its conclusion regarding this violation. It seems likely the panel chose not to rely upon this testimony because when read in context, it simply does not support the Disciplinary Administrator's argument. Instead, it is apparent Kline intended to convey that his office sought the La Quinta records to identify *child* patients and their *adult* traveling companions and he simply misspoke in indicating that his staff intended to "identify adult patients and the adult traveling companions." As Kline speculated in the second portion of the above-quoted response, Reed may have identified or developed adult patient information in order to isolate it from juvenile patient information based on Kline's direction to focus on identifying juvenile patients. Moreover, other than this one apparent misstatement, Kline testified consistently throughout the hearing that his office sought to identify only juvenile patients not adult patients.

The Disciplinary Administrator also asks this court to rely on evidence that Kline and members of his staff eventually knew of the spreadsheet containing adult identities to find he knew of the

spreadsheet during his testimonies. Specifically, the Disciplinary Administrator points to Rucker's testimony at the disciplinary hearing that Kline's office made an effort to identify potential adult patients. But Rucker qualified this "acknowledgement" by explaining that he did not learn of an effort to identify adult patients until 2 years after Kline left his position as Attorney General and that he did not believe Maxwell or Kline knew of this effort. Thus, Rucker's testimony supports Kline's position that Kline did not know of his office's efforts to identify adult patients until after Kline testified and after any obligation to correct his testimony ended.

Further, the Disciplinary Administrator suggests Kline's actual knowledge can be inferred from evidence that during Kline's tenure as Johnson County District Attorney, his office possessed a compact disc containing the spreadsheets with the names of adult patients created by Reed years earlier. But again, as Kline points out, the discovery of a compact disc containing the spreadsheet data in a locked file cabinet nearly 2 years after Kline testified does not demonstrate he knew of the disc's existence and content at the time he testified.

Additionally, the Disciplinary Administrator points out that Deputy Attorney General Jared Maag, who was involved with the investigation, testified at Kline's disciplinary hearing that Maag believed the identity of adult patients would be necessary to prove any charges related to illegal late-term abortions, which also was a topic of the investigation. Further, a physician consulted by Williams and Reed provided the same opinion. The Disciplinary Administrator infers from this testimony that Kline agreed with these opinions and accordingly directed his staff to seek adult patient identities in anticipation of trial.

But, as Kline points out, this evidence does not clearly and convincingly establish Kline agreed with Maag and the consulting physician that adult patient identities were necessary to prosecute illegal late-term abortions. And Maag never testified Kline agreed with his legal assessment; rather, he testified no one "vehemently disagree[d]" with it. Further, as discussed, Kline testified he never intended to use adult patients at trial, and it appears Kline's office was willing to permit the prosecution to hinge on expert testimony.

Additionally, Maxwell testified that Attorney General Six prosecuted charges in *State v. Tiller* without identifying adult patients.

Next, the Disciplinary Administrator relies on Maxwell's testimony at the disciplinary hearing indicating Kline's office realized the La Quinta subpoena might function as a "dragnet" that would reveal adult patients.

But Maxwell's testimony merely established the La Quinta subpoena would necessarily obtain *registration information* for some adult patients. As Maxwell explained, Kline's office would then have to separate this information "like wheat and chaff" to identify the *adult traveling companions* of child patients and discard information regarding *adult patients*. Thus, while Maxwell's testimony may support an inference that Kline knew the La Quinta registration information necessarily would generate information identifying adult WHCS patients and that this information could be cross-referenced to identify and discard adult patient information, it does not support an inference that Kline knew the La Quinta registration information would in fact be cross-referenced with termination of pregnancy reports for the purpose of identifying adult abortion patients.

Finally, the Disciplinary Administrator alternatively urges us to find that even if the evidence does not convincingly establish that Kline actually knew of his office's efforts to identify adult patients, Kline's "deliberate ignorance" equates to actual knowledge. But in light of the specific definition provided by our rules for the term "knowingly," we are not at liberty to expand that definition as suggested by the Disciplinary Administrator, nor have we been provided with any persuasive authority for doing so.

In light of the absence of clear and convincing evidence regarding Kline's actual knowledge of the falsity of his testimony that his office never sought the identity of adult abortion patients, we conclude the panel erroneously based its ultimate conclusion that Kline violated KRPC 3.3(a)(1) upon its determination that Kline "should have known" of the representation's falsity.

*Clear and Convincing Evidence Does Not Support the Panel's Finding That Kline Violated KRPC 3.3(a)(1) for Failing to Correct False Testimony.*

The panel also found Kline violated KRPC 3.3(a)(1) (2012 Kan. Ct. R. Annot. 582) by failing to "correct a false statement of material fact or law previously made to the tribunal by the lawyer." The Disciplinary Administrator does not separately address this violation, apparently recognizing it is linked to, and relies upon, the panel's finding of a violation of KRPC 3.3(a)(1) based upon Kline's inaccurate testimony.

But we have found no clear and convincing evidence that Kline knew of his office's efforts to identify adult patients at any point prior to his testimony at either hearing. Additionally, we note that although Rucker testified he believed Kline learned of the spreadsheet containing potential adult patient names at the hearing in *State v. Tiller*, Kline testified he did not know of its existence until after that case was resolved. Under these circumstances, and in the absence of any additional findings from the panel as to this violation, we find no clear and convincing evidence that Kline learned of his office's effort to identify adult abortion patients while he remained under an obligation to correct his testimony. See KRPC 3.3 Comment 13 (2012 Kan. Ct. R. Annot. 585) (discussing that there must be "[a] practical time limit" on an attorney's obligation to correct false evidence and statements and "[t]he conclusion of the proceeding is a reasonably definite point for the termination of the obligation"). Therefore, we conclude the panel's finding of a KRPC 3.3(a)(1) violation for Kline's failure to correct his false testimony is not supported by clear and convincing evidence.

CLEAR AND CONVINCING EVIDENCE SUPPORTS THE PANEL'S CONCLUSION THAT KLINE VIOLATED KRPC 8.4(d), KRPC 8.4(g), AND KRPC 5.1(c) WHEN HE DIRECTED HIS STAFF TO ATTACH SEALED DOCUMENTS TO A PUBLICLY FILED BRIEF.

This violation resulted from Kline's March 2005 instruction to his staff to attach sealed documents to his office's publicly filed brief in the *Alpha* mandamus action. See *Alpha*, 280 Kan. at 926. In essence, the panel found Kline's directive violated the *Alpha*

court's order to the parties to publicly file their briefs but to ensure that the record remained sealed and that Kline's action violated KRPC 8.4(d) (2012 Kan. Ct. R. Annot. 643) prohibiting conduct prejudicial to the administration of justice. Further, the panel found Kline's directive to attach the court-ordered sealed documents to the publicly filed brief defeated the court's purpose in protecting the confidential record and violated KRPC 8.4(g) prohibiting conduct reflecting adversely on the lawyer's fitness to practice.

The panel also found Kline culpable for his staff's actions in following his directive. Specifically, the panel found Kline's staff attorneys violated KRPC 8.4(d) and (g) by following Kline's instructions and, consequently, that Kline violated KRPC 5.1(c)(2) (2012 Kan. Ct. R. Annot. 612), which places responsibility on a lawyer with direct supervisory authority over another lawyer for the other lawyer's misconduct if the supervising lawyer knows of the misconduct and fails to take remedial actions when the misconduct's consequences could be avoided. Thus, if we find clear and convincing evidence supports the panel's conclusion that Kline's directive to publicly file the sealed documents violated KRPC 8.4(d) and (g), we would necessarily find clear and convincing evidence supported the panel's conclusion regarding Kline's responsibility under KRPC 5.1(c)(2) for his employees' actions in following that directive because Kline clearly knew of the conduct and could have avoided its consequences.

*Additional Relevant Facts*

As noted, the *Alpha* court directed the parties to publicly file their briefs but ordered the record remain under seal. Judge Anderson filed his answer under seal and attached the transcript from the motion to quash hearing, while the clinics publicly filed their briefs but did not attach sealed records.

Prior to filing Kline's brief, Kline's staff attempted to clarify the court's order regarding the briefs. Maag, who was in part responsible for preparing Kline's *Alpha* brief, testified at the disciplinary hearing that he found the court's order confusing because the parties necessarily would base their arguments on the contents of the

record, but the record was to remain sealed. Due to his uncertainty as to how to proceed, Maag sought clarification from the Clerk of the Appellate Courts. Maag testified the Clerk provided him with no additional guidance and referred him back to the order.

Maxwell testified that before deciding to attach the sealed documents, Kline's staff had a "really strong debate" about how to write the brief without attaching the record. Maag testified Kline was frustrated by the "[clinics] and the information that they were putting out to the press and the inability to get the office's position out unless these items were attached."

Michael Strong, who represented Judge Anderson in the mandamus action, testified attorneys from Kline's office also contacted him before filing Kline's brief. Strong said Maxwell and other staff attorneys were "frustrated" by what they perceived as misstatements in the clinics' briefs and that "only one side of the story had been presented," *i.e.*, the clinics' side. Maxwell questioned Strong as to whether including information from the sealed record in Kline's brief would violate Judge Anderson's orders. Strong reminded Maxwell that Judge Anderson lacked any authority over orders from the Supreme Court.

Ultimately, Kline directed his staff to publicly file the brief with four sealed documents attached: subpoenas issued to CHPP and WHCS; the transcript of the hearing on the motion to quash; and Judge Anderson's memorandum decision and order denying the motion to quash. Kline's office redacted the attachments so that, according to Kline, the attachments contained no confidential information. Kline testified at his disciplinary hearing that his staff included the sealed information in the attachments in order for "people to understand the arguments, the Court and others, certainly."

After filing his brief, Kline also conducted a press conference. During this conference, Kline discussed the sealed documents he had attached to his brief. See *Alpha*, 280 Kan. at 926, 928. Kline later argued the press conference was " 'necessitated by the false impression left by the public filing of [the clinics'] brief and [the clinics'] representation of the record.' " 280 Kan. at 928.

The clinics objected to both the public filing of the sealed documents and the press conference and requested a show cause order requiring Kline to demonstrate why he should not be held in contempt for violating the court's order. *Alpha*, 280 Kan. at 926.

After the *Alpha* court issued the requested show cause order, Maxwell filed a motion with Judge Anderson seeking clarification regarding whether Kline's public filing of documents from the sealed record violated Judge Anderson's nondisclosure orders. Judge Anderson concluded his nondisclosure orders prohibited the parties from revealing the existence of an inquisition and the Supreme Court's directive to publicly file briefs mooted that purpose. But Judge Anderson also clarified that his nondisclosure orders related only to his inquisition proceedings and not to the mandamus action.

In his written response to the show cause order, Kline did not suggest he unintentionally or mistakenly directed his staff to file sealed documents as an attachment to the brief. Instead, he admitted knowingly attaching the sealed court records to the brief because he believed this was necessary to further an understanding of his arguments. *Alpha*, 280 Kan. at 928. But then in oral argument to the *Alpha* court, Kline's attorney, former Attorney General Stephan, "altered the tone" and characterized Kline's actions as honest "mistakes" made in good faith. 280 Kan. at 929. Stephan, on Kline's behalf, also argued the disclosure did not impair the proceeding, did not harm or prejudice the administration of justice, and did not deter the court from performing its duty. 280 Kan. at 929.

In ruling on the show cause order, the *Alpha* court gave Kline the "benefit of the doubt," citing the unusual nature of its order and the keen public interest in the case. 280 Kan. at 929-30. It declined to hold Kline in contempt, noting that "[n]o prejudice has resulted from [Kline's] conduct." 280 Kan. at 929.

*Kline's Conduct Prejudiced the Administration of Justice in Violation of KRPC 8.4(d).*

Initially, Kline argues that because the *Alpha* court declined to hold him in contempt, he could not have violated KRPC 8.4(d),

which prohibits "conduct that is prejudicial to the administration of justice." Additionally, Kline reiterates his "cabining" argument from above, *i.e.*, that when misconduct occurs during a proceeding it must prejudice that proceeding to be "prejudicial to the administration of justice"—an argument we have already rejected. Further, he contends he could not have violated KRPC 8.4(d) because the redacted documents revealed no confidential information and because his attachment of the sealed documents assisted the court in understanding his legal arguments rather than prejudicing the proceeding.

The Disciplinary Administrator argues the *Alpha* court's decision declining to hold Kline in contempt did not resolve whether Kline's "willful disobedience" of the court's orders violated KRPC 8.4(d). Focusing on testimony describing Kline's motives for attaching the documents, the Disciplinary Administrator argues the panel relied on clear and convincing evidence in finding a KRPC 8.4(d) violation.

We agree with the Disciplinary Administrator that the *Alpha* court's refusal to hold Kline in criminal contempt does not preclude a finding that Kline's conduct prejudiced the administration of justice under KRPC 8.4(d). Kline's argument ignores the distinction between criminal contempt, the question at issue in *Alpha*, and a violation of KRPC 8.4(d), which is at issue here. Further, this argument fails to take into account the facts known to the *Alpha* court and the additional testimony heard by the panel. And although the *Alpha* court gave Kline the "benefit of the doubt," primarily because of his counsel's efforts to characterize his mistakes as honest, given the testimony from Kline's disciplinary hearing, we can no longer extend Kline the benefit of any doubt.

We turn first to Kline's argument that the court's statement in *Alpha* directs the conclusion in this disciplinary case. Conduct rises to the level of criminal contempt when it is " 'directed against the dignity and authority of the court, or a judge acting judicially; it is an act obstructing the administration of justice which tends to bring the court into disrepute or disrespect.' " *Hendrix v. Consolidated Van Lines, Inc.*, 176 Kan. 101, 109, 269 P.2d 435 (1954) (quoting 17 C.J.S., Contempt § 5). A finding of criminal contempt requires

the court to determine that the person acted with the requisite intent, and such a finding depends not only on the " 'nature of the act,' " but also upon " 'intent, good faith, and the surrounding circumstances.' " *Alpha*, 280 Kan. at 928 (quoting *Threadgill v. Beard*, 225 Kan. 296, Syl. ¶ 6, 590 P.2d 1021 [1979]). Thus, we must consider the *Alpha* court's conclusion that "[n]o prejudice" resulted from Kline's actions against the backdrop of the criminal contempt elements and Kline's counsel's arguments in *Alpha* that Kline made an "honest" mistake in attaching the documents. See *Alpha*, 280 Kan. at 929.

In considering the criminal contempt issue, the *Alpha* court limited its review to whether Kline's violation of the court's order prejudiced the proceeding before the court. *Alpha*, 280 Kan. at 929 ("Any disclosure of sealed material did nothing to impair the orderly nature of this proceeding or the soundness of its eventual result; the attorney general and his staff did not release information harmful to personal privacy, prejudicial to the administration of justice, or detrimental to this court's performance of its duties.").

In *CHPP*, the court recognized the distinction between a contempt proceeding and the rules of professional conduct. There, the court considered and rejected CHPP's invitation to find Kline in indirect civil contempt for mishandling patient records once they reached his office. In doing so, the court implicitly recognized that Kline's actions might implicate the KRPC, despite not meeting the requirements for civil contempt. *CHPP*, 287 Kan. at 418, 425 (rejecting CHPP's invitation to initiate civil contempt proceedings but noting "these and other instances of [Kline's conduct relating to the handling of confidential medical files] raise troubling questions about Kline's and any other involved lawyer's compliance with the Kansas Rules of Professional Conduct" and ordering a copy of the opinion sent to the Disciplinary Administrator).

In contrast to the contempt question in *Alpha*, we are tasked here with considering the broader implications of Kline's conduct. And as we have discussed, an attorney's conduct can violate KRPC 8.4(d) even if it does not result in identifiable harm to an actual proceeding. Rather, conduct is "prejudicial to the administration of justice" when it tends to injure or harm the justice system more

generally. See *Pyle*, 283 Kan. at 829-30. In sum, the *Alpha* court's decision regarding contempt does not direct our conclusion here.

Further, in considering whether Kline's conduct violated KRPC 8.4(d), we note the hearing panel considered evidence not available to the *Alpha* court. Namely, in the disciplinary proceeding, Kline's subordinates testified they knowingly attached the sealed documents because of their frustration with the clinics' public statements and the clinics' perceived ability to provide a one-sided version of events to the public. Moreover, Kline specifically admitted that while his office attached the documents in order to aid the court in understanding his position, the record is clear the court already had the hearing transcript in its possession, and Kline testified the documents were attached so "others" would understand his position. In addition, Kline's press conference and his office's public disclosure of the sealed documents through that venue did nothing to further the *Alpha* court's consideration of the issues presented.

Taken collectively, the testimony presented at the hearing does not demonstrate a staff struggling to understand a difficult order so as to present clear arguments to the court, nor does it evidence an "honest mistake." And while Kline's motivations may have been in doubt at the time of the *Alpha* court's decision, his motivations are clear now. The *CHPP* court's prophetic implication that additional facts could become known and warrant sanction was borne out at Kline's disciplinary hearing. See *CHPP*, 287 Kan. at 418-19, 425 (declining to institute a civil contempt proceeding "at this time" but recognizing that such an action might be "appropriate particularly if additional or amplifying information should come to light about [Kline's] behavior" after the patient records came into his possession).

Simply said, regardless of Kline's view about the wisdom of the *Alpha* court's order or any frustration with his inability to fully express his position to the public, as an officer of the court he was obligated to follow the court's directive. Kline's intentional disregard of that directive lessened the public's confidence in the judicial system's integrity and prejudiced the administration of justice generally. Accordingly, we find clear and convincing evidence to

support the panel's conclusion that Kline violated KRPC 8.4(d) by directing his staff to attach sealed documents to his brief in contravention of the *Alpha* court's order.

*Kline's Conduct Adversely Reflected on His Fitness to Practice Law in Violation of KRPC 8.4(g).*

The panel also found Kline's actions in having sealed documents attached to the *Alpha* brief violated KRPC 8.4(g) (2012 Kan. Ct. R. Annot. 644), which prohibits a lawyer from engaging in "any other conduct that adversely reflects on the lawyer's fitness to practice law." In so finding, the panel specifically noted Kline's actions defeated the court's purpose in sealing the record.

In contesting this violation, Kline again points to the *Alpha* court's refusal to hold him in contempt and suggests this refusal precludes the panel from finding a KRPC 8.4(g) violation. Further, he argues his actions did not defeat the court's purpose in sealing the record because he redacted personal information. In response, the Disciplinary Administrator reiterates that Kline is required to follow court orders and points out the distinction between this proceeding and the proceeding for contempt in *Alpha.*

Just as Kline's actions in directly contravening a Supreme Court order prejudiced the administration of justice, his actions most certainly reflect poorly on his fitness to practice law. Once again, regardless of Kline's view about the court's direction or his frustration with being required to act within the confines of that direction, the KRPC and our caselaw are replete with examples demonstrating that attorneys are obligated to show deference and respect for tribunals. See KRPC 3.3 (2012 Kan. Ct. R. Annot. 582) (requiring candor towards tribunals); KRPC 8.2 (2012 Kan. Ct. R. Annot. 640) (prohibiting a lawyer from making a false statement regarding the integrity or qualifications of a judge); see also *In re Nelson,* 278 Kan. 506, 509, 511, 102 P.3d 1140 (2004) (disciplining attorney under KRPC 8.4[g] for failing to follow court's orders); *In re Arnold,* 274 Kan. 761, 765, 773, 56 P.3d 259 (2002) (disciplining attorney for "intemperate" remarks made to judge and noting remarks showed lack of respect).

Further, Kline's action in redacting personal information supports the violation by demonstrating Kline's awareness of the court's order and his effort to circumvent that order rather than adhere to its directive. Kline's violation of KRPC 8.4(g) is established by clear and convincing evidence.

*Kline Failed to Mitigate or Avoid Consequences of His Subordinates' Conduct in Violation of KRPC 5.1(c)(2).*

Finally, the panel found Kline's failure to mitigate the consequences of his staff's actions in attaching the sealed documents to the brief in *Alpha* violated KRPC 5.1(c)(2), which places responsibility on a lawyer with direct supervisory authority over another lawyer for the other lawyer's misconduct if the supervising lawyer knows of the misconduct and fails to take remedial action when the misconduct's consequences could be avoided.

Because we have concluded Kline's directive to his staff to attach sealed documents to his brief contradicted the *Alpha* court's order in violation of KRPC 8.4(d) and (g), it necessarily follows that Kline's subordinates' actions in carrying out this directive violated those same rules. And because Kline clearly knew of his subordinates' misconduct and failed to correct it, clear and convincing evidence supports the panel's conclusion that Kline also violated KRPC 5.1(c)(2).

THE PANEL'S CONCLUSION THAT KLINE VIOLATED KRPC 3.3(a)(1) AND KRPC 8.4(c) BY FILING A MOTION TO CLARIFY CONTAINING FALSE STATEMENTS IS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

In arguments before the *Alpha* court on September 8, 2005, Rucker advised that Kline's office had not subpoenaed mandatory reporters of sexual abuse other than abortion clinics. But after the argument, Kline's office filed two motions purporting to clarify Rucker's statements. The hearing panel concluded the second motion, which indicated Kline's office actually had "sought records and information from other mandatory reporters," contained a false statement in violation of KRPC 3.3(a)(1) and KRPC 8.4(c).

*Additional Relevant Facts*

Rucker argued Kline's position before the *Alpha* court while Kline listened from his office to the live Internet audio feed. During the argument, justices questioned Rucker about the extent of Kline's investigation of the abortion clinics. Justice Donald L. Allegrucci asked Rucker if Kline's office had any evidence, other than medical records, that these clinics had failed to report instances of sexual abuse of patients under the age of 16. Rucker replied that other evidence existed "on a case by case basis." Continuing with that line of questioning, Justice Allegrucci asked if Kline's office had "evidence on other situations like this and which do not involve abortions, but involve a child coming to—being term and being born in a hospital, do you go around to hospitals and attempt to get these records . . . [or] is your evidence only concerning those who have abortions." Rucker replied, "No." Justice Allegrucci then clarified and asked, "You have evidence of those who come to full term, are you pursuing those as well?" and Rucker answered in the affirmative.

At this point, Justice Carol A. Beier clarified, "You subpoenaed hospitals—[?]" Rucker replied, "No," and explained that Kline's office had investigated but not subpoenaed hospitals. Justice Beier then asked whether Kline's office had subpoenaed other mandatory reporters. Rucker described the investigation as secret and advised the court he could reveal only that Kline's office had "looked into live births." Justice Beier asked, "Have you subpoenaed entities who are mandatory reporters like the abortion clinics that you have subpoenaed in this inquisition?" Rucker replied, "At this juncture the answer is no." Rucker then stressed the investigation's ongoing nature and indicated it was not limited to abortion clinics.

After Rucker's argument, Kline, Rucker, Maag, and Assistant Attorney General Kristafer Ailslieger met to discuss the argument. As a result of that discussion, approximately 1 week after oral argument, Kline filed two motions to clarify. The first motion simply clarified that Kline's office had no issues with a court-appointed physician reviewing the medical files for redaction, rather than a

physician selected by the State. *Alpha*, 280 Kan. at 912. But the second motion, the one pertinent to this proceeding, stated:

"1. As part of this criminal investigation and/or inquisition, [*Kline*] *has sought records and information from other mandatory reporters besides the petitioners in the present mandamus action.* This effort has included subpoenas for records relating to live births involving mothers under the legal age of sexual consent.

"2. At oral argument, counsel was unable to directly and adequately respond to the questions from the bench specifically relating to this topic because of the secret nature of the criminal investigation and inquisition and the existence of a do not disclose order relating to the subpoenas of live birth records." (Emphasis added.)

In its opinion, the *Alpha* court concluded Kline's motion to clarify changed rather than clarified Rucker's statements at oral argument. *Alpha*, 280 Kan. at 912. The court speculated that the "do not disclose" order referenced in the motion to clarify may have caused Rucker to be "less than forthright" with the Supreme Court. Nevertheless, the court pointed out this "order" apparently had been lifted approximately a month later because Kline conducted a press conference during which he stated he possessed birth records for infants born to girls younger than 16. 280 Kan. at 912-13.

At his disciplinary hearing, Kline testified the court drew a false inference that Rucker was untruthful and that Kline "fe[lt] terrible about that" because he believed "Rucker was trying very hard to be forthright." Nevertheless, Kline characterized as dicta the court's comments regarding Rucker's initial response at oral argument, the motion to clarify, and Rucker's lack of forthrightness. Therefore, Kline decided to "leave it alone" and "get on with business."

In further explanation of the statements in the second motion to clarify, Kline testified his office had subpoenaed documents from KDHE, a state agency, which Kline characterized as a "repository" of information from mandatory reporters. Therefore, he reasoned the motion to clarify accurately indicated his office had subpoenaed "other mandatory reporters." Specifically, Kline testified that prior to the oral argument in *Alpha*, Judge Anderson issued a subpoena to KDHE for live-birth records of mothers un-

der the age of 16, but the subpoena prohibited revealing its existence. According to Kline, this nondisclosure order put Rucker between a "rock and a hard place" because he could not reveal the existence of the KDHE live-birth subpoena. Kline testified Rucker's responses left an improper impression that the office had not issued other subpoenas—an impression he intended to correct with the motion to clarify.

In contrast, Rucker testified at Kline's disciplinary hearing that Rucker did not believe KDHE was a mandatory reporter; thus, he did not believe his statement at oral argument required correction or clarification. In fact, Rucker testified he was "disappointed" the motion to clarify was filed and he did not sign the document purporting to clarify his own statements to the court.

### Kline's Statement in the Motion to Clarify Was Untruthful.

The panel found Kline's statement that his office had "sought records and information from other mandatory reporters" was false because Kline, in fact, had not subpoenaed any mandatory reporters other than abortion clinics. Therefore, the panel concluded his statement violated KRPC 3.3(a)(1), prohibiting false statements of material facts, and KRPC 8.4(c), prohibiting dishonesty.

In disputing these violations, Kline points out the panel applied a version of KRPC 3.3(a)(1) that was not in effect until July 1, 2007, which was after the conduct supporting this violation had occurred. Kline contends this court cannot apply a version of the rule not in effect at the time of the alleged misconduct. At oral argument, the Disciplinary Administrator conceded the former rule applies. Therefore, we will consider the panel's findings utilizing the version of KRPC 3.3(a)(1) in effect at the time. That rule provided: "(a) A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal . . . ." KRPC 3.3 (2005 Kan. Ct. R. Annot. 462).

For this court to conclude that Kline's motion to clarify contained a false statement violating KRPC 3.3 or KRPC 8.4, we must first determine the statement's truthfulness. See KRPC 3.3(a)(1) (2005 Kan. Ct. R. Annot. 462); KRPC 8.4(c). The hearing panel rejected Kline's explanation that the statement was truthful and

concluded that while Kline did subpoena KDHE, a "repository" of information received from mandatory reporters, he clearly did not subpoena any mandatory reporters other than the clinics.

In arguing against the panel's findings, Kline relies on a game of semantics. Specifically, he claims his statement was truthful because of a single word not included in the statement. Namely, he contends, the motion to clarify did not indicate that "he sought records *directly* from other mandatory reporters." Instead, the motion simply indicated Kline sought records "from other mandatory reporters besides the petitioners in the present mandamus action." Kline contends that by omitting the word "directly," his motion left open the possibility that he sought information from KDHE, an agency that acts as a *repository* for mandatory reporters.

The Disciplinary Administrator's response is simple and straightforward—Rucker's answers to the court in *Alpha*, when read in context, demonstrate Kline's motion to clarify contained a false statement.

The flaws in Kline's attempts at nuance are numerous, not the least of which is that he now seems to be suggesting he purposefully provided the court with a vague clarification of Rucker's oral argument statement in order to preserve the truthfulness of the clarification. But putting this aside, the more obvious and fatal flaw is that Kline asks us to consider the clarification's statements in a vacuum, with no context or clues as to their motivation.

As the Disciplinary Administrator points out, the court did not ask Rucker whether Kline's office had sought information from a "repository" for mandatory reporters. Instead, the inquiry pointedly asked, "Have you *subpoenaed entities who are mandatory reporters* like the abortion clinics that you have subpoenaed in this inquisition?" (Emphasis added.) Rucker answered simply, "[N]o."

Significantly, Kline's motion to clarify acknowledged in the second paragraph that his explanations were directed to "questions from the bench specifically relating to this topic." Yet he now seeks to persuade us that his statements were far more general, responding to a question never asked—*i.e.*, whether the Attorney General had sought information from entities that were merely repositories of information from mandatory reporters.

Kline further argues that Rucker's responses at oral argument were "consistent with, and clarified by" the motion to clarify. But this is not true. Rucker provided a straightforward response when he answered "no" to the question whether Kline had subpoenaed other mandatory reporters like the abortion clinics. In contrast, Kline's motion essentially sought to change Rucker's "no" to a "yes" by indicating Kline had sought records and information from "other mandatory reporters besides the petitioners in the present mandamus action."

Under these circumstances, we find clear and convincing evidence supports the panel's conclusion that Kline falsely advised the *Alpha* court through the second motion to clarify that he had "sought records and information from other mandatory reporters."

Having determined clear and convincing evidence supports the panel's conclusion that Kline's statement in the second motion to clarify was false, we must next consider Kline's claim that his statements were not material to any issue before the *Alpha* court. Notably, Kline cites no authority to support his argument.

Under KRPC 3.3 (2005 Kan. Ct. R. Annot. 462), "(a) A lawyer shall not knowingly: (1) make a false statement of *material* fact or law to a tribunal . . . ." (Emphasis added.) While the panel made no finding regarding materiality, this court can do so since materiality is a question of law. See *State v. Wilson*, 295 Kan. 605, 617, 289 P.3d 1082 (2012) (stating that this court reviews materiality de novo).

This court has found evidence to be material when it is " ' "significant under the substantive law of the case and properly at issue." ' " *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008). Similarly, we have held a fact " ' "is not material unless it has a legitimate and effective bearing on the decision of the ultimate facts in issue." ' " *State v. Goodson*, 281 Kan. 913, 922, 135 P.3d 1116 (2006). Thus, Kline's statement was material if it had "bearing" on an ultimate issue in *Alpha*.

We need not linger long on materiality. By Rucker's own account, his responses were straightforward and truthful. And Kline's actions taken at the time to clarify these straightforward and truthful statements belies his current position that the statements were

not material. Clearly, Kline believed Rucker's responses—and their "clarification"—were material or he would not have insisted on filing the motion over Rucker's objection. Moreover, the recognition in the *Alpha* opinion that the motion to clarify "change[d]" rather than "clarifie[d]" Rucker's responses, demonstrates materiality.

Finally, we note that because we have found clear and convincing evidence to support the panel's finding that Kline's motion to clarify contained a materially false statement, we also agree with the panel that Kline's conduct violated KRPC 8.4(c) (2012 Kan. Ct. R. Annot. 643), which prohibits engaging in conduct involving "dishonesty, fraud, deceit or misrepresentation."

## THE PANEL INAPPROPRIATELY APPLIED KRPC 3.8(f), AND ITS FINDINGS ARE INSUFFICIENT FOR THIS COURT TO DETERMINE WHETHER KLINE'S COMMENTS ON "THE O'REILLY FACTOR" VIOLATED KRPC 3.6.

The panel concluded that Kline's comments on the nationally televised show, "The O'Reilly Factor," a few days before the general election in November 2006 violated KRPC 3.8(f) (2012 Kan. Ct. R. Annot. 602) because they "had a substantial likelihood of heightening public condemnation of Dr. Tiller" and served no legitimate law enforcement purpose. Kline disputes both that the panel can rely on KRPC 3.8(f) and that the record contains clear and convincing evidence to support this violation. Alternatively, he contends he did not violate the applicable rule, KRPC 3.6 (2006 Kan. Ct. R. Annot. 479), because his actions fell within the rule's two "safe harbors."

### Additional Relevant Facts

Four days before the November 2006 election in which he was a candidate for re-election as Attorney General, Kline appeared by remote interview on "The O'Reilly Factor." The program's host, Bill O'Reilly, opened the program with a monologue questioning Tiller's morality. O'Reilly referred to Tiller's "barbaric [medical] practice" and characterized Tiller's actions as an "abortion mill." Following his monologue, O'Reilly engaged in a heated discussion

with a pro-choice advocate. He then conducted a remote interview with Kline, who was in Topeka.

Highly summarized, during the exchange, Kline, who O'Reilly introduced as the Kansas Attorney General seeking to "rectify the [Tiller] situation," discussed that the reason for mandatory reporting laws was uncovering child rape. Specifically, Kline stated, "One of the first steps of a rapist when they have a child victim and the child is pregnant is to eradicate evidence of the rape. And that means stopping in at an abortion clinic." After O'Reilly proffered that Tiller performed abortions based on patients' diagnosis of depression, Kline verified his office's investigation revealed WHCS had performed some late-term abortions based on patients' mental health rather than physical health. At that point in the interview, Kline reiterated, "[I]t's important for your listeners to know that women were never under investigation. Their identity [was] never sought." He then discussed an instance in which he claimed a Wichita man convicted of rape took his child victim to a clinic for an abortion.

O'Reilly closed the interview by asking Kline, "[L]ook, man-to-man, American-to-American, is this just far left craziness gone wild?" To which, Kline replied:

"Yeah. There's a deception being perpetrated in Kansas and on America. And that is, that we cannot recognize any value at any time in an unborn child. And, therefore, we have to cover up that deception by not admitting at any time that there ought to be any scrutiny for what is happening inside abortion clinics. And as a result, they can be safe havens for child rapists."

Kline further responded, "As a result, illegal late-term abortions can be performed and nobody has the right to look inside the clinic. That is wrong." Finally, Kline reiterated that his job was to enforce the law.

*In Finding a Violation, the Panel Relied on a Rule Not in Effect When Kline Appeared on "The O'Reilly Factor."*

In considering the Disciplinary Administrator's allegations regarding Kline's interview with O'Reilly, the panel relied on KRPC 3.8(f) to conclude Kline's actions "had a substantial likelihood of heightening public condemnation of Dr. Tiller" and served no le-

gitimate law enforcement purpose. On its face, KRPC 3.8(f) would seem to apply. That rule pertains to the "Special Responsibilities of a Prosecutor" and limits public statements of prosecutors. See KRPC 3.8(f) (2012 Kan. Ct. R. Annot. 602-603 ("The prosecutor in a criminal case shall . . . except for statements . . . that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused."). And at the time of the interview, Kline continued to criminally investigate Tiller.

But KRPC 3.8(f) was not effective until July 1, 2007, 8 months after Kline appeared on "The O'Reilly Factor" (O'Reilly). Compare KRPC 3.8 (2012 Kan. Ct. R. Annot. 602); with KRPC 3.8 (2006 Kan. Ct. R. Annot. 482). Further, the pre-2007 version of KRPC 3.8 contained no similar prohibition on prosecutorial statements heightening public condemnation of the accused. See KRPC 3.8 (2006 Kan. Ct. R. Annot. 482). Thus, as the Disciplinary Administrator conceded at oral argument, the panel's findings of a KRPC 3.8(f) violation cannot stand.

*The Panel's Findings Are Insufficient to Enable This Court to Find a Violation of KRPC 3.6.*

Alternatively, the Disciplinary Administrator points out that he also alleged Kline's appearance on O'Reilly violated KRPC 3.6, which regulates trial publicity. The version of KRPC 3.6 in effect when Kline appeared on O'Reilly provided: "A lawyer shall not make an extrajudicial statement . . . if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding." KRPC 3.6(a) (2006 Kan. Ct. R. Annot. 479).

Although no criminal charges had been filed against Tiller when Kline appeared on O'Reilly, the Disciplinary Administrator contends this court can find clear and convincing evidence that Kline knew or reasonably should have known his statements had a substantial likelihood of prejudicing a future adjudicative proceeding—*i.e.*, a criminal trial against Tiller. Kline disputes the Disciplinary Administrator's suggestion, arguing there is no evidence Kline knew his statements had a chance of prejudicing an adjudi-

cative proceeding; alternatively, he contends his statements fell within two "safe harbors" to KRPC 3.6 that permit a lawyer to "state without elaboration: (1) the general nature of the claim or defense; [or] (2) the information contained in a public record." KRPC 3.6(c) (2006 Kan. Ct. R. Annot. 480).

But we need not consider application of the safe harbors because we are unable to determine from the panel's report whether it considered KRPC 3.6 and found a lack of clear and convincing evidence or whether it simply declined to consider KRPC 3.6, opting instead to apply the not-as-yet effective amended KRPC 3.8(f), which specifically applies to prosecutors.

Significantly, while the Disciplinary Administrator charged a KRPC 3.6 violation, we note the Disciplinary Administrator's investigators concluded Kline's appearance on O'Reilly did not violate the Rules of Professional Conduct. And while the Disciplinary Administrator discussed KRPC 3.6 at the hearing and asserted in closing argument that Kline violated that rule, the Disciplinary Administrator also advocated for a violation of KRPC 3.8(f), which required entirely different findings by the panel.

This lack of findings is problematic. To determine whether Kline's conduct violated KRPC 3.6, we would be required to resolve unanswered factual questions, including whether there is evidence that (1) Kline's comments on O'Reilly had a substantial likelihood of materially prejudicing an adjudicative proceeding and (2) whether Kline knew or should have known of the impact of his comments.

In addition to resolving these factual questions, to apply KRPC 3.6, we would also need to consider whether Kline's statements on O'Reilly should be considered in isolation or in the context of the entire program. While the parties adopt contrary positions as to whether O'Reilly's inflammatory monologue can be attributed to Kline under KRPC 3.6, neither party cites authority for their respective positions. We are unwilling to engage the issue further on this record.

Finally, even if this court were willing to resolve these factual and legal questions to find a violation of KRPC 3.6, we would then have to consider Kline's argument that his statements fall under

the two safe harbors. Again, these determinations would require factual findings regarding whether Kline stated "without elaboration" the "general nature of the claim or defense" or whether the "information [was] contained in a public record." KRPC 3.6(c)(1)-(2) (2006 Kan. Ct. R. Annot. 480).

To summarize, while Kline's appearance on O'Reilly might well invite questions regarding the scope and prohibitions of KRPC 3.8(f), he cannot be held responsible for his conduct under a rule that did not exist at the time of that conduct. And while appearances like Kline's on O'Reilly certainly can implicate an attorney's responsibilities under KRPC 3.6, we have not been presented with a sufficient record to make the multiple findings necessary to consider whether Kline's conduct violated that rule.

THE PANEL'S CONCLUSION THAT KLINE VIOLATED KRPC 3.3 BY FAILING TO CORRECT A FALSE STATEMENT IN A STATUS REPORT IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

The panel concluded Kline had personal knowledge that his office filed a status and disposition report with Judge Anderson identifying the location of the copies of all medical files obtained by Kline's office when he was Attorney General. Therefore, the panel found Kline violated KRPC 3.3(a)(1) (2012 Kan. Ct. R. Annot. 582) when he failed to update the report after he ordered copies of the WHCS medical records be taken to Johnson County, a fact not contained in the report. And by failing to update the report, the panel found the report contained false information, which Kline failed to correct in violation of KRPC 3.3(a)(1)'s prohibition on "fail[ing] to correct a false statement of material fact or law previously made to the tribunal." Additionally, the panel found Maxwell violated KRPC 3.3(a)(1) by failing to correct the report and, as Maxwell's direct supervisor, Kline was responsible for Maxwell's violation under KRPC 5.1(c).

*Additional Relevant Facts*

On January 8, 2007, the day Morrison was sworn in to statewide office and Kline was sworn in as Johnson County District Attorney, Williams and Reed delivered a status report to Judge Anderson.

That report, which Judge Anderson requested to ensure that all copies of the medical files were accounted for, indicated WHCS records would be delivered to the Shawnee County District Attorney for potential prosecution. By implication, the report informed Judge Anderson that Kline would not retain a copy of the WHCS medical records when Kline moved to his new position in Johnson County.

But later that same day, after the report had been delivered to Judge Anderson, Kline ordered Rucker to have Williams and Reed copy the WHCS medical files and take those copies to the Johnson County District Attorney's office. This request frustrated Williams because the transition plan did not include taking a copy of the WHCS records to Johnson County. Additionally, Williams asked Rucker who authorized copying the records, and Rucker assured him Kline, as Attorney General, had authorized the copying.

This late request forced Williams and Reed, who had already delivered a copy of the WHCS records to the Shawnee County District Attorney, to retrieve those records, take them to a local copy shop, personally copy each record, and then return the initial copies to the Shawnee County District Attorney's office. Williams directed Reed to retain the new copies of the WHCS medical records at Reed's apartment until he was instructed to deliver them to the District Attorney's office.

In spite of this late change of plans, Kline's office did not update the status report given to Judge Anderson. Nor did Kline's office update the status report to show that due to turmoil in the transition and security concerns, these copies of WHCS patient files were being kept in Reed's apartment in a plastic container from January to mid-February 2007, when Reed delivered them to Kline's Johnson County office.

Judge Anderson testified he relied on the status report and sent a letter and copy of it to then Attorney General Morrison. After receiving Judge Anderson's letter and the status report, a member of Morrison's staff, Chief Counsel Richard Guinn, sent written correspondence to Kline asking him to return all records related to the abortion clinic investigation. Kline quickly replied by letter that "[a]ll of the documents were accounted for during my tenure as

Attorney General" and that "[a] report was filed with the Court reflecting [the] same." Kline indicated any additional questions should be directed to Maxwell.

Kline continued to investigate CHPP and WHCS in his new role as Johnson County District Attorney. On April 9, 2007, as a part of that effort, Kline met with Judge Anderson to request a subpoena in the Shawnee County inquisition to allow Kline to obtain additional records. During this meeting, Kline showed Judge Anderson a copy of a WHCS patient file and indicated he believed some WHCS patient files contained evidence of a criminal conspiracy between CHPP and WHCS to commit illegal late-term abortions. Judge Anderson, who was "pretty sure" the status report had not indicated the "Tiller records were going to Kansas City," testified he asked Kline where he obtained the WHCS file. Kline indicated his staff members had taken copies to Johnson County and Kline " 'thought [Anderson] knew' or something of that nature."

After confirming the status report did not indicate Kline retained copies of WHCS patient files, Judge Anderson telephoned Maxwell the next day, April 10, 2007, and advised him the court would order the WHCS records returned. Later that same day, Kline telephoned Judge Anderson and advocated that he be permitted to retain the WHCS patient files. Judge Anderson set a hearing on the matter for the following day in order to permit Kline to "make [his] position known" but indicated the court intended to issue a written order requiring Kline to return the files.

The panel concluded that Kline and Maxwell violated KRPC 3.3(a)(1), which governs "Candor toward the Tribunal," by failing to correct the status report provided to Judge Anderson. The panel also held Kline responsible for Maxwell's violation under KRPC 5.1(c).

*The Record Does Not Contain Clear and Convincing Evidence That Kline Had Actual Knowledge of the Falsity of Statements in the Status Report.*

In arguing the panel's findings regarding this violation of KRPC 3.3 are not supported by clear and convincing evidence, Kline re-

iterates his argument that KRPC 3.3 requires proof of actual knowledge of the statement's falsity. He contends the evidence does not clearly and convincingly show he had actual knowledge of the status report's omissions regarding the location of the WHCS files. As Kline argues, if he was unaware the report contained a false statement, he cannot be obligated to correct it. We agree.

Instead, as with the panel's findings regarding Kline's testimony about whether his office sought adult patient identities, it appears the panel relied upon evidence that indicates, at best, that Kline should have known the report contained false information regarding the location of the WHCS records. Specifically, the panel's findings can be summarized as follows: (1) Maxwell, with Williams and Reed's assistance, prepared the status report requested by Judge Anderson; (2) the status report did not indicate a copy of redacted WHCS records would be transferred to Johnson County; (3) shortly after Williams and Reed delivered the status report to Judge Anderson, Kline directed Rucker to have copies of the redacted WHCS patient files taken to Johnson County; (4) Rucker then instructed Williams and Reed to retrieve the WHCS records, which had already been delivered to the Shawnee County District Attorney's office, and make copies of them for delivery to Johnson County; and (5) Williams and Reed retrieved the records, made copies, and delivered them to Reed's apartment in Topeka.

Significantly, while the panel clearly found Maxwell prepared, and thus had actual knowledge of, the status report's contents, the panel made no findings regarding whether Kline actually knew the report's contents. Instead, the only finding regarding Kline's knowledge of the report noted Judge King specifically found as part of the mandamus proceedings that Kline was not familiar with the " 'content of the Status and Disposition Report,' " nor was Kline aware that Judge Anderson had requested an accounting of the location of the files. Nevertheless, the panel minimized Judge King's findings, noting Judge King "must not have realized the significance" of Kline's statement in a letter to Morrison's newly appointed Chief Counsel, Rick Guinn, that a " '[status] report was filed with the Court.' " But as Kline points out, his letter to Guinn establishes only that Kline had knowledge a report was prepared

by Maxwell and provided to the court, *not* that Kline had actual knowledge about the report's *specific content* or its falsity.

In his response brief, the Disciplinary Administrator fails to address Kline's argument that KRPC 3.3 requires clear and convincing evidence that Kline had "actual knowledge" of the falsities contained in the report. Instead, the Disciplinary Administrator simply reiterates the panel's finding that within 4 days of the status report's issuance, Kline "was familiar with the status and disposition report," because he referred to it in written correspondence to Guinn.

We reiterate that if the panel had been tasked with determining whether Kline "should have known" of the report's contents prepared by Maxwell, the result of our review might be different. Instead, because KRPC 3.3 requires actual knowledge of the statement's falsity, we conclude the panel's findings are not supported by clear and convincing evidence.

In light of this conclusion, we need not consider Kline's additional argument that even if he had actual knowledge of the statement's falsity, he had no obligation to correct it because it was not material. Similarly, we need not consider Kline's reply brief argument that the panel applied a version of KRPC 3.3 that was not in effect at the time the conduct at issue occurred. While it does appear the panel applied the version of KRPC 3.3 that became effective on July 1, 2007, nearly 3 months after Kline surrendered the WHCS records, the current rule, like the prior rule, requires proof Kline had actual knowledge of the report's falsity. Thus, under either the current rule or the former rule, we would lack clear and convincing evidence of Kline's actual knowledge of the statement's falsity.

*The Panel's Finding That Kline Violated KRPC 5.1 Due to His Subordinate's Failing to Correct the Report Is Not Supported by Clear and Convincing Evidence.*

The panel also found Maxwell violated KRPC 3.3(a)(1) by failing to correct the report and that as Maxwell's direct supervisor, Kline was responsible for Maxwell's violation under KRPC 5.1(c)(2).

But KRPC 5.1(c)(2) (2012 Kan. Ct. R. Annot. 612) holds a supervising lawyer responsible for another lawyer's conduct only if the lawyer "knows of the conduct at a time when its consequences can be avoided." As discussed above, while there may well have been clear and convincing evidence that Maxwell knew of the falsity in the report, there is no clear and convincing evidence Kline knew of the misstatements at a time when the consequences could be avoided. Therefore, we cannot uphold the panel's finding that Kline violated KRPC 5.1(c)(2).

### The Panel's Conclusion That Kline Violated KRPC 3.3(a)(3) by Failing to Correct His False Testimony to Judge King That He Had Three Summaries of WHCS Patient Medical Files Is Supported by Clear and Convincing Evidence, as Is the Panel's Finding That Kline Violated KRPC 8.4(c) by Advising the Court in Oral Argument That He Had No Summaries.

The panel found Kline's testimony on the same subject on two different occasions formed the basis for multiple rule violations. All stemmed from Kline's attempt to retain information from WHCS patient files, in spite of Judge Anderson advising Kline during a telephone call on April 10, 2007, that Kline would likely be ordered to return these patient files. But unbeknown to Judge Anderson, Kline then directed a staff member to make handwritten "summaries" of all 62 WHCS patient files. And at a hearing on April 11, 2007, Kline was ordered to return the files to Judge Anderson. Seven months later, in November 2007, while Kline still had those 62 summaries, he testified under oath before Judge King that he had only 3 summaries.

The panel concluded Kline's testimony violated KRPC 3.3(a)(3), which prohibits offering false evidence and failing to take remedial measures if a lawyer comes to know false material evidence was presented, and KRPC 3.3(a)(1), which prohibits, in part, making false statements.

The other violations found by the panel relate to Kline's testimony during oral argument before the *CHPP* court on June 12, 2008. During that argument, Kline advised that he possessed no

summaries of patient files, when in fact he still had the same 62 summaries he had directed his staff to create in April 2007. The panel concluded this statement violated KRPC 8.4(c) (2012 Kan. Ct. R. Annot. 643), which prohibits dishonesty.

*Additional Relevant Facts*

An understanding of the significance of Kline's actions with respect to these violations requires the recitation of a detailed factual history spanning approximately 18 months.

As discussed above, on the day he left statewide office Kline directed his staff to copy the WHCS patient files and take them to the Johnson County District Attorney's office. But Kline's office had already provided Judge Anderson with a status report that same day that did not indicate any WHCS files would go to his new office in Johnson County. When Judge Anderson eventually discovered on April 9, 2007, that Kline had transferred WHCS patient files to Johnson County, he ordered all copies returned to his court at a hearing on April 11, 2007. Judge Anderson testified at Kline's disciplinary hearing that Kline was "really upset" about returning these medical records to the court and that Kline ardently advocated he had a right to maintain possession of them as Johnson County District Attorney.

While Kline brought the WHCS patient medical files to the hearing, he did not tell Judge Anderson he had directed a staff member to prepare handwritten "summaries" of all 62 WHCS patient files in the 24-hour period preceding the hearing or that he had retained the information contained in those files.

Notably, although described by Kline as "summaries," the information prepared by Kline's staff is more accurately characterized as a handwritten transcript of large portions of the contents of the WHCS files. Each summary states nearly all of the substantive information included in the corresponding WHCS patient files, including: the patient's age, address, current medications, and medical history; the patient's corresponding KDHE number; the name of the referring physician, if any; and Dr. Tiller's diagnosis. We have continued to use the term "summaries" to refer to these documents because they have been referred to in that manner

throughout the disciplinary process; but we do so reluctantly and only for ease of reference.

Kline, Rucker, Maxwell, Williams, Reed, and another attorney from Kline's office all appeared at the April 11, 2007, hearing ordered by Judge Anderson, as did members of Morrison's staff. Kline advised Judge Anderson that he had brought with him *"[a]ll the records that [Judge Anderson] requested be returned."* (Emphasis added.) In doing so, Kline suggested that Judge Anderson had granted authority for him to take the files to Johnson County and commented that Judge Anderson's "forgetfulness" had resulted in the misunderstanding. Kline indicated, however, that he understood this forgetfulness, "considering the circumstances which we were under at the time."

Unmoved, Judge Anderson reiterated that he had ordered Kline to return all copies of the WHCS files and that he had not been informed that the files would be taken to Johnson County. At one point, Judge Anderson clarified, "But, the point is clear now, those records are on the table and those are the records that—*all of the records* that are subject to this present dispute; is that right?" (Emphasis added.)

Kline reiterated that he had brought *"all copies"* with him to the hearing and that his staff had even had "sufficient time to remove work product notes and tabs from the record." Kline further informed Judge Anderson that no "scan[s]" had been taken of the records and that he had even returned the office's "working cop[ies]." But despite this specificity about the documents returned, Kline avoided mentioning the 62 handwritten summaries prepared at his direction on the eve of the hearing.

At his disciplinary hearing, Kline testified he used the information in the summaries to request three particular WHCS patient medical files from Morrison. Kline said he believed those files might provide evidence of a conspiracy between WHCS and CHPP to commit criminal late-term abortions. But while Kline's May 25, 2007, letter to Morrison refers generally to three files, it does not appear to indicate the number, nature, or circumstances of creation of the 62 summaries.

In a letter to Kline, dated June 1, 2007, Morrison's staff denied Kline's request. According to Kline, when Morrison denied the request, Kline considered his conspiracy investigation "dead." Kline testified that at some point between Morrison's denial and Kline's testimony before Judge King in late 2007, Kline simply forgot he had the 62 handwritten summaries.

In the meantime, CHPP filed a mandamus action before the Kansas Supreme Court seeking to compel Kline to return CHPP's medical records and provide an accounting of the records taken to the Johnson County District Attorney's office by Kline. CHPP also sought issuance of a show cause order asking why Kline should not be held in contempt for failing to comply with *Alpha*. *CHPP*, 287 Kan. at 386.

On October 24, 2007, the court appointed Judge King to resolve factual disputes and, as previously discussed, issued 17 specific questions. *CHPP*, 287 Kan. at 388. Significantly, these 17 questions, which Judge King directed the parties to answer, addressed the handling of both CHPP and WHCS records. See *CHPP*, 287 Kan. at 389-95.

In his written response, dated November 13, 2007, to Question 9, which asked Kline to describe "[e]xactly what inquisition records and/or documents, other than WHCS and/or CHPP records, were transferred by" Kline as Attorney General to Kline in his capacity as District Attorney, Kline provided the following response:

"I have no knowledge of any 'inquisition records and/or documents' that have been transferred by me in my position as Attorney General to myself in my position as District Attorney. I do have information and belief that electronic copies and drafts of pleadings and legal research compiled by Assistant Attorney General Stephen Maxwell (category 4, above) were transferred by Mr. Maxwell to his new office at the Johnson County District Attorney during transition. However, it is my information and belief that these did not include attorney notes and summaries, *as I am not aware of any summaries of the files, etc. that were transferred and as District Attorney have had to ask staff to recreate such summaries.* I have made requests to Attorney General Morrison for assistance in this regard, however, such assistance has been not forthcoming." (Emphasis added.)

Kline's written responses to this and the remaining 16 questions do not specifically mention the 62 summaries created only 7 months earlier under the last minute and hurried circumstances

following the phone conversation between Kline and Judge Anderson, nor do they provide any information to alert Judge King to the circumstances in which the summaries were created.

At the November 20, 2007, hearing conducted by Judge King, CHPP's counsel appears to refer to Kline's reference to "summaries" in questioning Kline:

"Q. [CHPP'S COUNSEL] Are there any summaries of Doctor Tiller's records left in Johnson County?

"A. [KLINE] *I have a summary of three records that pertain to a theory of criminal liability that would have jurisdiction in Johnson County against Doctor Tiller. I have mentioned that to the Office of the Attorney General through correspondence to the Attorney General's Office requesting copies of the actual records relating to those three abortions. The Attorney General has refused to provide those records.*

"Q. [CHPP'S COUNSEL] What is the—the nature of those summaries that you have regarding Doctor Tiller's records?

"A. [KLINE] Your Honor, we're getting into an area of executive privilege in which I'm engaged in a criminal investigation that involves this counsel's clients, as well as Doctor Tiller.

"THE COURT: This is a matter since it does not involve your [CHPP's] records, although it is—that I'm going to—so I'm clear about what I'm saying, I'm just going to start over. This is a matter that does not involve records of your client. It is a matter that the Supreme Court is interested in some answers to. I'm going to ask that you leave this to me to inquire into on this particular subject." (Emphasis added.)

During his disciplinary hearing, Kline explained his inaccurate testimony to Judge King: "It's one of two explanations. I can't remember my mind-set in this, when I get asked this question. I'm either saying I've got three that I'm evoking an executive privilege on [*sic*] aware of the others or I had forgotten about the others. I can't tell you which it is." Kline further explained he was "stunned" to be asked about the WHCS records because he believed Judge King's hearing concerned only CHPP records.

In any event, Judge King testified at Kline's disciplinary hearing that after Kline's statement regarding the summaries, Judge King conducted an *in camera* discussion with Kline about those summaries and his claim of executive privilege. Although Judge King could not recall the details of that discussion, he testified the purpose was to determine whether he would allow questions about

the contents of the summaries. Judge King's written report to the court contained no mention of any summaries.

Due to CHPP's request for Kline to be held in contempt, on May 2, 2008, the *CHPP* court ordered Kline to personally appear at oral argument on June 12, 2008. See *CHPP*, 287 Kan. at 401. From the court's 17 questions propounded to Judge King, Judge King's report, and the record of the proceedings before Judge King, it is clear the *CHPP* court was interested in Kline's transfer of WHCS patient medical file records from the Attorney General's office to the Johnson County District Attorney's office. See 287 Kan. at 405-06 (discussing Kline's "last-minute removal" of records during the transition and Kline's failure to correct the status report given to Judge Anderson).

During oral argument, the transcript shows the following exchange occurred between Kline and the court:

"[JUSTICE BEIER:] The record makes reference to the *summaries that were retained by your office—well actually recreated and then retained by your office,* Mr. Kline, have you ever told, or any of your subordinates, told Judge Anderson that those summaries were retained?

"KLINE: I'm not familiar as to what you're referencing, Justice Beier.

"JUSTICE BEIER: I'm referring to summaries that you swore to in your responses?

"KLINE: Again, Justice Beier, I have not seen those responses for several months.

"JUSTICE [BEIER]: *So you don't know whether you have summaries of certain records from the Wichita Clinic?*

"KLINE: *I don't believe that I do. I have sought the records from the Office of Attorney General and been refused.*" (Emphasis added.)

Kline then changed the subject, offering a lengthy explanation as to the role played by Judge Anderson in maintaining custody of the patient files, the redacting of the patient files, and Kline's office's maintenance of a working copy of the redacted file.

Significantly, although not cited by either party, the transcript of the hearing before the *CHPP* court demonstrates further attempts by the court to ascertain the nature of the summaries referenced in the proceedings before Judge King:

"JUSTICE BEIER: *I think the handling of the [WHCS] records is at issue before this Court.*

"[KLINE'S COUNSEL]: I agree, Justice, the handling certainly is.

"JUSTICE BEIER: That's exactly what we're here for today.

"[KLINE'S COUNSEL]: The—what happened—and Your Honor I believe is referring to the Tiller records. And simply put, what happened with the Tiller records—

"JUSTICE BEIER: Which [Kline] was not authorized to take to Johnson County. Correct?

"[KLINE'S COUNSEL]: Was not authorized by Judge Anderson, correct.

"JUSTICE BEIER: And which he was in fact ordered to return as soon as Judge Anderson learned he had taken them. Correct?

"[KLINE'S COUNSEL]: That's correct. And Judge Anderson learned that he took—

"JUSTICE BEIER: And he assured Judge Anderson, he or his subordinates, that he had not kept copies of those records. Correct?

"[KLINE'S COUNSEL]: That is correct.

"JUSTICE BEIER: And yet [Kline] had kept summaries of some of those records, had he not, and he continues to maintain those summaries?"

"[KLINE'S COUNSEL]: Your Honor, I don't know what the record reflects with regard to summaries. I'm not aware of specific summaries."

"JUSTICE BEIER: We'll just rely on the record then, [Counselor]? We'll just rely on the record, what it tells us?" (Emphasis added.)

Later in the argument, the court again expressed uncertainty, while questioning counsel for the intervenor Attorney General Six, as to what the "summaries" were, and the court attempted to clarify whether those summaries were "work product" that remained at the Attorney General's office. It appears this questioning was generated by Kline's written response to Judge King indicating Kline had not taken any summaries to Johnson County and that his staff had to "re-create" them, implying the summaries remained at the Attorney General's office.

"JUSTICE BEIER: *I'm still a little unclear about what's been referred to as summaries.* The copies that were left with Judge Anderson, were those of medical records and the KDHE records only?

"[COUNSEL FOR ATTORNEY GENERAL]: 'Um—

"JUSTICE BEIER: Was there any work product left with Judge Anderson, work product of the Attorney General's Office?

"[COUNSEL FOR ATTORNEY GENERAL]: I don't know the full extent of what the work product left, but I don't believe there was any.

"JUSTICE BEIER: Was there any of that left in the Attorney General's Office?

"[COUNSEL FOR ATTORNEY GENERAL]: The only work product that we—that we had in the Office when we got there was the stuff—what was ma-

terials that had been shipped or been picked up from Mr. McKinney, the special prosecutor who had been engaged in Sedgwick County." (Emphasis added.)

In late 2008, and before the *CHPP* court had issued an opinion, Tiller's attorney issued a subpoena to Kline in the Sedgwick County case, *State v. Tiller*. Kline's assistant found the 62 summaries in Kline's Johnson County office case file while preparing the subpoena response. Kline testified this discovery surprised him and that he called Judge Anderson on November 10, 2008, to inform him of the existence of these summaries. But there is no evidence Kline discussed with Judge Anderson the quantity or nature of the summaries, nor did he indicate the circumstances in which the summaries were created. Further Kline did not seek to correct his statements to Judge King or the *CHPP* court regarding these summaries.

In its December 5, 2008 opinion, the *CHPP* court noted Kline had "admitted more than once" that his staff members "created *summaries of at least three WHCS patient records* and have kept and employed those summaries in their activities in Johnson County." (Emphasis added.) 287 Kan. at 385. Significantly, the court also noted Kline did not admit he had any summaries in response to direct questioning by the court. 287 Kan. at 385. The court referred critically to Kline's office's "creation and use of summaries of WHCS records." 287 Kan. at 406. Finally, the court generally referred to the summaries in concluding that while it accepted Judge King's conclusion that Kline did not deceive Judge Anderson in failing to advise him in the status report of the transfer of the WHCS records to Johnson County, "the same cannot be said about Maxwell's, and thus Kline's, subsequent failure to set the record straight." 287 Kan. at 421. The court noted:

"Once Judge Anderson discovered that Kline had possession of the WHCS records, he demanded that the records be returned and questioned whether copies had been kept. He was told no. Yet Kline's sworn responses to the 17 fact questions reveal that Kline and his subordinates failed to disclose to [Judge] Anderson that certain summaries of the WHCS records had been created and maintained." 287 Kan. at 421-22.

The *CHPP* court's opinion left no doubt as to the scope of its order, demanding that Kline turn over on or before December 12, 2008,

"a full and complete and understandable set of any and all materials gathered or generated by Kline and/or his subordinates in their abortion-related investigation and/or prosecution since Kline was sworn in as Johnson County District Attorney. Neither Kline nor any of his subordinates or lawyers may make any exceptions whatsoever for any reason or on any rationale to the foregoing order. 'Full, complete, and understandable' means exactly what it says." 287 Kan. at 423.

Kline eventually admitted at a January 2009 hearing before Judge Owens on Dr. Tiller's motion to dismiss in *State v. Tiller* that when he told Judge King he had 3 summaries, he actually had 62.

### The Parties' Arguments

In challenging the hearing panel's findings regarding the summaries, Kline does not suggest that either his testimony regarding the summaries before Judge King or his statements regarding the summaries to the *CHPP* court were truthful. Instead, he posits what he contends are plausible explanations for these misstatements and contends that based on this plausibility, he did not *knowingly* make these false statements; therefore, Kline contends he could not have violated KRPC 3.3 or KRPC 8.4.

Specifically, as to his testimony to Judge King, Kline argues he did not knowingly make a false statement because after he testified he had three summaries, he invoked executive privilege. He also asserts his failure to correct his statement to Judge King was not material and did not violate KRPC 3.3 because his "right to have one, two, or all the summaries" has never been in question and because Kline was not ordered to "disgorge" the summaries as the Attorney General requested in *CHPP*.

As to his statement to the court in *CHPP* during oral argument, Kline contends it was not knowingly false because he had not prepared for the argument because he had not expected to be required to answer questions. Further, he points out he never advised the *CHPP* court that he did not have any summaries; rather, he said, "I don't believe that I do have" any summaries. Finally, he appears to make a "no harm, no foul" argument, asserting his responses to the 17 questions disclosed the summaries, the *CHPP* court assumed he had summaries, and the court's opinion "showed it was obviously under no misapprehension."

In urging us to find clear and convincing evidence supports the rule violations found by the panel regarding Kline's testimony to Judge King, the Disciplinary Administrator primarily relies upon the significance of Kline's initial directive to his staff to prepare the summaries in contradiction of Judge Anderson's order to immediately return all WHCS patient files and records to the court. The Disciplinary Administrator contends that in light of the hurried circumstances in which the summaries were created, the panel correctly chose not to believe Kline's testimony that he forgot about them. Further, the Disciplinary Administrator points out that although Kline subsequently learned of his misstatement to Judge King, Kline never attempted to correct his false testimony.

The Disciplinary Administrator makes a similar argument regarding Kline's proffered reasons for his misstatement to the court in *CHPP*. Namely, that in light of the highly unusual circumstances in which the summaries were created and the court's focus on Kline's handling of confidential patient medical files, it is simply not credible that Kline "forgot" he had any summaries when questioned.

Further, the Disciplinary Administrator argues that in light of the court's questioning regarding the summaries and Kline's professed uncertainty regarding their existence, it is "inconceivable" that Kline would not have verified his statement following oral argument and filed a motion to correct or clarify his statement if necessary. The Disciplinary Administrator points out Kline clearly knew how to correct a perceived misstatement from an oral argument, as he had done so in connection with Rucker's argument in *Alpha*. See discussion at 298 Kan. at 149-54.

*Clear and Convincing Evidence Supports the Panel's Finding That Kline's Failure to Correct His Testimony to Judge King Violated KRPC 3.3(a)(3).*

The panel concluded Kline's testimony to Judge King violated three provisions of KRPC 3.3. First, the panel found Kline made a false statement in violation of KRPC 3.3(a)(1) (2012 Kan. Ct. R. Annot. 582) which provides: "A lawyer shall not knowingly: (1) make a false statement of fact or law . . . ." Next, the panel found

Kline violated KRPC 3.3(a)(3) (2012 Kan. Ct. R. Annot. 582-83), which restricts a lawyer from, "knowingly . . . offer[ing] evidence that the lawyer knows to be false." Finally, by not correcting the false testimony, the panel found Kline violated an additional clause in KRPC 3.3(a)(3) (2012 Kan. Ct. R. Annot. 583): "If a lawyer . . . offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures . . . ."

In his brief, Kline does not specifically address the KRPC 3.3(a)(3) violation for failing to correct his testimony, except to suggest his testimony before Judge King was neither material nor knowingly false. But KRPC 3.3(a)(3) does not require that Kline make a knowingly false statement. Instead, it requires that Kline take remedial measures if he offers material evidence and *comes to know* of its falsity. And as noted, Kline does not contest that he came to know his testimony was false, and the record establishes that at a minimum, he clearly came to know his testimony was false by November 2008 when his assistant located the 62 summaries in his Johnson County office.

Even if Kline's initial false testimony can be excused because he failed to give his full recollection or forgot about 59 patient medical summaries, Kline clearly knew he possessed 62 summaries in November 2008. And by that time, Kline had testified before Judge King in connection with the *CHPP* mandamus action that he had three summaries of WHCS files. Significantly, at that point the *CHPP* court had not yet issued its opinion. Thus, when Kline *came to learn* of the falsity of his testimony, KRPC 3.3(a)(3) required him to correct his statement with Judge King, but he did not.

*Kline's testimony to Judge King was material.*

Kline repeatedly claims his testimony before Judge King was immaterial and therefore he was not required to correct it. In support, he points out that because the mandamus action was brought by CHPP, rather than WHCS, his testimony regarding WHCS records was unimportant. Further, he contends that because the *CHPP* court knew he had three summaries, and his right to the summaries "has never been in question," the fact that he main-

tained an additional 59 summaries and the circumstances of their creation was unimportant.

But, as discussed below, our review of the transcript of the *CHPP* oral argument, as well as the *CHPP* court's opinion issued in December 2008, leaves no doubt as to the materiality of Kline's testimony and responses.

*The WHCS summaries were at issue.*

Kline takes issue with the panel's finding that a "material fact" in the *CHPP* proceeding was whether Kline retained any materials in the Johnson County District Attorney's office. Kline argues "this general question was raised not by the Tiller Clinic, but by Kline's successor as Attorney General in an effort to disgorge them."

Implicitly, Kline suggests his testimony before Judge King was immaterial because CHPP—not WHCS—was the petitioner in the mandamus action and because the Attorney General, and not WHCS, sought to require Kline to turn over the records he continued to possess. We find this suggestion wholly unconvincing. The *CHPP* court directed answers to fact questions regarding whether Kline had any materials from *either* clinic in his possession in Johnson County and, if so, how those documents came to be in his possession. Kline's testimony before Judge King directly concerned the court's inquiries in the *CHPP* mandamus action. Simply stated, what Kline said to Judge King mattered to the *CHPP* court.

Further, in arguing the WHCS records were not important to the *CHPP* court, Kline overlooks the key questions at issue. CHPP brought the mandamus action, in part, to ensure compliance with *Alpha. CHPP*, 287 Kan. at 386. The court's questions were focused on the nature of information Kline possessed from *both* clinics. And, critically, at oral argument in *CHPP*, the intervenor Attorney General Six specifically asked that any summaries of WHCS patient files be returned. See 287 Kan. at 404 ("These items include, as asserted at oral argument, any summaries Kline or his subordinates have created of WHCS patient records.").

Finally, Kline's current argument as to the immateriality of WHCS records is particularly curious in light of his attorney's candid responses during the *CHPP* oral argument and his agreement

that the handling of the WHCS records was "certainly" at issue. Moreover, in light of the court's comment following this concession that the handling of the WHCS records is *exactly* what we're here for today," we have no hesitation in rejecting Kline's current rationalization that his handling of the WHCS records was not at issue in the *CHPP* proceeding. (Emphasis added.) Kline's "handling" of the WHCS records would necessarily include his direction to staff to hurriedly prepare handwritten summaries of the records on the eve of the April 11, 2007, hearing with Judge Anderson and Kline's retention of those summaries afterwards.

*The* CHPP *court was not aware of the full nature and existence of the summaries.*

Kline further suggests his statement to Judge King that he had three summaries was immaterial because the *CHPP* court was aware of the summaries, as evidenced by the comments in the *CHPP* opinion.

But the oral argument transcript and the *CHPP* court's opinion make quite clear the court was not at all aware when it issued its opinion in December 2008 of the significance of 3 summaries Kline admitted to Judge King that he possessed, much less the existence of 59 other summaries, each containing almost all of the substantive confidential information from the WHCS patient medical files. Instead, the record reflects the court was struggling to grasp the number, nature, and scope of the summaries when at the close of the argument, Justice Beier indicated she was still *"unclear about what's been referred to as summaries."* (Emphasis added.)

Not surprisingly, this confusion remained even as the court questioned Kline, his counsel, and the Attorney General's counsel about these summaries. Kline told the court he did not believe he had any summaries, while Kline's counsel responded that he did not know what the record reflected regarding the summaries, and he was not aware of any "specific summaries." The Attorney General's office, which at that point had not received the summaries, accurately advised the court there was no work product, or "summaries," in the materials Kline's office returned to Judge Anderson.

Thus, in reciting the lengthy factual and procedural history of the case in its *CHPP* opinion, the court noted only the limited information it knew for certain from Kline's written responses to and testimony before Judge King:

"The record reflects that Kline has admitted more than once—although not in response to direct questioning by this court at oral argument in this case on June 12, 2008—that his *staff members have created summaries of at least three WHCS patient records* and have kept and employed those summaries in their activities in Johnson County." (Emphasis added.) 287 Kan. at 385.

Further, in reaching its conclusions regarding Kline's mishandling of patient medical records, the court again refers to the existence of "certain summaries" and expresses skepticism about Kline's uncertainty regarding the existence or possession of the summaries:

"We are also deeply disappointed by Kline's casual treatment of the WHCS patient records. First, he moved them to the Johnson County District Attorney's office, despite the clinic's location in Sedgwick County. Second, he and Maxwell failed to correct the Status and Disposition Report given to Judge Anderson on this point. Even accepting, as we do, Judge King's factual finding that no initial deception or misrepresentation was intended, the same cannot be said about Maxwell's, and thus Kline's, subsequent failure to set the record straight. Once Judge Anderson discovered that Kline had possession of the WHCS records, he demanded that the records be returned and questioned whether copies had been kept. He was told no. *Yet Kline's sworn responses to the 17 fact questions reveal that Kline and his subordinates failed to disclose to Anderson that certain summaries of the WHCS records had been created and maintained. By the time Kline appeared before this court for oral argument, he again expressed uncertainty as to whether the summaries existed or were in the possession or use of his office.*" (Emphasis added.) 287 Kan. at 421-22.

Thus, at the time it issued its *CHPP* decision, the court did not know what Kline admittedly did know by that point—*i.e.*, that when he told Judge King he had 3 summaries, he in fact had 62. Further, the *CHPP* court did not know what Kline knew about the context in which those summaries were created—*i.e.*, that Kline had directed the immediate creation of those *handwritten* "summaries" on the very same day Judge Anderson directed the return of all *copies* the following morning. Finally, at the time the *CHPP* court issued its decision in December 2008, the court still did not

know what Kline knew about the summaries' content, *i.e.*, they contained nearly all of the substantive detail in the WHCS patient medical files, including highly confidential identifying information and specific medical data.

In addition to claiming his testimony to Judge King was not material because the *CHPP* court was aware of the summaries, Kline also contends in his reply brief that his statement to Judge King was not material because "there was only marginal variation between Kline's live testimony and his fully correct sworn written responses, all of which were before both Judge King and the Supreme Court." Kline further surmises that because of that "fully correct" sworn response, "[n]either tribunal labored in ignorance of the only (possibly) material fact: that Kline did, in fact, have summaries."

We are not persuaded for several obvious reasons. First, Kline's after-the-fact claim that the "only (possibly) material fact" was his possession or lack of possession of summaries is simply wrong. As we have stated, the *CHPP* mandamus action was *not* solely about the quantity of highly confidential and private patient medical information possessed by Kline but about CHPP's allegations of Kline's *mishandling* of that information. In appointing Judge King as a special master and asking Judge King to investigate Kline's handling of confidential information, the court certainly did not limit Judge King's inquiry to quantifying how many pieces of confidential information Kline possessed. Instead, the court clearly was interested in Kline's alleged mishandling of the patient records, including receipt, copying, storing, dissemination, and transmission of the content contained in both clinics' patient medical records.

Further, Kline's brief notably fails to cite to the location in the record where he provided "fully correct sworn written responses," and we are aware of none other than what is quoted above from the 17 questions and those can hardly be considered "fully correct sworn written responses" based on this record. Nor does Kline explain how the responses provided Judge King and the *CHPP* court with all of the information necessary to dispel any ignorance or misunderstanding either tribunal might have had as to the true facts.

Indeed, the only sworn written response regarding the summaries was Kline's cryptic reference in response to Question 9:

"I am not aware of any summaries of the files, etc. that were transferred and *as District Attorney have had to ask staff to recreate such summaries.* I have made requests to Attorney General Morrison for assistance in this regard, however, such assistance has been not forthcoming." (Emphasis added.)

Characterizing this response as "fully correct" is patently incorrect on several levels. First, Kline's written response suggested he had directed the "re-creation" of information from the files. The information was not re-created; it was hand-copied. But the use of the term "re-create" is not surprising since Judge Anderson had required Kline in no uncertain terms to return all *copies* of the WHCS records. Kline's careful word choice seems calculated to deflect attention away from the hand-copied material prepared by his staff. Further, Kline's vague written response references "summaries" but fails to explain that the summaries were, in fact, handwritten copies of the substantive confidential patient information in each of the 62 files. Finally, Kline's written response certainly did not alert Judge King that the summaries were developed overnight in response to Judge Anderson's direction to return *all* WHCS documents the following day.

Under these circumstances, we have no hesitancy in concluding that accurate information regarding the number of "summaries" (which not coincidentally equaled the number of WHCS patient files turned over to Judge Anderson) would most certainly have led to further inquiry regarding the summaries' content and, ultimately, a realization that the summaries were not really summaries at all.

Thus, even giving Kline the benefit of the doubt and assuming he did not know of the falsity of his statements to Judge King while giving his testimony, he admittedly came to know of that falsity by November 2008. Kline's failure to correct his testimony to Judge King, which the *CHPP* court relied upon, clearly violated KRPC 3.3(a)(3) (2012 Kan. Ct. R. Annot. 583), which prohibits a lawyer from "offer[ing] material evidence" and failing to correct it if "the lawyer comes to know of its falsity."

Having found clear and convincing evidence to support the panel's finding that Kline violated KRPC 3.3(a)(3) by failing to correct his testimony to Judge King after he came to know of the falsity of his testimony, we find it unnecessary to consider whether clear and convincing evidence supports the panel's findings that this same evidence supported two additional violations of KRPC 3.3.

*Clear and Convincing Evidence Supports the Panel's Conclusion That Kline's Statement in Oral Argument before the* CHPP *Court Violated KRPC 8.4(c).*

The panel also concluded that when Kline advised the *CHPP* court in the oral argument that he did not believe he had any summaries, he engaged "in conduct involving dishonesty" in violation of KRPC 8.4(c) (2012 Kan. Ct. R. Annot. 643). In his brief, Kline makes no specific argument regarding this finding, although he generally contends he was confused by the court's questions and his statement was a miscommunication rather than a falsehood. Thus, he essentially argues his statement was not knowingly false. The Disciplinary Administrator reiterates that given the circumstances surrounding Kline's order to create the summaries and their importance to his ability to continue investigating WHCS from his office in Johnson County, clear and convincing evidence supports the panel's conclusion that Kline was not credible when he responded he did not believe he had any summaries.

Kline further asserts his inaccurate response was due to surprise at having "to testify again . . . months later, without the record before him in open court." Thus, he suggests he was "unable to confirm the premise in Justice Beier's question" about whether he had any summaries. From this, Kline seems to proffer that he was unprepared to respond to questions at the *CHPP* argument, a suggestion the *CHPP* court implicitly rejected:

"Also at oral argument, Kline took the offered chance to address this court personally, and he responded to the court's questions. He nevertheless repeatedly expressed a lack of preparation, asserting he had read the language in the court's May 2 order only to require him to be physically present in the courtroom rather than to be prepared to speak knowledgeably about his or his subordinates' conduct. He also described himself, at one point, as too busy discharging his obliga-

tions as the Johnson County District Attorney to address this matter. He expressed ignorance of the content of the record and said he had not reviewed his two sets of sworn written responses to this court's 17 questions." 287 Kan. at 402.

Kline essentially argues it would be nonsensical for him to have falsely responded to Justice Beier's question because he had provided "correct" information in his sworn written responses to Judge King and because "the Court's opinion showed it was obviously under no misapprehension." But as we explained in the previous section, Kline's brief reference in his sworn written response to "re-creating summaries" is a far cry from providing "correct information."

Moreover, Kline's suggestion that he was forthcoming with information about the summaries rings hollow now because Kline promptly claimed executive privilege when pressed for further explanation and refused to answer CHPP's counsel's question: "What is the—the nature of those summaries that you have regarding Doctor Tiller's records?"

Thus, the *CHPP* court had scant, highly incomplete, and largely inaccurate information about the "summaries" at oral argument, and Kline's response that he had no summaries only added to the court's misconception.

Further, as the Disciplinary Administrator points out, the panel obviously did not believe Kline's explanations about the oral argument that he simply forgot he had any "summaries." The panel had good reason for finding Kline's statements incredible, and we have no reason to challenge the panel's determination. See *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008) (discussing that appellate courts do not reassess credibility determinations).

Finally, in addition to the panel's credibility findings, we note that knowledge may be "inferred from circumstances." KRPC 1.0(g) (2012 Kan. Ct. R. Annot. 433). The circumstances that permit an inference of knowledge here are: (1) Judge Anderson's order to Kline to return *all* WHCS documents after Judge Anderson learned the files had been taken to Johnson County without his knowledge and in contradiction of the status report provided to him a few months earlier; (2) Judge Anderson's testimony that Kline was very upset about having to return the files; (3) Kline's

order to his staff, after learning he would have to return the files the next day, to hand copy the files' content to "summaries"; (4) Kline's staff's overnight creation of 62 handwritten summaries containing nearly all of the substantive and highly confidential patient information from the medical files; and (5) Kline's statement to Judge Anderson at the hearing the next day verifying he had returned all of the documents, including "scan[s]," but failing to mention 62 handwritten "summaries."

Under these circumstances, we have no hesitancy in concluding that clear and convincing evidence supports the panel's finding Kline knew his statement in oral argument before the *CHPP* court that he did not believe he had any summaries was false and violated KRPC 8.4(c)'s prohibition against engaging in "conduct involving dishonesty." KRPC 8.4(c) (2012 Kan. Ct. R. Annot. 643).

THE PANEL'S CONCLUSION THAT KLINE VIOLATED KRPC 8.1 BASED ON STATEMENTS HE MADE DURING THE DISCIPLINARY INVESTIGATION IS SUPPORTED, IN PART, BY CLEAR AND CONVINCING EVIDENCE.

The panel found Kline made two statements in a letter dated September 19, 2007, that violated KRPC 8.1 (2012 Kan. Ct. R. Annot 634), which prohibits a lawyer, in connection with a disciplinary matter, from "(a) knowingly mak[ing] a false statement of material fact; or (b) fail[ing] to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter . . . ."

Specifically, the panel found Kline falsely advised the Disciplinary Administrator that the clinics' confidential patient medical files were constantly maintained "under lock and key," when in fact the files were kept in a plastic container in Reed's Topeka apartment for 5 weeks at the start of Kline's tenure as Johnson County District Attorney. Additionally, the panel found Kline's failure to correct this response constituted a separate violation of KRPC 8.1(b). Further, the panel found Kline separately violated KRPC 8.1(a) by falsely advising the Disciplinary Administrator that he "did not have direct access to the [patient files]" while he was Attorney General and that when he reviewed the files "the docu-

ments were immediately returned to the locked closet by an investigator." The panel found Kline knew this statement was false because on at least one occasion, the files were not returned to the locked closet but instead were left out overnight in Kline's office.

*Additional Relevant Facts*

In November of 2006, attorneys who represented the clinics filed a complaint with the Disciplinary Administrator regarding Kline's conduct during the investigation. In part, that complaint questioned Kline's handling of patient medical files and whether he maintained those files in a secure and confidential manner as mandated by the *Alpha* court. Sometime later the Disciplinary Administrator asked Kline to respond to the allegations. Kline did so in a letter to the Disciplinary Administrator dated September 19, 2007.

In that letter, Kline stated that while he served as Attorney General, he could access the files only by requesting an investigator retrieve them:

"I did not have direct access to the records while I was Attorney General. To gain access it was necessary that I make a request to my investigative division. The only time I reviewed the documents, others where [*sic*] in the room and the documents were immediately returned to the locked closet by an investigator."

Kline further stated the records were kept under "lock and key the entire time since they have been produced," referring to his time as both Attorney General and as Johnson County's District Attorney.

In finding Kline falsely stated he did not have access to the patient files while he was Attorney General unless he requested them from Williams or Maxwell, the panel relied upon Williams' testimony at Kline's disciplinary hearing that Williams occasionally worked from a conference table in Kline's office when Kline was out of the office. According to Williams, on one such occasion—November 5, 2006—he inadvertently left a box of patient files in Kline's office overnight. The following morning, Rucker found the box, gave it to Williams, and Williams placed a memo in the file.

In finding Kline falsely indicated the confidential patient files were "constantly under lock and key," the panel also relied upon

evidence that for a 5-week period in January and February 2007, while Kline was Johnson County District Attorney, copies of the patient files were kept in a Rubbermaid tub in Reed's Topeka apartment and not under "lock and key." The panel concluded Kline knew of the falsity of the "lock and key" statement at least 8 days after his September 19, 2007, letter, when Morrison filed a memorandum in support of CHPP's petition for writ of mandamus indicating, *inter alia*, that Reed kept copies of patient medical files in Reed's apartment.

On October 19, 2007, Kline personally responded to the petition for writ of mandamus. Significantly, Kline did not challenge Morrison's allegation that the confidential patient files were kept in Reed's apartment during January and February of 2007. Instead, Kline simply indicated he had delegated responsibility for moving the patient medical files to his staff.

At his disciplinary hearing, Kline initially testified he did not recall reading in the mandamus filings that patient files were stored in Reed's apartment for a period of time in 2007. Further, Kline claimed the location of the confidential patient files was not relevant to him because his concern was whether "anybody had access who didn't have the authority to have access and the answer is no." But Kline later testified he "generally learned" about the files being kept in Reed's apartment in the same time period as he filed his personal response to the writ of mandamus, October 19, 2007.

Although not cited by the panel, the evidence at the hearing further showed that in September 2007—the same month Kline responded to the allegations in the disciplinary complaint against him—he received a copy of a transcript of a deposition given by Reed in which Reed verified that he had the WHCS patient files in his apartment in January and February 2007. Reed gave this deposition in April 2007 in exchange for immunity, after he heard "water cooler talk" that Morrison might pursue criminal charges against individuals involved in the Tiller investigation if Morrison's investigation revealed criminal misconduct. In September 2007, Morrison's office released Reed's deposition, and Kline received a copy.

Reed testified at Kline's disciplinary hearing that Kline angrily confronted Reed about Reed's deposition statement concerning the files being stored in his apartment, and Kline threw the transcript across the room. Although Kline claimed he did not recall when that meeting with Reed occurred, Kline admitted he probably read the information regarding the storage of the WHCS patient files if that information was contained in Reed's statement.

*The Record Does Not Contain Clear and Convincing Evidence of Kline's Knowledge of the Falsity of His Statement That He Never Had Access to Patient Medical Files.*

The panel concluded that because Williams left a box of patient medical files in Kline's office overnight on November 5, 2006, Kline falsely advised the Disciplinary Administrator in his September 19, 2007, letter that he had never had direct access to patient files while he was Attorney General. The panel found this conduct violated KRPC 8.1(a)'s prohibition against "knowingly mak[ing] a false statement of material fact." KRPC 8.1(a) (2012 Kan. Ct. R. Annot. 634).

Kline argues the panel inappropriately assumed from Williams' testimony that Kline knew patient files were left in his office overnight. Alternatively, he contends that even if the evidence supported his knowledge of the falsity of this statement, the statement was not material. Notably, the Disciplinary Administrator does not separately address the sufficiency of the evidence regarding whether Kline had direct access to the patient files.

We agree the record does not contain clear and convincing evidence that Kline knew on September 19, 2007, that his statement regarding access to the patient files was false. While Williams testified he discussed the event with Maxwell and Rucker and that he placed a memo in the case file regarding the incident, there is no evidence Williams discussed the incident with Kline or that Kline ever saw that memo. Further, Williams testified he only used Kline's office when Kline was not there.

Because we have found a lack of clear and convincing evidence to support the panel's conclusion that Kline violated KRPC 8.1(a) by falsely stating that he never had direct access to the patient files,

we need not address Kline's alternative argument regarding the materiality of that statement.

*Clear and Convincing Evidence Supports the Panel's Finding That Kline Violated KRPC 8.1(b) by Failing to Correct His Statement to the Disciplinary Administrator That His Office Continuously Stored the Confidential Patient Files "Under Lock and Key."*

The panel further found Kline falsely advised the Disciplinary Administrator that his offices "constantly" stored the confidential patient files "under lock and key" in violation of KRPC 8.1 (2012 Kan. Ct. R. Annot. 634), which prohibits a lawyer, in connection with a disciplinary matter, from "(a) knowingly mak[ing] a false statement of material fact; or (b) fail[ing] to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter . . . ." The panel based this finding on evidence that for a 5-week period in January and February of 2007, the patient files were stored in Rubbermaid tubs in Reed's apartment and Kline either knew this when he wrote his letter to the Disciplinary Administrator or he later learned of his statement's falsity and failed to correct the misstatement.

Before us, Kline argues his statement regarding the patient files being "kept under lock and key" was neither knowingly false nor material. Further, he contends he was unaware the Disciplinary Administrator was "laboring" under a misapprehension regarding this statement and thus he was not responsible for correcting the misstatement under KRPC 8.1(b). Specifically, Kline suggests the Disciplinary Administrator would have known of the misstatement because he received Judge King's report in June 2008, which discussed the fact that the patient files were maintained in Reed's apartment. Therefore, Kline urges us to conclude he could not have "known" that the Disciplinary Administrator misapprehended his statement.

The Disciplinary Administrator's argument is straightforward. He contends that at the latest, within a few weeks of Kline's September 19, 2007, letter, Kline knew of the falsity of his statement that the patient files were "constantly under lock and key" and that, under KRPC 8.1(b), Kline "had an obligation to clear up that mis-

apprehension and failed to do so." Further, the Disciplinary Administrator contends Kline essentially conceded the materiality of the misstatement by responding to questions posed to him by the Disciplinary Administrator about how the patient files were kept under "lock and key."

We agree with Kline that the record does not contain clear and convincing evidence that he knew on September 19, 2007, when the letter was dated, that the records had been stored in Reed's apartment for 5 weeks and thus were not under "lock and key." So we cannot agree with the panel's finding that Kline knowingly made a false statement of material fact under KRPC 8.1(a) when he first stated the patient files were constantly maintained under lock and key.

But Kline's own testimony establishes that within just a few weeks after his September 19, 2007, response, Kline knew of the falsity of his statement. Specifically, Kline testified that sometime in September 2007, he received Morrison's mandamus filing and personally filed a response in October 2007. Morrison's filing made clear that at least for a 5-week period in early 2007, patient medical files were not under lock and key because they were in Reed's Topeka apartment. Further, about that same time, Kline had reviewed Reed's deposition, which provided even greater detail regarding the storing of the records and would unquestionably have alerted Kline to the falsity of his statement that the patient medical files were "constantly under lock and key."

This is buttressed by Reed's testimony regarding Kline's angry confrontation with him in September 2007 after Kline learned that Reed had given a sworn statement to Morrison about storing the files in Reed's apartment. According to Reed, Kline was so angry that he threw Reed's deposition across the room.

Kline's statement that the files were constantly maintained under "lock and key" conveyed the erroneous impression that his office continuously maintained the files in a secure location with access only by authorized individuals—an impression entirely at odds with reality—*i.e.*, patient medical files were kept for approximately 5 weeks in a Rubbermaid tub in Reed's apartment. Under these circumstances, we have no hesitancy in finding clear and convincing

evidence that even if Kline did not know of the falsity of his "lock and key" representation to the Disciplinary Administrator when he made the statement in his September 19, 2007, response, he knew it was false shortly thereafter, and KRPC 8.1(b) required him to correct this misstatement.

Kline alternatively argues that even if he was aware of the misstatement, he was not obligated to correct it absent some evidence that he knew the Disciplinary Administrator was "laboring under any 'misapprehension' " because of the misstatement. Kline cites no authority to support this suggestion, and, in fact, the comment to the rule indicates otherwise:

"Paragraph (b) of this Rule also requires correction of any prior misstatement in the matter that the . . . lawyer may have made *and* affirmative clarification of any misunderstanding on the part of the admissions or disciplinary authority of which the person involved becomes aware." (Emphasis added.) KRPC 8.1(b), Comment 1 (2012 Kan. Ct. R. Annot. 634).

Consistent with the language of the comment, we read KRPC 8.1(b) to require correction of misstatements made by the lawyer as well as clarification of any misunderstanding on the part of the disciplinary authority of which the lawyer becomes aware. See also *State Ex Rel. Okla. Bar Ass'n v. Gassaway*, 196 P.3d 495, 500 (Okla. 2008) (finding violation based on respondent's failure to correct misapprehension when respondent knew he falsified a letter but administrator presented no other evidence regarding respondent's knowledge of disciplinary authority's misapprehension).

Finally, Kline points out that because the Disciplinary Administrator had access to Judge King's report in June 2008, which indicated the falsity of Kline's September 19, 2007, statement that the records were constantly maintained under lock and key, Kline was not required to correct his misstatement. But just as the Disciplinary Administrator need not prove that he was "laboring under any 'misapprehension' " based on Kline's misstatement and that Kline knew of that misapprehension, Kline is not absolved of responsibility under KRPC 8.1(b) for correcting a misstatement when the Disciplinary Administrator has the ability to learn of its falsity through a third party. Moreover, even if we were to adopt Kline's "no harm, no foul" approach to a lawyer's obligation under

KRPC 8.1(b), we would nevertheless uphold the panel's decision here. The record is clear Kline definitively learned of the falsity of his statement more than 8 months before the Disciplinary Administrator had access to Judge King's report in June 2008. At a minimum, even under Kline's liberal reading of KRPC 8.1(b), he was obligated during that 8-month period to correct his misstatement to the Disciplinary Administrator, and his failure to do so violated KRPC 8.1(b).

FACTUAL SUMMARY RELATED TO KLINE'S ADVISORY ROLE WITH A JOHNSON COUNTY CITIZEN-REQUESTED GRAND JURY

While Kline was serving as Johnson County District Attorney, a citizen-requested grand jury convened in Johnson County District Court in December 2007. The citizens' petition charged the grand jury with investigating whether CHPP violated statutes regulating abortion providers, including K.S.A. 38-1522, which concerned mandatory reporting by certain professionals of child sexual abuse. During the grand jury's investigation, Kline's office was also in the midst of prosecuting CHPP on 107 criminal counts, charges Kline's office filed 2 months earlier.

As District Attorney, Kline had a statutory role to fulfill with this grand jury as its legal advisor. See K.S.A. 19-713 ("Whenever required by the grand jury . . . it shall be the duty of the county attorney . . . [to give the grand jury] advice in any legal matter."); see also K.S.A. 22a-107 (construing the term "county attorney" to include district attorneys); K.S.A. 22-3007 (prosecuting attorney can advise the grand jury on "any legal matter" or examine witnesses, but only at the grand jury's request).

The disciplinary panel found multiple violations resulting from Kline's actions with the grand jury. Generally speaking, the panel concluded Kline acted dishonestly and prejudiced the administration of justice by failing to fully advise the grand jury about the law applicable to its investigation, violating KRPC 8.4(c) and (d). The panel further held Kline responsible for Maxwell's violations of those same rules arising from Maxwell's own failure to fully advise the grand jury. Finally, the panel concluded Kline's direction to his staff regarding two public court filings reflected adversely on his

fitness to practice law, violating KRPC 8.4(g), because Kline ignored the grand jury's request to see additional pleadings before filing and because the public nature of the filings and their contents violated K.S.A. 22-3012 (secrecy of grand jury proceedings).

*Statutory and Federal Case Law Relevant to Reporting Statutes*

The significance of Kline's actions in advising or failing to advise the citizen-requested grand jury can be understood only in the context of the procedural and factual history of the child abuse reporting statute in effect until January 1, 2007, K.S.A. 38-1522, information we discussed briefly at pages 298 Kan. at 98-100, but now elaborate on. In addition to the statutory framework itself, that backdrop includes the two Attorney General advisory opinions interpreting the statute and significant federal caselaw interpreting—and ultimately rejecting—Kline's advisory opinion.

*K.S.A. 38-1522 and related Attorney General opinions*

As previously discussed, the Kansas Code for Care of Children requires individuals engaged in certain professions, including those licensed under the Board of Healing Arts, to report suspected child abuse to state authorities. K.S.A. 38-1522, the reporting statute in effect until January 1, 2007, provided: "When any of the following persons has reason to suspect that a child has been *injured* as a result of physical, mental or emotional abuse or neglect or sexual abuse, the person shall report the matter promptly . . . ." (Emphasis added.)

As defined in the Code for Care of Children, the term "sexual abuse" encompassed all sexual activity with someone under the age of 16 regardless of the age of the other participant and regardless of whether the activity was voluntary. See K.S.A. 38-1502(c); see also *Aid for Women v. Foulston*, 327 F. Supp. 2d 1273, 1283-84 (D. Kan. 2004) (*Aid for Women I*) (discussing that the term "sexual abuse" encompassed all sexual activity with someone under the age of 16 regardless of the other participant's age; thus voluntary sexual contact between two people under the age of 16 fell within the definition of "sexual abuse").

But the statute did not define the term "injured." In 1992, Attorney General Robert T. Stephan examined the statute and con-

cluded the pregnancy of a minor "puts one on notice that sexual abuse (as statutorily defined) has probably occurred" but the determination whether sexual abuse has caused an "injury" should be made on a case-by-case basis. Att'y Gen. Op. No. 1992-48. In short, Attorney General Stephan's opinion "left the reporter to determine if there was reason to suspect the child had suffered an injury requiring reporting." *Aid for Women v. Foulston*, 427 F. Supp. 2d 1093, 1099 (D. Kan. 2006) (*Aid for Women II*), *vacated by* Nos. 06-3187, 06-3188, 06-3202, 2007 WL 6787808 (10th Cir. 2007) (unpublished opinion). A few years later, Attorney General Carla Stovall issued a letter opinion reaching a similar conclusion. See 427 F. Supp. 2d at 1099.

Aid for Women *litigation*

A few months after Kline began serving as Attorney General, a state senator asked his office to provide a legal opinion as to the following question: "[U]nder what circumstances a doctor who provides abortion procedures is required to report rape and/or sexual abuse of a minor." See Att'y Gen. Op. No. 2003-17; see also 298 Kan. at 98-100. Kline's June 18, 2003, opinion noted its disagreement with Stephan's 1992 opinion, which focused on whether the minor's pregnancy constituted an "injury" under K.S.A. 38-1522, suggesting the proper focus was whether the sex act leading to the pregnancy was "inherently injurious and harmful." And after examining insurance caselaw from this and other jurisdictions and the purpose of the statutory rape laws, Kline's opinion concluded that "sexual intercourse by minors under the age of 16, whether voluntary or involuntary" was "injurious as a matter of law." Att'y Gen. Op. No. 2003-17. Accordingly, Kline's opinion further concluded that abortion clinics "called upon to perform an abortion for a girl under the age of 16 [are] put on notice that, as a matter of law, an injury as a result of sexual abuse has occurred. Such doctor is obligated to report this injury to the proper authorities." Att'y Gen. Op. No. 2003-17.

Kline recognized that although his opinion responded to a question concerning abortion providers, the opinion would have far-reaching implications for any mandatory reporter with knowledge

of sexual activity by a minor. See Att'y Gen. Op. No. 2003-17 (noting that "[o]ther situations ... might trigger" a reporting obligation, including teenagers who are already sexually active seeking birth control, treatment of a sexually transmitted disease, or medical attention for a pregnancy).

Within 4 months after Kline issued his opinion, a group of licensed professionals, including abortion providers, social workers, and a clinical psychologist, filed suit in United States District Court seeking to enjoin prosecutors from applying Kline's interpretation of K.S.A. 38-1522 to cases involving consensual sexual activity between consenting minors under the age of 16 and minors of a similar age, or "age mates." See discussion 298 Kan. at 102-08. The plaintiffs argued, in part, that the statute, as interpreted by Kline, unconstitutionally violated minor patients' confidentiality and informational privacy rights. See *Aid for Women I*, 327 F. Supp. 2d at 1285. On July 26, 2004, United States District Judge J. Thomas Marten issued a preliminary injunction, finding it likely the plaintiffs would prevail on the merits. 327 F. Supp. 2d at 1288, 1294. Subsequently, on appeal, the Tenth Circuit Court of Appeals vacated the injunction and remanded the case to the district court, determining the plaintiffs failed to show a substantial likelihood of success on their informational privacy claims and the district court failed to adequately address three factors in the preliminary injunction analysis. *Aid for Women v. Foulston*, 441 F.3d 1101, 1121 (10th Cir. 2006).

After conducting a 7-day bench trial on remand, Judge Marten issued a permanent injunction on April 18, 2006, enjoining prosecutors from enforcing the statute as Kline had suggested in Attorney General Opinion No. 2003-17. *Aid for Women II*, 427 F. Supp. 2d at 1096; see discussion 298 Kan. at 107-08. The court held that mandatory reporters are not required to report consensual sexual activity between minors under the age of 16 and of a similar age when the reporter does not suspect injury, and, in doing so, the court rejected Kline's assessment that *any* sexual activity with a minor as a matter of law was injurious under the statute. Further, the court specifically concluded that Kline's opinion contradicted the statute's plain meaning, which could not be inter-

preted to include a per se reporting requirement when a reporter suspected consensual sexual activity between age-mates. 427 F. Supp. 2d at 1102-04.

In reaching this conclusion, Judge Marten essentially agreed with Stephan's 1992 opinion finding a minor's pregnancy to be a natural condition rather than a per se "injury." Under Stephan's assessment, the statute did not require a mandatory reporter to report every pregnancy of a minor under the age 16. Instead, Stephan concluded mandatory reporters should make a case-by-case determination whether a minor had been "injured" by a pregnancy. 427 F. Supp. 2d at 1102-03 (discussing Att'y Gen. Op. No. 1992-48). In contrast, Kline's opinion "shifted the focus away from the condition of pregnancy and toward the underlying sexual intercourse." 427 F. Supp. 2d at 1102. In sum, Judge Marten's opinion rejected Kline's " 'zero tolerance' " interpretation of K.S.A. 38-1522, finding Kline's advisory opinion inappropriately "eliminate[ed] all discretion on the part of the reporter." 427 F. Supp. 2d at 1116.

*Recodification of K.S.A. 38-1522 and dismissal of* Aid for Women

On May 22, 2006, the Kansas Legislature enacted a recodification of the Kansas Code for Care of Children, which included amending and moving the mandatory reporting statute. Effective January 1, 2007, the mandatory reporting law provides:

"When any of the following persons has reason to suspect that a child has been *harmed* as a result of physical, mental or emotional abuse or neglect or sexual abuse, the person shall report the matter promptly . . . ." (Emphasis added.) K.S.A. 2012 Supp. 38-2223.

Under the new version of the law, "sexual abuse" is defined as "any contact or interaction with a child in which the child is being used for the sexual stimulation of the perpetrator, the child or another person." K.S.A. 2012 Supp. 38-2202(dd). The new statute substitutes the word "harmed" for the word "injured" and defines "harm" as "physical or psychological injury or damage." K.S.A. 2012 Supp. 38-2202(l). The committee that recommended reworking the statute suggested the change because the term " 'injured' [is] too often misinterpreted to require serious physical harm

before abuse is to be reported." Revised Kansas Code for Care of Children (Including Committee Comments) 47, http://www.kansas judicialcouncil.org/Documents/JO_CINC/cinc_code_new05[1].pdf.

After this statutory change, the plaintiffs in *Aid for Women* sought dismissal of the appeal, arguing the case was moot. The Tenth Circuit Court of Appeals agreed, dismissed the case, and vacated the lower court's order. *Aid for Women v. Foulston*, Nos. 06-3187, 06-3188, 06-3202, 2007 WL 6787808, at *1 (10th Cir. 2007) (unpublished opinion). At the time the plaintiffs sought dismissal, Kline was no longer Attorney General.

*Citizen-Requested Grand Jury*

Kansas is among six states permitting its citizens to petition for a grand jury. See 1 Beale, Bryson, Felman, Elston & Yanes, Grand Jury Law and Practice 2d § 4:2 & n.1 (2012). In 2013, the Kansas Legislature revised the grand jury statutes, including provisions dealing with the citizen-requested grand juries. None of those changes are at issue or relevant here.

Pursuant to K.S.A. 22-3001(2), a grand jury "shall be summoned" when a petition is submitted "bearing the signatures of a number of electors equal to 100 plus 2% of the total number of votes cast for governor in the county in the last preceding election." Pursuant to the law in effect at the time, once summoned by a valid citizens' petition, the "role of the citizenry in the grand jury process ceases," and the grand jury operates in the same fashion as a grand jury called by a prosecutor. See *Tiller v. Corrigan*, 286 Kan. 30, 37, 182 P.3d 719 (2008). And like a grand jury called by a prosecutor, the prosecutor has a limited role in part because the grand jury's role is not to determine guilt or innocence, but to investigate and, if warranted, issue a true bill. See K.S.A. 22-3011(1) (explaining an indictment requires the concurrence of 12 or more grand jurors and that once an indictment is found, the presiding juror "shall endorse thereon 'a true bill.' "); *State v. Snodgrass*, 267 Kan. 185, 190, 979 P.2d 664 (1999) (stating a grand jury's function is investigatory and the county attorney has a limited role in grand jury proceedings).

Nine months after Kline began serving as Johnson County District Attorney, the Life Is For Everyone Coalition, led in part by the Concerned Women for America and Operation Rescue, secured enough valid signatures to summon a citizen-requested grand jury in Johnson County. The petition directed the grand jury to investigate CHPP and its affiliated entities and persons in seven areas: (1) performing illegal late-term abortions; (2) failing to report suspected child abuse; (3) failing to follow the standard of care in providing medical advice or failing to conduct medical procedures required by statute; (4) providing false information to induce government action or inaction; (5) harvesting and/or illegal trafficking in fetal tissue; (6) failing to comply with the parental consent law; and (7) failing to enforce the 24-hour waiting period.

This citizen-requested grand jury convened on December 10, 2007, and Johnson County District Court Judge Kevin P. Moriarty selected Juror Number 9 to preside. After convening, the grand jury asked for special counsel. Judge Moriarty appointed local attorney Richard Merker and retired Johnson County District Court Judge Larry McClain as special counsel on December 19, 2007. The applicable statute, K.S.A. 22-3013(1), required the grand jury to complete its investigation in 3 months but permitted the court to extend that period by an additional 3 months. The statute of limitations allowed the grand jury to issue a true bill on any acts occurring in the preceding 5 years. See K.S.A. 21-3106(4).

*Kline omits relevant statutory and caselaw in advising the grand jury.*

Kline and his staff members appeared before the grand jury on December 17, 2007, prior to the appointment of special counsel, to provide jurors with an explanation of the law necessary to investigate CHPP. Kline gave the grand jury a copy of K.S.A. 2012 Supp. 38-2223, the mandatory reporting law in effect as of January 1, 2007, but he did not provide or discuss the prior statute, K.S.A. 38-1522, or mention the *Aid for Women II* decision, which permanently enjoined state prosecutors during a portion of the time period relevant for the grand jury from enforcing K.S.A 38-1522

pursuant to Kline's " 'zero tolerance' " Attorney General Opinion No. 2003-17. See 427 F. Supp. 2d at 1116.

Kline provided the grand jury with what he termed an "overview" of the law necessary for them to conduct their investigation. Regarding the mandatory reporting issue, Kline identified the "operable language" of K.S.A. 2012 Supp. 38-2223 as "has reason to suspect that a child has been harmed as a result of physical, mental or emotional abuse or neglect or sexual abuse." He then proceeded to define the terms used in that operative language, including the term "child" and the phrase "sexual abuse." But in defining sexual abuse, Kline focused on sexual offenses, noting that a child cannot legally consent to sexual activity. He then explained:

"And by definition of the statute, if you have a 13-year-old that is pregnant, you have a child that has been raped and you have a mandatory report because it is sexual abuse. *Some might say I don't have reason to believe there was harm to the child.* That's an issue for you all to take up, but that is how Kansas law works in this area." (Emphasis added.)

Kline then described the crime of "voluntary sexual relations," or consensual sex between two partners within 4 years of age when no coercion is used. Finally, Kline explained the reporting requirements under the Child Rape Protection Act, K.S.A. 2012 Supp. 65-67a09, and indicated he believed CHPP and its affiliates were following that statute.

A juror then asked, "There is still mandated reporting for a 14- and 15-year-old; correct?" Kline replied, "Yes. Under the statute, reason to suspect harm caused by sexual abuse. All of this is defined as sexual abuse. The only issue you are dealing with is reason to believe there's harm caused by."

In concluding his presentation on the mandatory reporting issue, Kline stated,

"Now the theory behind this, as it relates to abortion providers, is that law enforcement has better tools to determine the truth as relates to who is the father of the child than an abortion clinic just engaging in an intake application form.

"In other words, oftentimes when reports of child sexual abuse do not occur to the police and a pregnancy results, someone with authority or control over the child is the perpetrator of the sexual abuse. Parents report when their children are raped unless somebody in that environment is engaged in the sexual abuse that caused the pregnancy or it truly was an issue of consenting teens making a

mistake. *In either event, law enforcement has better tools to determine the truth so the legislative thinking behind the statute is you don't just let the rapist walk in with the child and say, 'It was her boyfriend,' because that gives them magic words to get away with the crime."* (Emphasis added.)

Kline then discussed other issues related to the citizens' petition. Near the end of his presentation, Kline suggested a method by which the grand jury could begin its investigation of mandatory reporting and illegal late-term abortions. Specifically, he suggested the jury obtain KDHE termination of pregnancy reports for patients under the age of 16 as well as termination of pregnancy reports for all patients who had late-term abortions. Kline further suggested the grand jury obtain SRS sexual abuse reports. He concluded, "By comparing [SRS and KDHE reports], you have a feel whether there are any reports. If they match up, there's no need to go further really." Later a juror asked, "All three of these records should match up, KBI, SRS, and Kansas Department?" Kline replied:

"If everybody is doing their job, under the law there should be some ability to match. There are some exceptions, of course. Those exceptions being that if SRS is not open and the reporter can go to local law enforcement, and the followup might be to go to local law enforcement to see what reports they have sent to SRS. And that can be done."

Two days later, Maxwell appeared before the grand jury. He began by explaining that when a child under the age of 16 is pregnant, a felony has been committed and that in 2003, Kline's office began an investigation into whether medical providers were reporting child rape. He further explained a method by which the grand jury could discover whether "medical providers" were reporting rape:

"To answer that question, you have to look at records that are required to be submitted to the state, because every time a child is in that situation, it's supposed to be reported to SRS . . . .

"Now, all of us know what when that happens, it could either be little Johnny down the street, the 15-year-old boyfriend or the 14-year-old boyfriend, or it could be stepfather or it could be uncle.

"Now, we're not necessarily as a society necessarily concerned with two 14-year-olds having sex, but we are concerned with uncle or stepfather or father if it's him. The only way to determine that is to report it and look into it."

Later during Maxwell's presentation, the presiding juror requested that Maxwell provide the grand jury with law review articles, judicial opinions, and official opinions relating to mandatory abuse reporting. Maxwell told the grand jury it "can look at anything" it wanted and agreed to supply information.

On January 2, 2008, Maxwell provided the grand jury with a notebook containing "legal research." Maxwell testified at the disciplinary hearing that he did not personally compile the notebook but instead asked another attorney to prepare it. According to Maxwell, he did not instruct the attorney as to what to include in the notebook, nor did he review the notebook himself.

The notebook is not included in the record before this court, but according to the parties and the record, it appears the notebook contained Kline's Attorney General opinion, Att'y Gen. Op. No. 2003-17, as well as Attorney General Stephan's 1992 opinion on the same topic, Att'y Gen. Op. No. 1992-48. According to the presiding grand juror, the notebook contained no law review articles but did include cases related to insurance law. Further, it is uncontroverted the binder did not contain the previous mandatory reporting statute in effect for 4 of the 5 years being investigated by the grand jury. Nor did it include a copy of the *Aid for Women II* decision in which the United States District Court found Kline's Attorney General Opinion No. 2003-17 unenforceable.

On January 7, 2008, the grand jury issued a subpoena to CHPP seeking 16 patient files, all from procedures occurring in 2003. About the same time, the jury also subpoenaed KDHE seeking termination of pregnancy reports from 2004 to 2007 relating to all abortions performed by CHPP on patients 16 years old or younger and all abortions performed on patients of any age when the fetus was 22 weeks or older. The grand jury also requested information from SRS.

The grand jury met on January 9, 2008, and asked Maxwell to draft a letter seeking CHPP's voluntarily appearance before the jury. The letter requested CHPP contact McClain, the jury's special counsel. At some point thereafter, McClain began communicating with counsel for CHPP.

*The grand jury discovers* Aid for Women *and K.S.A. 38-1522.*

That same day, the grand jury had additional questions for Maxwell regarding the mandatory reporting requirements:

"JUROR NO. 2: Well, I understand that, but the concept of mandatory reporting—

"MR. MAXWELL: Right.

"JUROR NO. 2: —is not for that person to investigate and decide whether it was little Johnnie, big Johnnie, Uncle Johnnie, Daddy Johnnie. Okay. it was that [the pregnancy] occurred.

". . . .

"[MR. MAXWELL]: The purpose of the mandatory reporting statute is to allow the proper people to look at the issue. . . . It's so that the proper people get notice of the fact.

"JUROR NO. 14: It also takes it off our back. It totally takes me out of the judgment. I do what the law says. . . .

"MR. MAXWELL: For example, you are a principal, and you have little Susie saying she is having sex with little Johnnie. . . . *Do you have to make the judgment of whether it's true or not? Instead of having to make the judgment yourself, you just report it.*" (Emphasis added.)

The presiding juror then asked a question about whether family practitioners were required to report teenagers seeking contraception. Maxwell responded:

"You have provided [*sic*] 38-2223, and I can't quote that statute. . . . But I have read it, and it defines pretty much what has to be reported. Okay. There's been multiple opinions from the Attorney General and at various prior—the Attorney General before Mr. Kline, the one before that. There's been multiple court decisions.

"The statute got changed, I think—and if I'm not mistaken it was '07."

After Maxwell mentioned the previous statute, a copy of the statute was retrieved and the grand jury reviewed K.S.A. 38-1522 for the first time. An annotation in that copy of the statute to the *Aid for Women II* federal court decision led the grand jury and Maxwell to briefly discuss the decision. During lunch, McClain and the presiding juror more thoroughly reviewed the *Aid for Women II* decision; afterward, McClain confronted Maxwell about why Kline's office had not provided the grand jury with that decision. And as a result of that failure, McClain told Maxwell he no longer trusted him.

On January 14, 2008, Special Counsel Merker gave copies of the *Aid for Women II* decision to the grand jury, and each juror reviewed it. Merker testified at Kline's disciplinary hearing that the grand jury was "not happy" when it read the decision. According to Merker, "You could have dropped a pin in that room and heard it if you would have listened closely enough. They weren't happy and they expressed it clearly."

After reading *Aid for Women II*, the grand jury concluded its subpoena issued to CHPP lacked reasonable suspicion for requesting records related to the reporting issue. The presiding juror testified the grand jury discontinued its consideration of potential mandatory reporting violations. But the grand jury did not withdraw the subpoena because, as the presiding juror testified, it "considered the subpoena to be somewhat of a leverage."

CHPP filed a motion to quash the grand jury's subpoena on January 17, 2008. Kline's office responded on behalf of the grand jury, arguing that contrary to CHPP's assertions, the subpoena protected patient privacy in a manner consistent with *Alpha*. Judge Moriarty conducted a hearing on the motion to quash on February 15, 2008.

At that hearing, Judge Moriarty indicated the court preferred not to extend the grand jury's service and hoped to find common ground among the parties so that the grand jury could review information from CHPP before the 3-month service period expired. McClain informed the court the grand jury had reached an agreement with CHPP whereby CHPP would provide some but not all of the information sought by the grand jury. Kline advised the court he had only learned of the agreement just prior to the hearing and objected to this compromise, stating, "It is either compliance or non-compliance."

When the grand jury convened again on February 20, 2008, Kline advised the grand jury to ask Judge Moriarty to order CHPP to fully comply with the subpoena but then allow CHPP to file a mandamus challenging the order. Kline further advised the grand jury to ask Judge Moriarty to extend its service until the court ruled on that mandamus. Special Counsel Merker advised the jury that McClain had met with CHPP's attorneys and CHPP had agreed

to give the jury some of the information contained in the 16 patient files if the jurors executed a confidentiality agreement. CHPP also agreed to answer certain questions posed by the grand jury if the grand jury signed a second confidentiality agreement.

Kline and Maxwell argued to the grand jury that the confidentiality agreements were unwise and would prevent Kline's office from prosecuting a case. After an off-the-record discussion among the grand jury members, the grand jury decided not to use the confidentiality agreements.

That same day, a grand juror who apparently spoke for the group, advised Kline the grand jury did not want to extend its service. The same juror then asked Kline if he could provide evidence on all seven areas of the investigation prior to the expiration of the 3-month period. After Kline indicated he could not do so, Judge Moriarty offered to conduct a hearing and order CHPP to provide certain information so the grand jury could continue working without requiring compliance with the subpoena. Given the grand jury's decision not to enter into a confidentiality agreement but its desire to see records, as well as CHPP's refusal to comply with the subpoena, Judge Moriarty agreed to hold a telephone conference the next day to facilitate discussions with CHPP regarding its willingness to voluntarily provide information.

According to Kline's Assistant District Attorney John Christopher Pryor, who testified at Kline's disciplinary hearing, at about the time of the February 20, 2008, grand jury session, Pryor and Maxwell were in Kline's office when Maxwell advised Kline that Kline was "losing this grand jury." According to Pryor, Maxwell's statement bothered Kline, and Kline responded that he wanted to "keep trying to convince [the grand jury]." After Maxwell left the room, Pryor asked Kline why he cared about the grand jury, given that it was convened by a citizens' petition and had independent status and that Kline had 107 counts pending against CHPP. Pryor testified Kline "became very angry, his body was stiff and he slammed the table and he said if I lose this grand jury it will destroy me."

*Kline disregards the grand jury's request to review pleadings.*

Following a telephone conference with Judge Moriarty, CHPP voluntarily provided information, although its nature and format are unclear from the record. On February 25, 2008, the grand jury viewed the information, and after an off-the-record discussion, the grand jury, through the presiding juror, requested:

"[PRESIDING JUROR]: Second is a request, and while we understand that we don't have the authority to issue this, we are asking the DA's office and anyone else that might submit any documents to the Court in our name, that the Grand Jury be advised of those prior to the filing.

"THE COURT: Say it one more time now.

"[PRESIDING JUROR]: The Grand Jury would like to review any documents that are provided to the Court in our name. For example, if there are to be any more briefs related to the subpoena, we would like to see that information since it's being submitted in our name prior to that.

"THE COURT: Okay.

"[PRESIDING JUROR]: It's a request.

Pryor, who appeared on behalf of Kline's office, agreed to relay that request stating:

"MR. PRYOR: In all candor from our office's standpoint, I don't have the authority to accept or reject, but I will pass that on. I just wanted to—

"[PRESIDING JUROR]: We understand that.

"MR. PRYOR: Unless you order it.

"[PRESIDING JUROR]: That's just a general request.

. . . .

"[THE COURT]: If you believe that you don't need your subpoena, if that's what one of your thoughts is, then you simply have to tell me that you want to withdraw your subpoena request. If you want the subpoena fulfilled, you have to simply tell me that as well. . . .

"[PRESIDING JUROR]: Okay. That's fine. We would just want to review anything before anything is submitted on our behalf."

The grand jury also advised the court that it had nearly completed its investigation and asked Kline's office to present any true bills that were warranted. Pryor testified at the disciplinary hearing that he informed Kline about the grand jury's request to see any additional filings submitted on the grand jury's behalf.

The presiding grand juror testified the grand jury requested to review before filing any documents prepared in its name because the District Attorney's office's supplemental response to CHPP's

motion to quash had contained information "contrary to what [the jury was] trying to accomplish."

Despite this grand jury direction, on February 26, 2008, Kline's office filed a new motion to enforce the grand jury subpoena without first permitting the grand jury to review it. The motion, captioned "State's Motion to Enforce Grand Jury's Subpoena and Original Citizen Petition," was not filed under seal and discussed the number of days the jury had met, the necessity of the CHPP subpoena, and the confidentiality agreement proposed by special counsel but not agreed to by the grand jury. Additionally, the motion accused McClain of violating the grand jury secrecy statute by communicating with CHPP.

Pryor, who drafted the motion, testified Kline also directed him to attach the proposed confidentiality agreement but Pryor refused because it was under seal. According to Pryor, Kline sought to attach the confidentiality agreement in order "to get the truth out."

On February 27, 2008, Rucker and Pryor informed the grand jury that Kline's office would not present any true bills and that Kline's office believed the jury's investigation was incomplete because CHPP had not complied with the subpoena. After the grand jury indicated its members were divided as to whether to enforce the subpoena, Judge Moriarty advised it of several options: enforce the subpoena; ask CHPP to voluntarily provide additional information; or make a decision without additional information. The judge further informed the grand jury that any order the court issued regarding the subpoena likely would be appealed and the grand jury's time would expire before it received the additional information.

Later that same day, Judge Moriarty, on behalf of the grand jury and with Kline's staff present, requested additional information from CHPP. The following day, CHPP agreed to provide that information in a spreadsheet format, which was delivered to Judge Moriarty on March 3, 2008. The judge gave it to the grand jury.

Also on March 3, 2008, Kline directed Pryor to file another request to enforce the CHPP subpoena. That request, captioned "State's Fourth Request to Enforce Subpoena," like the prior enforcement motion, was not filed under seal and was not provided

to the grand jury before filing. Unlike the prior motion, however, when Pryor presented this motion to Kline for his approval, Kline directed Pryor to remove Kline's signature block. Pryor explained that Kline made the request because "there was abortion controversy and he didn't want to have another thing to make it appear like he was just the abortion attorney."

Finally, on March 3, 2008, the grand jury withdrew its subpoena and ended its 3-month service period without issuing a true bill.

CLEAR AND CONVINCING EVIDENCE SUPPORTS THE PANEL'S CONCLUSION THAT KLINE VIOLATED KRPC 8.4(c) AND (d) WHEN HE FAILED TO INFORM THE GRAND JURY ABOUT THE AID FOR WOMEN DECISION AND K.S.A. 38-1522.

The panel found the failure by both Kline and Maxwell to inform the grand jury about the Aid for Women II decision and provide it with a copy of K.S.A. 38-1522 when purporting to inform the jury about the mandatory reporting law violated three disciplinary provisions: (1) KRPC 8.4(c), which prohibits engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; (2) KRPC 8.4(d), which prohibits engaging in conduct prejudicial to the administration of justice; and (3) KRPC 5.1(c)(2) (2012 Kan. Ct. R. Annot. 612), which makes a lawyer (in this case, Kline) with direct supervisory authority over another lawyer (in this case, Maxwell) responsible for the actions of the other lawyer if the supervising lawyer "knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action."

Kline contends in reaching its conclusions, the panel departed from the facts and ignored the grand jury transcripts, records, and filings. He suggests a review of those documents reveals that, although he failed to cite the previous mandatory reporting statute or provide the jury with the *Aid for Women II* decision, he otherwise accurately explained the applicable law to the grand jury. Therefore, he reasons his description of the law did not violate KRPC 8.4(c)'s prohibition against dishonesty, fraud, deceit, or misrepresentation. Further, he argues his actions did not prejudice the grand jury's investigation or constitute a violation of KRPC

8.4(d) because the grand jury did not alter its course after learning of the *Aid for Women II* decision and K.S.A. 38-1522.

The Disciplinary Administrator argues clear and convincing evidence supports the panel's finding, noting Kline and Maxwell failed to inform the jury of the applicable statute and caselaw relevant to the legal obligations of CHPP during a significant period of the time subject to the grand jury's investigation and that this significant omission prevented the jury from making an informed decision regarding the issuance of a subpoena.

*The Role of the Prosecutor in Guiding a Citizen-Requested Grand Jury*

In challenging the panel's findings, Kline does not suggest he and Maxwell were not required to provide the grand jury with an accurate summary of the law. Instead, he once again employs semantics to restate his obligation, claiming he "was under a duty *not to incorrectly* state the law to the grand jury. . . ." (Emphasis added.) Maxwell testified at the disciplinary hearing that a prosecutor is a "legal advisor" to the grand jury and should ensure that the jury understands the criminal law.

Maxwell's description is consistent with the statutory provisions describing the prosecutor's role as legal advisor to a citizen-requested grand jury. These statutes authorize the district attorney to act at the grand jury's request, see K.S.A. 22-3007, and most critically require the prosecutor to give "advice in any legal matter" but only when the grand jury "require[s]" such advice. See K.S.A. 19-713.

Similarly, the ABA Standards for Criminal Justice Prosecution Function explains that the prosecutor, in connection with a grand jury, may appropriately explain the law and express an opinion on the legal significance of the evidence. Further, the ABA standards direct that a prosecutor, in presenting a case to a grand jury, should not intentionally interfere with the grand jury's independence, preempt a grand jury function, or abuse the grand jury's processes. See ABA, Standards for Criminal Justice Prosecution Function and Defense Function 3-3.5, 3-3.6(f), (3d ed. 1993); see also 2 United States Department of Justice, United States Attorneys' Manual 9-

11.010 (1997) (Prosecutor should advise the grand jury on the law, and when dealing with a grand jury, prosecutor should act as an "officer of the court.").

Logically, we must consider the prosecutor's duties with respect to a citizen-requested grand jury in the context of the grand jury's role—*i.e.*, to investigate, and if appropriate, issue a true bill. See *Snodgrass*, 267 Kan. at 190 (stating the grand jury's function is "investigatory and accusatory"). Thus, a prosecutor, when called upon to do so, must provide the grand jury with a description of the law that adequately permits the grand jury to conduct an investigation sufficient to lead to a true bill capable of being prosecuted. Additionally, as the statutory language makes clear, the prosecutor appears and takes actions only at the request of the citizens' grand jury. In short, the prosecutor's role is to assist the grand jury, rather than direct its outcomes or manipulate the process.

So while Kline may be correct that a prosecutor is obligated "not to incorrectly state the law to the grand jury," that does not mean, as Kline implies, that a prosecutor may provide incomplete information necessary to permit the jury to make an informed decision. To do so undoubtedly would not assist or aid the jury in its investigation as to whether there has been a violation of the law.

*Clear and Convincing Evidence Supports Kline's Violation of KRPC 8.4(c).*

The panel concluded that by failing to inform the grand jury about the pre-2007 mandatory reporting statute and the *Aid for Women II* decision, Kline presented false and misleading information by omission. Kline contends that although he did not cite the applicable statute or decision, he adequately informed the grand jury. The Disciplinary Administrator's brief as to this issue is conclusory, suggesting only that the grand jury acted on its "misunderstanding of the law caused by [Kline's] and his staff's omissions."

It is helpful at this juncture to be reminded that the relevant portion of the mandatory reporting statute actually provided to the jury is quite succinct:

"When any of the following persons has reason to suspect that a child has been *harmed* as a result of physical, mental or emotional abuse or neglect or sexual abuse, the person shall report the matter promptly. . . ." (Emphasis added.) K.S.A. 2012 Supp. 38-2223.

Similarly, the statute's relevant portion in effect until January 1, 2007, was relatively straightforward:

"When any of the following persons has reason to suspect that a child has been *injured* as a result of physical, mental or emotional abuse or neglect or sexual abuse, the person shall report the matter promptly. . . ." (Emphasis added.) K.S.A. 38-1522.

Kline points out that he correctly informed the grand jury that as to age-mate minors, the grand jury "would still need to find that 'harm' occurred," and he argues that without citing the case he "precisely stated the holding of" *Aid for Women II*. And while he does not cite to a particular portion of the record to support this contention, we presume he is referring to his comment: "Some might say I don't have reason to believe there was harm to the child. That's an issue for you all to take up, but that is how Kansas law works in this area." While later, Kline commented, "All of this is defined as sexual abuse. The only issue you are dealing with is reason to believe there's harm caused by."

First, we must point out the obvious. In light of the grand jury's complete lack of context to Kline's cryptic comments, Kline can hardly be said to have "precisely stated the holding" of *Aid for Women II*, as he casually now claims. Moreover, assuming for the moment that Kline's obscure comments somehow adequately informed the jury of the results of the *Aid for Women II* litigation and the federal court's interpretation of the statute, Kline failed to advise the jury that the statute he was discussing was not even in effect for 4 years of the 5-year period being investigated by the grand jury. Kline's argument does nothing to dispel the fact that his failure to provide the grand jury with a copy of the prior statute and its corresponding legal analysis in the *Aid for Women II* decision were significant omissions.

Further, Kline's suggestion to the grand jury that the issue of "harm" was for the jury to take up was blatantly incorrect. As Kline was acutely aware after his office unsuccessfully litigated the same

issue for 3 years in federal court, the meaning of the term "injured"—the term corresponding with the term "harmed" in the prior statute—was *not* an open question, nor was it an "issue" for the grand jury to decide. Rather, under K.S.A. 38-1522, "health care providers," not law enforcement or other charging bodies, had "discretion to determine when there is 'reason to suspect a child had been injured.'" See *Aid for Women II*, 427 F. Supp. 2d at 1116. And under the Attorney General's opinion preceding Kline's assumption to that office, decisions by mandatory reporters as to the "injury" specified in the prior statute rested on a case-by-case determination. 427 F. Supp. 2d at 1099, 1103 (discussing Stephan's opinion).

In sum, the grand jury was not tasked with considering whether it believed a child was injured by sexual activity. Instead, after *Aid for Women II*, the only open question was whether the *reporter* had reason to suspect injury, or at most failed to investigate potential injury, and nevertheless failed to report it. The United Stated District Court for the District of Kansas had already decided this same issue contrary to Kline's interpretation and had issued an injunction specifically prohibiting prosecutors from enforcing Kline's interpretation of the statute. By any measure, this information was directly relevant to the grand jury's charge as outlined in the citizens' petition that summoned it into being.

Kline also seems to imply the grand jury should have inferred Kline was referring to Judge Marten's *Aid for Women II* decision in advising the grand jury that "[s]ome might say I don't have reason to believe there was harm to the child." But it goes without saying a citizens' grand jury would not have understood Kline's remark absent further context and explanation, which could most pointedly come by providing a copy of the relevant statute or key court decision, as well as accurately describing their background. As it happened, the grand jury got an incomplete informational background under Kline's guise of objectively aiding it in the performance of its duties.

We have no hesitancy in rejecting Kline's claims that his enigmatic comments, as fully set out above, somehow adequately informed the grand jury about the correct interpretations and appli-

cations of the reporting statute as they evolved during the time frame relevant to the grand jury's investigation. In fact, if anything, Kline's comments misled the grand jury because they suggested mandatory reporters were required to report any suspicion that a minor (under the age of 16) has engaged in sex, whether consensual or with an age-mate, during the preceding 5 years.

Further, Kline reinforced the grand jury's misapprehension when he suggested it could simply compare KDHE and SRS reports. Kline emphasized that if the records matched, *i.e.*, if the clinic reported to KDHE that 10 young women under the age of 16 underwent abortions and the clinic also reported to SRS 10 cases of potential sexual abuse of young women under the age of 16, the grand jury's investigation could end. And by implication, the jury understood that if the records did not match, the grand jury would have sound evidence the clinic failed to report sexual abuse.

But as Kline was acutely aware, this would not necessarily be true. *Aid for Women II* had concluded that whether an individual had been "harmed" by sexual abuse was dependent upon individual circumstances. Put another way, under the reporting statute, "reporters were not only authorized, but compelled, to make a case-by-case determination as to whether injury occurred." 427 F. Supp. 2d at 1103. This required case-by-case determination could easily explain why some KDHE termination of pregnancy reports might not have a corresponding SRS sexual abuse report—but without a fuller presentation of the law's background, this possibility would not be apparent. Instead, Kline identified a single exception when the two reports might not match up—when SRS offices were closed, so reports would be made to law enforcement.

By failing to explain the grand jury's investigation could not end with a record comparison, Kline left the grand jury with the mistaken impression that if the records did not match, a per se violation of the reporting law had occurred. And this is exactly what the grand jury erroneously believed based on Kline's comments until the truth was discovered later.

As the presiding grand juror testified at Kline's disciplinary hearing, after getting Kline's description of the law, the grand jury be-

lieved reporters who learned that a minor under the age of 16 was pregnant by necessity knew that minor had been sexually abused and thus had been harmed, so the reporter would have had no choice but to report the abuse. Significantly, the presiding juror also testified that before the jury learned of the *Aid for Women II* decision, the grand jury intended to issue a true bill as to the allegations regarding CHPP's failure to report allegations of sexual abuse and that the grand jury intended to base that indictment on its comparison of the 2003 KDHE termination of pregnancy reports and SRS records, which fell within the time frame of the prior statute not disclosed by Kline.

Kline further misled the grand jury with his statement that "law enforcement" is better equipped than a statutory reporter to determine if a child has been "harmed." Kline told the grand jury, "[L]aw enforcement has better tools to determine the truth so the legislative thinking behind the statute is you don't just let the rapist walk in with the child and say, 'It was her boyfriend,' because that gives them magic words to get away with the crime."

Thus, Kline advocated to the grand jury that even if a minor patient reports that her pregnancy resulted from consensual sex with an age-mate boyfriend, a statutory reporter was not entitled to believe that explanation. Instead, according to Kline, the incident must be reported so that law enforcement could determine the truth to the patient's statement.

Again, Kline's interpretation of the statute was entirely inconsistent with the federal district court's decision in *Aid for Women II*. There, the court held that under the statute's plain language, the reporter had the initial discretion to determine whether the child was injured, *not* law enforcement. 427 F. Supp. 2d at 1116 ("Contrary to defendants' claims, a prosecutor is not in a better position to make an initial determination of 'injury,' as required by statute, than is a health care professional.").

Kline argues in his reply brief that his statement to the grand jury that law enforcement is better equipped to deal with the issue referred to the identity of the father and not the issue of harm or injury and therefore was consistent with *Aid for Women II*. But the court in *Aid for Women II* concluded that Kline's opinion that

age-mate intercourse was per se reportable was flawed because the legislature allowed some voluntary sexual activity, such as age-mate sex, to fall outside the statute when no injury had been caused. 427 F. Supp. 2d at 1102-03. Thus, as the *Aid for Women II* decision made clear, if the father of the unborn child was the age-mate boyfriend, the pregnancy was not a per se injury. Therefore, Kline's statement that law enforcement was better equipped to determine whether the father of the unborn child was the minor patient's boyfriend or father was inconsistent with the *Aid for Women II* decision—something the grand jury could have determined for itself if Kline had provided it with the decision.

Further, by omitting any discussion about the key element of "injured" and failing to discuss the only caselaw interpreting that crucial element, Kline hindered the jury's informed decision making. The presiding grand juror testified that after learning of *Aid for Women II*, the jury no longer believed it had reasonable suspicion to subpoena records from CHPP on the reporting issue. Similarly, Merker testified the grand jury was "not happy" it had not learned earlier of the *Aid for Women II* decision. Simply stated, the grand jury was obligated to make an informed and objective decision on how to proceed. By failing to provide the jury with K.S.A. 38-1522 and discuss the federal litigation surrounding the meaning of the term "injured" and its explicit rejection of Kline's interpretation, Kline prevented that informed and objective decision making.

Read in its entirety, we find clear and convincing evidence supports the panel's finding that Kline substantially and significantly misrepresented the law by omitting not only the relevant statute itself, but any explanation of the *Aid for Women II* decision prohibiting prosecutors from enforcing the statute in the manner Kline suggested to the grand jury was legally required. Kline thereby engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of KRPC 8.4(c).

*Clear and Convincing Evidence Supports Kline's Violation of KRPC 8.4(d).*

Kline argues his failure to inform the grand jury of the prior reporting statute and the surrounding litigation did not impact the

grand jury's investigation. Therefore, he reasons there can be no clear and convincing evidence that he violated KRPC 8.4(d), which prohibits engaging in conduct prejudicial to the administration of justice. But as addressed in our discussion of Kline's actions in attaching sealed documents to his *Alpha* brief, this court has not required a showing of actual prejudice to violate KRPC 8.4(d). See 298 Kan. 134-38. Rather, Kline violated KRPC 8.4(d) if he harmed, injured, or disadvantaged the legal system generally. See *Pyle*, 283 Kan. at 829-30.

We find clear and convincing evidence that Kline's conduct harmed, injured, and disadvantaged the legal system generally. His failure to mention the only federal court decision interpreting the reporting statute the grand jury was being called upon to enforce or the fact that the decision specifically rejected his assessment of that statute calls into legitimate question his trustworthiness as a prosecutor and impacted the efficiency and reliability expected from the grand jury process.

Further, clear and convincing evidence demonstrates actual harm. As discussed, two individuals with direct knowledge of the grand jury's reaction to the *Aid for Women II* decision—the presiding grand juror and the jury's legal counsel—testified the grand jury was unhappy that it had not learned of the *Aid for Women II* decision earlier. The presiding juror specifically testified the discovery of the opinion impacted the investigation as the grand jury felt it no longer had reasonable suspicion to request records from CHPP on the reporting issue. The panel determined these witnesses were credible, and the evidence bears the panel out.

*We Decline to Hold Kline Liable for Maxwell's Violations.*

Under KRPC 5.1(c)(2) (2012 Kan. Ct. R. Annot. 612), Kline can only be responsible for Maxwell's actions if he knew about them. And as to this, the panel simply found Kline "knew or should have known" about Maxwell's omissions but did not describe the evidence it relied on to support this conclusion. As previously noted, the term "knows" does not encompass constructive knowledge, and the panel could not properly rely on a conclusion that Kline "should

have known" about Maxwell's omissions and statements to the grand jury.

Having found clear and convincing evidence that Kline's own conduct before the grand jury directly violated KRPC 8.4(c) and (d), and in the absence of the necessary findings from the panel regarding Kline's actual knowledge of Maxwell's conduct, we decline to engage in an analysis of what evidence might support it.

THE PANEL'S CONCLUSION THAT KLINE VIOLATED KRPC 8.4(g) BY DIRECTING AN ATTORNEY TO PUBLICLY FILE TWO PLEADINGS TO ENFORCE GRAND JURY SUBPOENAS IS SUPPORTED, IN PART, BY CLEAR AND CONVINCING EVIDENCE.

The panel concluded Kline violated KRPC 8.4(g)'s prohibition against conduct adversely reflecting on a lawyer's fitness to practice law when he directed his staff to file two motions to enforce the grand jury's subpoena without first permitting review of the motions by the grand jury, as the grand jury had requested. The panel found Kline acted intentionally in filing the "unauthorized" enforcement motions and contrary to the grand jury's efforts to seek voluntary disclosure of information from CHPP. The panel also found a second KRPC 8.4(g) violation, concluding Kline violated the grand jury secrecy statute when he directed the two motions be publicly filed.

*Clear and Convincing Evidence Supports the Panel's Finding That Kline Violated KRPC 8.4(g) by Failing to Comply with the Grand Jury's Request to Review Pleadings Before Filing.*

Kline first challenges the panel's finding that his direction to a staff attorney to file two enforcement motions without first providing them to the grand jury for review violated KRPC 8.4(g) (2012 Kan. Ct. R. Annot. 644), which prohibits engaging in conduct "adversely reflect[ing] on the lawyer's fitness to practice law. In doing so, Kline reiterates his argument, discussed at 298 Kan. 117-19, that his conduct was not "clearly egregious and flagrantly violative of accepted professional norms"—a standard we have already rejected. Kline further contends the jury "requested," rather than directed, review of documents filed in its name and therefore he

had no obligation to comply with the request. Alternatively, Kline contends he filed the enforcement motions on behalf of *the State*, rather than the grand jury, and therefore his actions did not implicate the grand jury's request. Finally, he argues these filings did not prejudice the proceedings or impact the grand jury's investigation.

The Disciplinary Administrator responds that Kline could act only in his statutory capacity as a legal advisor with respect to the citizens' grand jury and, as such, he was duty-bound to follow its request. Further, the Disciplinary Administrator argues Kline's actions were egregious by contradicting the grand jury's efforts to obtain CHPP's voluntary compliance with the grand jury's requests in order to avoid an appellate challenge.

*Kline was charged with assisting, not directing, the citizen-requested grand jury.*

As discussed, a county or district attorney acts as a legal advisor to a citizen-requested grand jury. And as the statutory language conveys, a prosecutor acts almost exclusively at the grand jury's request and direction. For instance, *"whenever required by the grand jury,"* a prosecutor must attend sessions of the grand jury to examine witnesses, provide advice on legal matters, issue subpoenas or other processes, and draw up bills of indictment. K.S.A. 19-713; K.S.A. 22-3007(1); see also *Tiller*, 286 Kan. at 38 (grand jury's subpoena power authorizes the issuance of subpoenas for witnesses as well as the production of documents).

Similarly, while K.S.A. 22-3007(2) utilizes mandatory language regarding a prosecutor's authority to appear before the grand jury, the prosecutor must nevertheless *request* to appear. K.S.A. 22-3007 (providing that a prosecuting attorney *"shall*, upon his request, *be permitted* to appear before the grand jury for the purpose of giving information relative to any matter cognizable by the grand jury" [Emphasis added.]). But in the same sentence, the legislature gave the grand jury discretion as to whether to permit the prosecutor to examine witnesses. K.S.A. 22-3007(2) (providing prosecutor *"may* be permitted to interrogate witnesses if the grand jury deems it necessary" [Emphasis added.]).

As Kline acknowledged during the grand jury proceeding and in his disciplinary hearing, the grand jury functions as an independent body. See *Tiller*, 286 Kan. at 39-43 (relying on *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 111 S. Ct. 722, 112 L. Ed. 2d 795 [1991] for proposition that grand jury has a "unique role" as "an investigatory body," and recognizing that despite differences in federal and state systems, federal rules and caselaw regarding the grand jury process provide guidance); see also ABA. Standards for Criminal Justice Prosecution Function and Defense Function 3-3.6(f) (3d ed. 1993) (stating that a prosecutor should not "intentionally interfere with the independence of the grand jury, preempt a function of the grand jury, or abuse the processes of the grand jury"); National District Attorneys Association, National Prosecution Standards § 4-8.3 (3d ed.) (providing that a prosecutor should refrain from actions that "have the potential to improperly undermine the grand jury's independence").

*By directing the two enforcement motions be filed, Kline contradicted the plain desires and goals of an independent investigatory body.*

Kline does not dispute the panel's finding that he intentionally ignored the grand jury's request to review documents before they were filed. Significantly, Kline fails to acknowledge the circumstances leading to the jury's request—a previous filing in which Kline's office sought to extend the grand jury's service without first seeking the grand jury's input as to whether it wished to extend its service. And Kline also fails to acknowledge that by this point in the proceedings, his office's relationship with the grand jury was strained—the jury was unhappy about Kline's and his office's failure to disclose *Aid for Women II*, and it questioned whether it had reasonable suspicion to issue the CHPP subpoena with respect to mandatory reporting.

Instead, Kline embarks upon a misguided trajectory. He claims he did not violate the grand jury's wishes, or his ethical duty, because the filings were "made solely in the name of *the State* and signed by his office,—in stark contrast to other documents which

the grand jury did purport to issue or request be filed in its own name." (Emphasis added.)

Not surprisingly, Kline points to no legal authority supporting his suggestion that a prosecutor occupies dual roles in a citizens' grand jury proceeding and that when those roles diverge, the prosecutor may elect to act on the State's behalf rather than the grand jury's behalf. Simply stated—this was *not* an inquisition brought by the prosecutor on behalf of the State in which the prosecutor assumes a more independent role. This was a statutorily defined citizens' grand jury proceeding in which Kline played a limited and specific role—a role explicitly set out by statute. He was not free to assume a different role once he no longer approved of the grand jury's direction.

Moreover, Kline's recognition that his enforcement motions represented a "stark contrast" to previous filings made at the grand jury's request only solidifies our conclusion that Kline's singular purpose in filing these motions was inconsistent with his statutory role as an advisor to an independent grand jury and that Kline was acutely aware of this distinction. In other words, Kline sought to prod the grand jury proceeding in the direction he wanted it to go, rather than allowing the grand jury to chart its own course.

Notably, the only citation Kline provides to support his argument, K.S.A. 22-3008(1), is relegated to a footnote in his brief. That statute allows the clerk of the court to issue subpoenas and other process "[w]henever required by any grand jury, its presiding juror or the prosecuting attorney." But Kline provides no explanation for his reliance upon this statute or its application here.

Kline's failure to expand on the footnoted citation is predictable since K.S.A. 22-3008(1), by its very terms, is not relevant. That statute addresses a *clerk's issuance* of "subpoenas and other process to bring witnesses to testify before the grand jury," and it indicates the process can be initiated by the grand jury, its presiding juror, or the prosecuting attorney. But this statute has no application whatsoever to efforts to seek *court enforcement* of grand jury subpoenas, which is the circumstance at issue. Instead, under K.S.A. 22-3008(2), the district court controls whether compulsory process shall issue.

Under K.S.A. 22-3008(2), the district court can enforce compulsory process when "any witness duly summoned to appear and testify before a grand jury *fails or refuses to obey*" the summons. See *Tiller*, 286 Kan. at 38 (noting district court has authority to enforce compulsory process in a citizen-directed grand jury proceeding). Here, it is undisputed CHPP had filed a motion to quash the subpoena and was working with the grand jury and its special counsel to voluntarily produce information. Thus, CHPP had not failed or refused to obey the summons. Moreover, even if we were concerned with the enforcement of the subpoena, we see nothing in K.S.A. 22-3008(1) permitting a prosecuting attorney to seek enforcement of a subpoena on behalf of the State without a citizen-requested grand jury's direction to do so.

When Kline filed the two enforcement motions, he purported to act on behalf of the State, yet he had no statutory authority to do so. Instead, his role was limited only to acting on behalf of and at the request of the grand jury. But the grand jury had specifically requested to review any documents filed, and this request came only *the day before* Kline filed the first of the two motions. Even more significantly, Kline filed the second motion on the *very same day* the grand jury was reviewing information voluntarily provided by CHPP and had chosen to end its service.

By intentionally and purposefully failing to honor the grand jury's request and by acting on behalf of the State without authority to do so, Kline exceeded his statutory responsibility to the grand jury in favor of his own interests. Under these circumstances, we conclude the evidence clearly and convincingly establishes Kline's actions violated KRPC 8.4(g)'s prohibition against conduct adversely reflecting on a lawyer's fitness to practice law.

Additionally, we note as did the panel, that at the time Kline filed his enforcement motions, the grand jury had already redirected its efforts towards seeking voluntary compliance from CHPP. And while the grand jury maintained its subpoena as leverage, it did not wish to pursue enforcement based on its concern that such action would lead to a mandamus action challenging the subpoena and redirecting the course of the proceedings. The grand jury had clearly expressed its desire not to extend its service beyond

its initial 3-month limitation, and the court was unwilling to order an extension without the jury desiring it. In other words, despite Kline's recognition that the grand jury was an independent investigatory body, his two motions seeking enforcement of the CHPP subpoena directly contradicted the jury's independent efforts and goals. Again, that is not the role the statute gave Kline's office in this circumstance.

Further, both motions filed by Kline's office engaged in substantial criticism of the grand jury, its special counsel, and even the judge; thus, the motions went well beyond seeking subpoena enforcement. For example, the first motion chided the grand jury's special counsel for "chit chat[ting]" with CHPP, *i.e.*, in seeking to mediate an agreement permitting the grand jury to view requested information without extending its time. And the motion hinted at chiding the grand jury for not meeting regularly.

Similarly, the second enforcement motion took issue with the "mediated agreement" through which CHPP had agreed to provide information, even though by that point the grand jury had expressed its willingness to review information voluntarily provided by CHPP. Unquestionably, Kline's intent, especially regarding the second motion filed on the last day of the grand jury's service, was *not* to advance the grand jury's direction or to benefit its process in any way. Instead, he acted at complete cross-purposes with the grand jury—a course that contradicted the grand jury statutes defining his role.

While Kline's conduct in filing the enforcement motions contrary to the direction and purpose of the grand jury provides strong circumstantial evidence of Kline's contrary purpose, the testimony of Kline's assistant district attorney, Pryor, provides direct evidence of Kline's motive. Although Kline disputes some of Pryor's testimony, the panel's decision to cite Pryor's testimony and not Kline's is a credibility determination we will not reexamine. Pryor told the disciplinary panel that approximately 1 week prior to the filing of the first enforcement motion, Maxwell advised Kline that Kline was "losing this grand jury." This statement bothered Kline, who wanted to "keep trying to convince [the grand jury]." Pryor questioned Kline as to why he cared so much about this grand jury and

reminded Kline that Kline had not called the independent body and that Kline had already filed 107 charges against CHPP. In response, Kline "became very angry, his body was stiff and he slammed the table and he said if I lose this grand jury it will destroy me." Pryor's testimony leaves no question that while Kline understood and was even reminded of the independence of the citizen-requested grand jury, he intentionally proceeded to act based on his own motive and contrary to the grand jury's direction.

Similarly, Pryor testified that Kline directed him to attach the confidentiality agreement, brokered by the grand jury's special counsel but later withdrawn, to the enforcement motion Kline had directed be publicly filed with the court. According to Pryor, Kline's purpose in attaching the agreement was to "get the truth out." While Pryor wisely chose not to comply with Kline's direction because the agreement was sealed, his testimony further supports the panel's conclusion that Kline clearly acted for his own purpose, and not that of the grand jury, in filing the motion.

Further, Pryor testified that when he presented Kline with the second enforcement motion for approval before filing it on March 3, 2008, Kline directed Pryor to remove Kline's signature block. According to Pryor, Kline did not want to appear on the pleading because "he didn't want to have another thing to make it appear like he was just the abortion attorney." Kline's insistence on filing the enforcement motion on the last day of the grand jury's service while simultaneously refusing to take responsibility for the motion provides further evidence that Kline understood that his actions were inconsistent with his advisory role.

Finally, Kline again makes an alternative "no harm, no foul" argument suggesting his conduct did not violate KRPC 8.4(g) because his direction to file the two enforcement motions did not impact the grand jury. Essentially, he argues his actions were neither prejudicial nor material. But neither of these factors is relevant or necessary to finding a KRPC 8.4(g) violation because they ignore the professional responsibility imposed by the grand jury statute and assumed by Kline under it. The court will not entertain this argument further.

We find clear and convincing evidence to support the panel's findings that contrary to the grand jury's request to view any document prepared in its name, and contrary to the grand jury's efforts to seek voluntary compliance from CHPP, Kline filed two motions to enforce the subpoena. We have no hesitation in concluding Kline's purposeful disregard for his obligation to act at the request of, and on behalf of, the grand jury negatively reflects on Kline's fitness to practice law in violation of KRPC 8.4(g).

*Clear and Convincing Evidence Does Not Support the Panel's Finding That Kline's Direction to Publicly File the Enforcement Motions Violated KRPC 8.4(g).*

The panel also found Kline violated KRPC 8.4(g) when he ordered the enforcement motions be publicly filed. In challenging this finding, Kline first contends he did not receive notice that he was being charged with a violation based on the public filing of the motions. Therefore, he claims, the panel's finding should be discarded on due process grounds. Alternatively, he contends the panel erred in finding a KRPC 8.4(g) violation because the grand jury secrecy statute, K.S.A. 22-3012, had already been disregarded by the grand jury's own special counsel.

The Disciplinary Administrator argues the complaint provided adequate notice with respect to this violation and that Kline's public filings of the two enforcement motions revealed to the public the grand jury's confidential workings in violation of K.S.A. 22-3012 and KRPC 8.4(g).

Initially, we note that while the Disciplinary Administrator characterizes Kline's "notice" argument as a due process challenge, Kline's brief does not directly raise a due process issue. Instead, he simply asserts the "[p]anel failed to provide Kline notice." We could deem Kline's notice argument abandoned. See *State v. Berriozabal*, 291 Kan. 568, Syl. ¶ 20, 243 P.3d 352 (2010) (deciding that arguments without pertinent authority or explanation will be deemed abandoned). Instead, we decline to address Kline's notice argument, as we agree with Kline that under the circumstances, the record lacks clear and convincing evidence of a KRPC 8.4(g) violation.

Turning to the merits, it appears that in finding a·KRPC 8.4(g) violation, the panel relied upon its conclusion that Kline's public filing of the enforcement motions violated the grand jury secrecy statute, K.S.A. 22-3012, which allows disclosure only in limited circumstances: "[An] attorney . . . may disclose matters occurring before the grand jury only when so directed by the court . . . ."

As the panel noted, in the first enforcement motion, Kline: (1) pointed out the grand jury had met for 11 days; (2) discussed Special Counsel McClain's efforts to voluntarily obtain information from CHPP; (3) accused McClain of violating the grand jury secrecy statute; and (4) discussed the confidentiality agreement's terms ultimately rejected by the grand jury. Further, while not specifically noted by the panel, in the second motion, Kline: (1) discussed the February 27 and 28, 2008, grand jury hearings; (2) described a "mediated agreement" brokered by Judge Moriarty resulting in CHPP providing information to the grand jury; and (3) questioned both the wisdom and legality of the manner in which CHPP provided information to the grand jury.

For purposes of our decision today, we will assume without deciding that Kline's public filing of the motions resulted in disclosure of "matters occurring before the grand jury." But unlike the panel, we find a lack of clear and convincing evidence to establish that Kline's actions adversely reflect on his fitness to practice law under the circumstances.

As Kline points out, when he filed the enforcement motions, information contained in the motions had already been publicly disclosed because Judge Moriarty permitted the media to attend and report on several grand jury proceedings. Further, Kline notes the grand jury's special counsel had filed other documents publicly. The Disciplinary Administrator does not respond directly to either argument.

While Kline's allegations regarding the media's participation and reporting appear to be supported by the record, the record is unclear as to whether other documents were publicly filed. Further, the case history does not indicate whether any documents were filed under seal. And while Pryor testified at the disciplinary hearing the first pleading or document to be filed publicly was Kline's

request to enforce the subpoena, the record indicates Special Counsel McClain advised the grand jury that SRS's Protective Order had been publicly filed.

In light of the Disciplinary Administrator's failure to respond, as well as the gaps in the record as to media participation and the public filing of other documents, we find a lack of clear and convincing evidence to conclude Kline's direction to publicly file two enforcement motions adversely reflects on his fitness to practice law.

## DISCIPLINE

Having found clear and convincing evidence that Kline committed 11 violations of the Kansas Rules of Professional Conduct, we now turn to the issue of discipline. Before doing so, it is helpful to summarize the violations found:

- violations of KRPC 8.4(d), 8.4(g), and 5.1(c) from Kline's direction to attach sealed documents to a public brief in violation of the *Alpha* court's order;
- violations of KRPC 3.3(a)(1) and 8.4(c) from Kline's direction to file a false motion to clarify in *Alpha*;
- violations of KRPC 3.3(a)(3) and 8.4(c) from Kline's false testimony to Judge King and his false statement to the *CHPP* court in oral argument concerning his retention of WHCS patient file summaries;
- violation of KRPC 8.1(b) from Kline's failure to supplement his letter to the Disciplinary Administrator to correct his prior incorrect statements regarding the storage of patient medical files subject to a protective order;
- violations of KRPC 8.4(c) and 8.4(d) from Kline's failure to advise the grand jury of the *Aid for Women* litigation and K.S.A. 38-1522; and
- violation of KRPC 8.4(g) from Kline's direction to file two motions to enforce the grand jury's subpoena against the express direction and wishes of the grand jury.

Based on the violations it found, which were more numerous than those we have found, the hearing panel recommended indefinite suspension. This recommendation is advisory only and does

not prevent us from imposing greater or lesser sanctions. Supreme Court Rule 212(f) (2012 Kan. Ct. R. Annot. 368); see *In re Ireland*, 294 Kan. 594, 603-04, 276 P.3d 762 (2012). The Disciplinary Administrator urges disbarment. Kline maintains he committed no violations of the KRPC and argues no discipline is warranted.

We base our disciplinary decision on the facts and circumstances of the violations and the aggravating and mitigating circumstances present. *In re Johanning*, 292 Kan. 477, 490, 254 P.3d 545 (2011). And although not mandated by our rules, this court and disciplinary panels "[h]istorically" turn to the American Bar Association Standards for Imposing Lawyer Sanctions to guide the discipline discussion. See ABA Compendium of Professional Responsibility Rules and Standards (2012); see also *In re Woodring*, 289 Kan. 173, 180, 186, 210 P.3d 120 (2009) (discussing and applying ABA Standards); *In re Rumsey*, 276 Kan. 65, 78-79, 71 P.3d 1150 (2003) (citing and discussing ABA Standards). Like the panel, we choose to utilize the ABA's framework to assist us in the task of determining the appropriate discipline.

Under that framework, we consider four factors in assessing punishment: (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the actual or potential injury resulting from the misconduct; and (4) the existence of aggravating and mitigating circumstances. See *Rumsey*, 276 Kan. at 78 (listing the four components of the ABA Standards' framework); ABA Standard 3.0.

*Kline Violated Ethical Duties to the Legal System, the Legal Profession, and the Public.*

The panel generally concluded Kline violated his duties to "the legal system, the legal profession, and the public to maintain his personal integrity." Kline does not dispute the panel's conclusion. Instead, he takes issue with the significance, noting the ABA Standards emphasize "the most important ethical duties are those obligations which a lawyer owes to clients." See ABA Standards, 461. Kline points out the panel did not find he violated any duties to a client.

But the obvious flaw in this is that as Attorney General of the State of Kansas and District Attorney for Johnson County, his "cli-

ent" was the public. See *Gray Panthers v. Schweiker*, 716 F.2d 23, 33 (D.C. Cir. 1983) (Public servants "have a higher duty to uphold because their client is . . . the public at large."); *Commission on Spec. Revenue v. Freedom of Information Commission*, 174 Conn. 308, 319, 322, 387 A.2d 533 (1978) (Attorney General holds a "special status" because "the real client of the attorney general is the people of the state."); *Humphrey on Behalf of State v. McLaren*, 402 N.W.2d 535, 540-41, 543 (Minn. 1987) (A government attorney "has for a client the public."); see also K.S.A. 22a-104 ("[I]t shall be the duty of the district attorney to appear in several courts . . . on behalf of the people . . . ."). And, as discussed below, we find several violations implicating this relationship.

Moreover, Kline's argument that he did not violate any duty to "a client" appears designed to minimize the significance of his violations of duties to the general public, the legal system, and the legal profession. We reject this notion.

Initially, the ABA Standards note the public entrusts lawyers with "property, liberty, and their lives." Therefore, the public is entitled to expect lawyers to behave with the highest standards of honesty and integrity and not to engage in conduct involving dishonesty, fraud, or interference with the administration of justice. See ABA Standards, 462 (citing Rule 8.2, prohibiting false statements regarding the qualifications or integrity of a judge, and Rule 8.4(b) and (c), prohibiting criminal acts and dishonest conduct).

We have found clear and convincing evidence of several violations implicating Kline's duty to his client—the public—including dishonest conduct in: directing the filing of a false motion to clarify in *Alpha*; falsely advising the *CHPP* court he had no summaries of WHCS records; and misrepresenting the applicable law to the grand jury when he failed to inform it of *Aid for Women II* and K.S.A. 38-1522, all in violation of KRPC 8.4(c). Additionally, as chief prosecutor for the State and later for Johnson County, Kline clearly had a duty to the public to refrain from conduct adversely reflecting on his fitness to practice law. Thus, when Kline violated KRPC 8.4(g) by directing sealed documents to be attached to a publicly filed brief in disregard of the *Alpha* court's order and later directed two enforcement motions be filed against the grand jury's

instructions and desire, he violated his duty to the public to act with integrity.

Further, as the panel recognized, lawyers also owe duties to the legal system. As officers of the court, lawyers must abide by the rules that "shape" the administration of justice. ABA Standards, 462. Lawyers violate this duty when they fail to "operate within the bounds of the law" and "create or use false evidence, or engage in any other illegal or improper conduct." ABA Standards, 462 (citing numerous rules implicating a lawyer's duty to the legal system, including Rule 3.3, requiring candor to the tribunal, and Rule 8.4[d], prohibiting conduct prejudicial to the administration of justice).

We have found clear and convincing evidence of multiple violations of rules implicating Kline's duty to the legal system. He engaged in conduct prejudicial to the administration of justice in violation of KRPC 8.4(d) and KRPC 5.1(c) by directing sealed documents to be attached to his publicly filed brief in *Alpha* in direct contravention of the court's order and by failing to advise the grand jury of *Aid for Women II* and K.S.A. 38-1522, causing the grand jury to issue a subpoena it later believed was not supported by reasonable suspicion, at least with respect to the mandatory reporting aspect. Further, Kline failed in his duty of candor to a tribunal, running afoul of KRPC 3.3(a)(1) and (a)(3), respectively, when he directed a false motion to clarify to be filed with the *Alpha* court and failed to correct his false testimony to Judge King.

Finally, because lawyers are a self-regulating profession, cooperation and honesty during the disciplinary process is crucial. Kline's obligations to the legal profession include a duty to maintain the profession's integrity. See ABA Standards, 462 (citing Rule 8.1 and Rule 8.3 as rules concerning a lawyer's duties to the legal profession). Kline violated this duty when he failed to supplement a false statement to the Disciplinary Administrator in violation of KRPC 8.1.

*Kline Acted Knowingly in Violating Multiple Rules of Conduct.*

The next factor we consider in assessing discipline is Kline's mental state. Before us, Kline argues there is no evidence he acted

in "knowing" violation of the rules, reiterating his earlier arguments that there is no evidence he violated any rule. But the panel concluded Kline knowingly violated his duties, and we must determine whether that conclusion is warranted.

The ABA Standards identify three mental states: "intent," the highest culpable mental state; "knowledge," the intermediate culpable mental state; and "negligence," the least culpable mental state. Under the ABA Standards, a lawyer acts intentionally when acting with the "conscious objective or purpose to accomplish a particular result," while a lawyer acts with knowledge when acting "with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result." Finally, a lawyer acts negligently when failing "to be aware . . . that a result will follow . . . ." See ABA Standards, 462; see also *In re Carpenter*, 337 Or. 226, 237-38, 95 P.3d 203 (2004) (concluding attorney acted with "intent" because he had a clear objective in mind); *Discipline of Eugster*, 166 Wash. 2d 293, 318-20, 209 P.3d 435 (2009) (noting that assessment of punishment under the ABA Standards focuses on the "state of mind relative to the consequences of his [or her] misconduct rather than the duty violated," recognizing a "fine line" between intentional and knowing conduct, and holding a lawyer generally acts with intent when acting to benefit himself or herself).

We have already found, by clear and convincing evidence, that Kline acted "knowingly," or "with conscious awareness of the nature or attendant circumstances of his . . . conduct . . . ." Namely, we found he acted knowingly in directing the attachment of sealed documents to a public brief in violation of the *Alpha* court's order and in directing the filing of a motion to clarify in *Alpha* falsely conveying to the court that his office had subpoenaed mandatory reporters other than abortion clinics. As to this violation, Kline's knowing conduct is best evidenced by the testimony of Kline's Senior Deputy, Rucker, who testified he was disappointed with the filing of the clarification motion. Rucker testified that because he had spoken accurately when he advised the court that Kline's office had not subpoenaed any other mandatory reporters, he believed "clarification" was unnecessary.

We also concluded Kline acted knowingly when he failed to correct his testimony to Judge King regarding the WHCS summaries and when he falsely told the *CHPP* court he did not believe he had any summaries of WHCS records. As we discussed, the panel's findings demonstrate the panel did not believe Kline's claim that he "forgot" that he had 62 handwritten summaries. But we further found Kline's knowledge could be inferred from the highly unusual circumstances in which he directed creation of those "summaries." Specifically, after Kline learned that despite his protestations, Judge Anderson would require him to return all copies of WHCS patient files the next day, Kline ordered his staff to hand copy the content of all 62 files to "summaries" and to complete this task overnight.

Further, Kline acted knowingly when he became aware that confidential patient files had not been maintained constantly under "lock and key" as he represented to the Disciplinary Administrator but failed to correct that false statement. Kline's knowledge of the falsity of this misstatement is best evidenced by the testimony of Kline's former staff member, Reed, who testified that when Kline became aware Reed had given a statement to Morrison about storing the files in Reed's apartment, Kline became so angry that he threw Reed's deposition across the room.

Similarly, Kline clearly acted with conscious awareness of the nature and attendant circumstances of his conduct when he failed to advise the grand jury about the mandatory reporting statute in effect for 4 of the 5 years the grand jury was investigating and in failing to advise the jury of the *Aid for Women* litigation. The omission of any reference to the statute or to the result of the litigation, which enjoined prosecutors from enforcing the mandatory reporting statute in the manner Kline advocated before the grand jury, is evidence that Kline knowingly misdirected the grand jury.

Finally, we found that Kline knowingly disregarded the grand jury's request to review all documents to be filed in its name when he filed two motions to enforce the grand jury's subpoena without the grand jury's review or knowledge. That Kline acted knowingly is again supported by testimony from one of his subordinates, Pryor, who told the panel he informed his superiors of the grand

jury's request. Further, Kline's knowing mental state is evidenced by his direction to file the two enforcement motions in the name of the State rather than the grand jury in an effort to assert a duality in roles that the statute does not authorize.

Thus, although we were not required to find a specific mental state with respect to each violation found to be supported by clear and convincing evidence, the evidence demonstrates Kline acted, at a minimum, with conscious awareness of the nature of his conduct as to each violation.

*Kline's Violations Resulted in Actual and Potential Injury.*

The panel concluded Kline's misconduct caused "actual injury to the legal system and the legal profession" as well as "potential injury to the public." In his brief, Kline challenges these conclusions, suggesting there is no evidence any violation found by the panel caused prejudice or potential injury to any party or legal proceeding and implying that in absence of monetary damage there can be no injury. At oral argument before this court, Kline's counsel took this position further, suggesting there were no "victims" of Kline's misconduct. We reject both notions.

Preliminarily, we reject the implication that the ABA Standards require proof of a monetary injury to a client in order to constitute "injury." See, *e.g., Ireland,* 294 Kan. at 601, 605 (finding attorney's false accusations against a judge injured legal profession); *In re Harris,* 292 Kan. 521, 528, 530, 257 P.3d 1231 (2011) (finding attorney's violation of rules regulating attorney registration injured legal profession and legal system); *In re Millett,* 291 Kan. 369, 378, 380, 241 P.3d 35 (2010) (finding attorney's dishonest actions during police investigation of client caused injury to the legal profession and legal system). Additionally, the ABA Standards contradict Kline's suggestion that proof of monetary injury is required because the Standards provide for suspension when misconduct adversely affects or interferes with a legal proceeding. See discussion at 298 Kan. 224-25; see also, *e.g.,* ABA Standard 5.2 (discussing standards related to a failure to maintain the public trust and indicating injury can be to the "integrity of the legal process"); ABA Standard 7.0 (discussing standards related to duties owed to the

profession and noting that injury can be to "a client, the public, or the legal system").

As Kansas Attorney General and later as Johnson County District Attorney, Kline held positions of particular honor, responsibility, and trust—positions bestowed on him by the citizens of Kansas and the Johnson County Republican Central Committee, respectively. When Kline violated rules regulating his professional conduct, he betrayed that trust, causing "incalculable harm to the public's perception" of both offices. See *Disciplinary Counsel v. Dann*, 134 Ohio St. 3d 68, 74, 979 N.E.2d 1263 (2012) (By violating ethical rules in filing false financial disclosure forms and soliciting improper compensation, Ohio Attorney General caused significant harm not only to his office but also to "those government agencies, departments, and institutions that the attorney general advises and represents."); see also *In re Marinoff*, 819 So. 2d 305, 312-13 (La. 2002) (Adverse publicity from assistant city attorney's professional misconduct in making false statements regarding automobile accident harmed the public's perception of the legal profession.); *Office of Disciplinary Counsel v. Cappuccio*, 616 Pa. 439, 48 A.3d 1231, 1240 (2012) (Misconduct of attorneys serving in public positions "speaks directly to the integrity of the legal system by placing the reputation of those tasked with serving and protecting the public at issue.").

Similarly, as the State's chief prosecutor and later as Johnson County's chief prosecutor, Kline was a highly visible member of the legal profession. Thus, Kline's misconduct reflects poorly on his profession and the legal system with even greater prominence than might otherwise be the case.

Our conclusion that Kline's conduct injured the public, the legal system, and the legal profession mandates our rejection of Kline's claims of "no injury" and "no victims." Further, we note our findings regarding some of Kline's violations explicitly recognize evidence of injury. For instance, Kline's directive to disobey the *Alpha* court's order and attach sealed documents to a public brief, as well as his directive to file a false motion to clarify, most certainly lessens the public's confidence in the judicial system. And the record demonstrates Kline's actions resulted in additional filings related to the

show cause order with respect to the sealed documents, oral argument devoted to the show cause order, and the *Alpha* court's devotion of considerable time and effort to address these issues.

In the same vein, Kline's failure to correct his false statement to Judge King that he possessed only 3 WHCS summaries instead of 62, and his false statement to the *CHPP* court that he possessed no WHCS summaries, misled both courts as to the existence of the summaries and misdirected their efforts to determine the nature and scope of the question whether Kline had mishandled patient medical records.

In addition, Kline's failure to advise the grand jury about *Aid for Women II* and K.S.A. 38-1522 prejudiced the administration of justice—*i.e.* harmed the judicial system generally—because it calls into question the trustworthiness of the county's prosecutorial process and impacted the grand jury's efficacy and the integrity of its work. Kline's failure to properly advise the grand jury resulted in actual harm when, after learning of *Aid for Women II* midway through the investigation, the grand jury questioned whether its subpoena to CHPP regarding mandatory reporting was supported by reasonable suspicion. Further, the grand jury's belated discovery of key legal authority led to the grand jury's special counsel distrusting Kline's office. And, Kline's filing of two enforcement motions without first obtaining grand jury review harmed the judicial system in that it contradicted the grand jury's specific request and compromised its efforts to voluntarily negotiate with CHPP, while at the same time casting public doubt as to the credibility of its internal workings and the confidence that should attend its ultimate conclusions.

## The Existence of Aggravating and Mitigating Circumstances

This court's rules require that a disciplinary panel explain "[m]itigating or aggravating circumstances which affect the nature or degree of discipline." Supreme Court Rule 211(f) (2012 Kan. Ct. R. Annot. 350). The panel must consider the evidence presented as to aggravating and mitigating circumstances and determine the weight to be assigned to each in arriving at an appropriate discipline. *In re Walsh*, 286 Kan. 235, 248, 182 P.3d 1218 (2008).

In its recommendations, the panel did this. We next determine whether we agree.

*Aggravating factors*

The panel found seven aggravating factors: dishonest or selfish motive; pattern of misconduct; multiple offenses; bad faith obstruction of the disciplinary process; submission of false evidence, false statements, or deceptive practices during the disciplinary process; refusal to acknowledge the wrongful nature of conduct; and substantial experience in the practice of law. Kline takes exception to the panel's findings of dishonest or selfish motive, bad faith obstruction of the disciplinary process, and deceptive practices during the disciplinary process.

First, Kline argues there is no evidence he acted with a dishonest and selfish motive. Instead, he contends he acted at all times as a public official diligently performing his duties. But we have found numerous instances in which Kline demonstrated, at a minimum, a selfish motive. For instance, Kline testified he directed the attachment of sealed documents to his office's *Alpha* brief in contradiction of the court's order so that "others" could understand his argument. Thus, Kline not only disobeyed the court's order and placed sealed court documents in the public domain, he did so intentionally to achieve public exposure of them to promote his own message—not to benefit the *Alpha* court's understanding of the issues.

Perhaps the strongest evidence that Kline acted to benefit himself or his own motives can be found in Kline's directive to file the two motions to enforce the grand jury subpoenas without permitting the grand jury to first review them, contrary to the grand jury's explicit request and in direct conflict with its efforts to voluntarily seek information from CHPP. Kline's improper motive is corroborated by the content of the motions, which engaged in substantial criticism of the grand jury, its special counsel, and even the presiding judge, and by Pryor's testimony regarding Kline's conduct with respect to those motions. Specifically, Pryor testified that prior to filing the enforcement motions, he confronted Kline about why Kline was so upset about "losing the grand jury." Kline responded

angrily, slamming the table and declaring that if he lost the grand jury, "it [would] destroy [him]." And then Kline specifically directed Pryor to remove Kline's signature block from the final motion so Kline would not appear to be "just the abortion attorney."

The evidence demonstrates that with respect to several violations, Kline acted to protect himself from perceived ridicule and unfavorable public scrutiny and cull favor with the public for his cause. But regardless of whatever fervid belief or desire to see his cause succeed, Kline's efforts at casting a favorable public image toward himself or elsewhere was clearly an improper motive upon which to act when his statutory duty with the grand jury was to serve as its legal advisor. See K.S.A. 19-713.

We also reject Kline's challenge to the panel's finding that he obstructed the disciplinary process by disobeying an evidentiary ruling twice made by the panel. This finding relates to Kline's unsuccessful attempt on two occasions to admit a 911 recording originating from WHCS. On both occasions, the panel refused to admit the evidence, finding the content irrelevant. One panel member specifically noted, "I think you've already got in the fact that there was a death associated with La Quinta, they were contacted and investigated. I don't think we need to go into the bullet by bullet details of how the death occurred." But despite the panel's rejection of Kline's two previous attempts to admit the evidence, in his closing argument, Kline personally provided the panel with a detailed recitation of the call, disregarding the panel's order.

We do not agree, however, with the panel's conclusion that Kline engaged in deceptive practices during the disciplinary process. Initially, the panel found that Kline engaged in deceptive practices when he proffered in his initial answer that in April 2007, he was unaware that summaries were created. Notably, Kline later filed an amended answer correcting this misstatement, and when asked about the initial answer at the hearing, Kline candidly responded that he could not say whether the mistake was "[a]ttorney error or bad information." And given the volume of information contained in the initial complaint and answer, the subsequent correction, and Kline's candid comment at the hearing, we cannot attribute deceptive intent to his initial answer in this regard.

Likewise, we cannot conclude Kline engaged in a deceptive practice when he testified that his office, rather than the clinics, sought to include the inquisition record in the record on appeal in *Alpha*. Before Kline proffered his potentially offending testimony, Maxwell testified that Kline's office filed a motion requesting the inquisition record be made part of the record on appeal. When asked about the same series of events, Kline initially testified his office filed the motion, but after being informed that this court's records verified that the clinics had in fact filed the motion, Kline essentially deferred to the record and indicated he could not remember.

Although we disagree with Kline's characterization of the panel's conclusion as going "to great lengths in a futile attempt to establish that Kline gave false testimony," we agree the record does not establish that he "intended to mislead" the panel. Instead, it appears equally likely Kline simply relied on Maxwell's earlier testimony to supplement his memory of a sequence of events in which his level of involvement is unclear. Thus, we conclude the record does not bear out the panel's finding that Kline engaged in deceptive practices in the panel's proceeding in this regard.

*Mitigating factors*

The panel found the presence of three mitigating factors: absence of prior disciplinary record, previous good character and reputation, and cooperative attitude towards the proceedings. Kline takes issue only with the panel's conclusions regarding his prior good character and reputation, suggesting essentially that the panel's findings were insufficiently detailed.

As Kline suggests, the panel's findings were brief: "Several friends and associates of [Kline] testified regarding [Kline's] good character." Nevertheless, the panel was not required to detail this testimony, and the finding is sufficient to demonstrate the panel heard and considered this evidence. See *In re Lovelace*, 286 Kan. 266, 269-70, 182 P.3d 1244 (2008) (approving a panel's findings when the findings implicitly considered specific acts). Like the panel, we have reviewed the evidence of mitigating circumstances

submitted by Kline and conclude he demonstrated mitigating evidence of good character and positive reputation.

*Conclusion: Aggravating and mitigating circumstances*

In conclusion, we find the evidence supports the panel's finding of the following aggravating factors: selfish motive; pattern of misconduct; multiple offenses; bad faith obstruction of the disciplinary process; submission of false evidence or false statements; refusal to acknowledge the wrongful nature of conduct; and substantial experience in the practice of law. Further, the evidence supports the following mitigating factors found by the panel: absence of prior disciplinary record, previous good character and reputation, and cooperative attitude towards the proceedings.

*Applicable ABA Standards*

The conclusions we reach above—that Kline violated his duties to the public, the legal system, and the legal profession; that he acted knowingly in doing so; and that he caused actual injury to the legal system and legal profession and injury to the public— inform which of the ABA Standards we turn to in guiding imposition of discipline. In recommending indefinite suspension, the panel considered ABA Standard 6.12, concerning conduct involving false statements, and 6.22, concerning a lawyer's obligations to the legal system:

"6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.
. . . .
"6.22 Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding."
ABA Standards, 472.

Although not cited by the panel, in light of Kline's status as a government official during the period of misconduct, we believe ABA Standard 5.22, concerning a lawyer's failure to maintain the public trust, also is relevant. That standard provides:

"5.22 Suspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process." ABA Standards, 471.

The Disciplinary Administrator recommends disbarment, but in his brief, he cites no particular ABA Standard to support that recommendation. However, in his closing argument at Kline's disciplinary hearing the Disciplinary Administrator cited the following standards:

"5.21 Disbarment is generally appropriate when a lawyer in an official or governmental position knowingly misuses the position with the intent to obtain a significant benefit or advantage for himself or another, or with the intent to cause serious or potentially serious injury to a party or to the integrity of the legal process.

. . . .

"6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding." ABA Standards, 471-72.

Thus far, we have found clear and convincing evidence that Kline committed 11 rule violations, that he acted knowingly in committing those violations, and that his misconduct caused injury. Further, we have found several aggravating and mitigating circumstances, and we have specified the ABA Standards which guide us in our determination of the appropriate discipline. All that remains is the task of imposing discipline.

### Submission of false documents and testimony

ABA Standard 6.12 suggests suspension is generally appropriate when a lawyer knows false statements or documents are being submitted to a court and takes no remedial action to correct those statements or documents, causing adverse or potentially adverse effect on the legal proceeding. As the panel found, application of ABA Standards 6.12 and 6.22 to the facts leads to the conclusion that Kline's conduct, at a minimum, warrants suspension from the practice of law. Further, application of ABA Standard 5.22 lends additional support to that conclusion.

In two instances, Kline knowingly submitted a false document or testimony to a court or knowingly failed to correct false testimony. First, Kline directed the filing of a false motion to clarify Rucker's statement at oral argument in *Alpha*. We concluded this motion changed Rucker's response in direct questioning as to whether Kline's office had subpoenaed other mandatory reporters like the abortion clinics from a truthful "no," to a false "yes."

Further, we found Kline's "clarification" to be materially false based on Rucker's testimony that he believed no "clarification" of his straightforward response was necessary. And in light of this court's direct question to Rucker as to whether Kline had subpoenaed other "mandatory reporters . . . *like the abortion clinics*," we specifically rejected Kline's carefully nuanced suggestion that his "clarification" somehow left open the possibility that he had subpoenaed information from KDHE, an agency acting as a *repository* of information from mandatory reporters. (Emphasis added.)

Likewise, we have found clear and convincing evidence Kline knowingly falsely advised the *CHPP* court that he did not have summaries of the 62 WHCS patient file summaries and knowingly failed to correct testimony to Judge King on the same subject matter. The information Kline's office possessed and his handling of that issue went to the very heart of the *CHPP* mandamus action. Kline's false submissions and failure to correct those submissions adversely impacted, or potentially adversely impacted, the outcome of the proceeding, warranting his suspension.

*Violation of a court order*

ABA Standard 6.22 directs suspension when a lawyer knows he or she is violating a court order or rule and causes interference or potential interference with a legal proceeding.

Directly relevant to this standard is our conclusion that Kline knowingly disobeyed the *Alpha* court's order when he instructed his staff to attach sealed documents to his office's publicly filed brief. In so finding, we relied upon the testimony of Kline's subordinates indicating Kline's motive was to increase public exposure—not to benefit the *Alpha* court's understanding of the issues.

We found that regardless of Kline's views as to the wisdom of the *Alpha* court's order or any frustration with his inability to fully express his positions publicly, as an officer of the court he was obligated to follow the court's order. His actions in knowingly disobeying the court's directive lessened the public's confidence in the judicial system and prejudiced the administration of justice generally, warranting his suspension.

### Failure to follow proper procedure and rules

As noted, ABA Standard 5.22 directs suspension when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules and causes injury or potential injury to a party or to the integrity of the legal system. This standard directly implicates Kline's conduct before the grand jury.

As we found, Kline stepped outside his limited statutory role of advising the grand jury and attempted first to direct, but then later to undermine, the grand jury. This jeopardized the integrity of the independent citizens' grand jury and the legal system. Kline's actions in this regard are especially concerning in light of their potential for abuse and probable impact.

Kline's failure to advise the grand jury of either the statute applicable to mandatory reporting for 4 of the 5 years it was investigating (K.S.A. 38-1522), or of the *Aid for Women* litigation, which interpreted that statute contrary to Kline's own opinion, directly and adversely impacted the grand jury proceeding—*i.e.*, it led the grand jury to issue a subpoena it later felt was not supported by reasonable suspicion, at least as it pertained to mandatory reporting.

Kline's actions in response to the grand jury's direction are equally troubling. Directly contrary to the grand jury's expressed desire to see any future pleadings or documents to be filed in its name, Kline filed two separate motions seeking to enforce the subpoena without first permitting the grand jury to review the motions. Further, he filed these motions with knowledge of the grand jury's efforts to seek CHPP's voluntary compliance. And more notably, the motions included information beyond what an "advisor" of the grand jury should have disclosed, including: publicly criticizing the

grand jury's special counsel, characterizing the negotiations between special counsel and CHPP as "bizarre" and "absurd," criticizing the grand jury's election to allow Judge Moriarty to facilitate obtaining information from CHPP, and asking that the grand jury be "clearly directed to carry out [its] investigative functions." More fundamentally, Kline's overreaching conflicted with a fundamental tenet of the legal system recognizing the citizens' grand jury as an independent and objective body. Kline's actions before the grand jury warrant his suspension.

In sum, a number of the violations found by this court merit suspension of Kline's law license under the advisory ABA guidelines. Notably, the ABA Standards also advise that they "do not account for multiple charges of misconduct" and indicate that when an attorney commits multiple instances of misconduct the sanction imposed should be at least the sanction for the most serious conduct. ABA Standards, 464.

*Disciplinary Administrator's recommended ABA Standards*

Next, we briefly turn to the standards advocated by the Disciplinary Administrator during his closing argument to the panel, ABA Standards 5.21 and 6.11. Initially, we note a concern with application of these standards. Namely, each standard requires a specific "intent" and we have no findings or argument by the Disciplinary Administrator that Kline acted with "intent" as that term is defined and used in the ABA Standards.

That being said, we do not lightly reject application of the standards suggested by the Disciplinary Administrator. As discussed, we have found Kline acted with improper motives when he knowingly filed the enforcement motions and in directing the attachment of sealed documents to a public brief in contravention of the *Alpha* court's order. We have further determined Kline made a materially false statement to the *Alpha* court and failed to correct a materially false statement made to Judge King and that those statements impacted, or potentially impacted, the outcome of the *CHPP* litigation. But these findings, while significant and consequential, do not compel us to conclude that Kline acted with "conscious objective or purpose to accomplish a particular result" such

that disbarment becomes the obvious, or correct, method of discipline. See ABA Standards, 462.

Further, we have considered and rejected imposition of a definite term of suspension. A termed suspension simply would not adequately address the multiple and significant violations of Kline's professional obligations to the public, the profession, and the legal system. Nor would it account for the injury his misconduct caused.

*Kline's Conduct Merits an Indefinite Suspension of His Law License.*

We conclude indefinite suspension is the appropriate discipline. In arriving at this conclusion, we have considered all the aggravating and mitigating circumstances described above. But three of those aggravating circumstances compel our ultimate conclusion that indefinite suspension is the appropriate discipline: Kline's selfish motive; his pattern of misconduct; and his refusal to acknowledge the wrongful nature of any of his misconduct.

We detailed above the multiple instances in which the evidence demonstrates Kline acted with a selfish motive, and we described the pattern of conduct that causes us great concern. But we have not yet commented on Kline's refusal to acknowledge the wrongful nature of his conduct, and we briefly do so.

While Kline is certainly entitled to challenge each and every allegation made by the Disciplinary Administrator and to take exception to each and every negative finding made by the panel, his approach must be viewed from the strength of the evidence against him. The violations we have found are significant and numerous, and Kline's inability or refusal to acknowledge or address their significance is particularly troubling in light of his service as the chief prosecuting attorney for this State and its most populous county.

Ultimately, we unanimously conclude the weight of the aggravating factors—*i.e.*, Kline's inability or refusal to acknowledge the line between overzealous advocacy and operating within the bounds of the law and his professional obligations; his selfish motives; and his lengthy and substantial pattern of misconduct—weigh

more heavily than the mitigating factors and merit his indefinite suspension.

## CONCLUSION

IT IS THEREFORE ORDERED that Phillip Dean Kline be indefinitely suspended from the practice of law in the State of Kansas effective on the filing of this opinion in accordance with Supreme Court Rule 203(a)(2) (2012 Kan. Ct. R. Annot. 294).

IT IS FURTHER ORDERED that Kline comply with Supreme Court Rule 218 (2012 Kan. Ct. R. Annot. 397), and in the event Kline seeks reinstatement, he shall comply with Supreme Court Rule 219 (2012 Kan. Ct. R. Annot. 398).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to Kline and that this opinion be published in the official Kansas Reports.

NUSS, C.J.; LUCKERT, J.; BEIER, J.; ROSEN, J.; and JOHNSON, J., not participating.

HENRY W. GREEN, JR., J.; KAREN ARNOLD-BURGER, J.; EDWARD E. BOUKER, District Judge; BRUCE T. GATTERMAN, District Judge; and MICHAEL J. MALONE, District Judge, assigned.